# United States Court of Appeals

*for the*

# First Circuit

Case No. 25-1817

GINO MARIO RECCHIA, III, individually and as owner of
Mass Armament, LLC, Inc.; MASS ARMAMENT, LLC, INC.,

*Plaintiffs-Appellants,*

v.

ANDREA JOY CAMPBELL, in the official capacity as Governor
of the Commonwealth of Massachusetts; TERRENCE M. REIDY,
in the official capacity as Secretary of the Executive Office of
Public Safety and Security of the Commonwealth of Massachusetts,

*Defendants-Appellees,*

MAURA HEALEY, in the individual capacity,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:24-CV-12560-RGS

## BRIEF FOR PLAINTIFFS-APPELLANTS

RICHARD C. CHAMBERS, JR.
CHAMBERS LAW OFFICE
*Counsel for Plaintiffs-Appellants*
220 Broadway, Suite 404
Lynnfield, Massachusetts 01940
(781) 581-2031

CP COUNSEL PRESS    (800) 4-APPEAL • (386362)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure Rule 26.1, Plaintiff Mass Armament, LLC, Inc. hereby certifies that it has no parent company and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................i

Table of Authorities................................................................................ iii

Oral Argument Requested ........................................................................v

Jurisdictional Statement ...........................................................................1

Issues Presented ......................................................................................1

Statement of the Case...............................................................................2

Summary of Argument.............................................................................3

    I.    The Second Amendment, when ratified, guaranteed citizens the right to possess firearms that were the equivalent of those carried by an individual Continental soldier .........................................3

    II.    The statute at issue in the instant action significantly interferes in the commerce between the states and other nations in violation of the United States congress' sole power to regulate ..............................................................................4

    III.    Appellants have a right under both the equal protection clause and the privileges and immunities clause of the Fourteenth Amendment to operate their business and earn a living .......................5

Argument..................................................................................................5

    I.    Appellants have a fundamental Second Amendment right to possess the equivalent firearm as a soldier in the military and thus *Capen* was wrongly decided..........................................5

    II.    The statute at issue violated the Dormant Commerce Clause.............20

    III.    The statute at issue violates Appellants' Equal Protection rights under the Fourteenth Amendment to operate in a lawful business as enjoyed by other States' citizens ......................................26

Conclusion .............................................................................................32

Certification ...........................................................................................33

Addendum ......................................................................................(attached)

**TABLE OF AUTHORITIES**

**Cases**

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023)...........................12

*Bianchi v. Brown,* 111 F.4th 438 (4th Cir. 2024)......................................9, 11, 13, 25

*Board of Regents v. Roth,* 404 U.S. 564 (1972) .............................................28

*Brown-Forman Distillers Corp. v. New York State Liquor Auth*.
476 U.S. 573 (1986)......................................................................21

*Butchers' Union Co. v. Crescent City Co*., 111 U.S. 746 (1884) ...........................28

*Capen v. Campbell*, 134 F.4th 660 (2025) .............................................11, 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................8, 9

*Duncan v. Bonta,* 133 F.4th 852 (9th Cir. 2025) ................................................13, 14

*Greene v. McElroy*, 360 U.S. 474, (1960).........................................................27

*Hanson v. District of Columbia*, 120 F.4th 223, (D.C. Cir. 2024) ...........................14

*H.P. Hood & Sons, Inc. v. De Mond*, 336 U.S. 525, 539 (1949).............................23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).........................................30, 31

*Meyer v. Nebraska*, 262 U.S. 390, (1923).........................................................27, 28

*Nadal-Ginard v. Holder*, 558 F.3d 61 (1st Cir. 2009)...............................................26

*National Association for Gun Rights v. Lamont*, __ F.4th __ (2nd Cir. 2025) ..........14

*National Pork Producers Council, et al. v. Ross*, 598 U.S. 356 (2023) .................21

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024)...................12

*Pike v. Bruce Church, Inc*. 397 U.S. 137 (1970) ...............................................21, 24

*Reeves v. Scott*, 324 Mass. 594 (1949)..................................................................29

*Shelton v. Tucker*, 364 U.S. 479, (1960) ..............................................................27

*Smith v. Texas*, 233 U.S. 630 (1914) ........................................................28

*Snope v. Brown*, 145 S.Ct. 1534 (2025) ...................................................11

*Welter v. Board of Registration in Medicine*, 490 Mass. 718 (2022).......................29

## **<u>Other Authorities</u>**

Article 1, Section 8, Clause 3 of the U.S. Constitution ...........................................20

Federalist Papers ..........................................................................................8

Fourteenth Amendment (Section 1) .............................................................. 5, 26-31

Heritage Foundation........................................................................................ 6-7

National Highway Traffic Safety Administration ....................................................18

National Institute of Justice .........................................................................16

President Reagan Library..............................................................................18

Second Amendment ............................................................... 9-16, 19-20, 25, 30-31

United States Census Bureau ......................................................................16

United States Congress .............................................................................4,7,20, 24

Wikipedia .................................................................................................. 17-18

## REASON WHY ORAL ARGUMENT SHOULD BE HEARD

Counsel respectfully suggests that oral argument may assist the Court in deciding this appeal, especially since it not only involves some novel constitutional issues, but because it questions the correctness of a precedent of this Court in *Capen v. Campbell*, 134 F.4th 660 (2025). Moreover, as noted *infra*, the Supreme Court has recently indicated that within the next term or two, they will be deciding the Second Amendment issue encompassed in the instant appeal.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction to hear this action pursuant to 42 USC 1983 and 28 USC 2201 and 2202. This Court has jurisdiction to hear this appeal pursuant to 28 USC 1291. On August 6, 2025, a Final Order was issued by Stearns, J. A Notice of Appeal was filed on August 22, 2025.

## ISSUE PRESENTED

1.      The purpose of the Second Amendment, when ratified, guaranteed that United States citizens would always have the fundamental right to keep and bear arms that the citizen soldier in the militia (military) carried so as to guard against tyranny by any government. This Court, and other appellate courts, have not factored this reasoning in their decisions upholding the bans on assault-type weapons, but instead have erroneously concentrated only on issues of personal self-defense.

2.      The United States Congress has the sole power to regulate commerce amongst the States and foreign nations. The Commonwealth of Massachusetts cannot usurp Congress' sole power.

3.      Citizens in numerous states throughout the United States have the right to possess, import, and sell the firearms banned by the statute at issue in the instant matter. Under both the Equal Protection clause and the Privileges and

Immunities clause, Appellants enjoy the same rights as citizens of the several states. The statute at issue denies Appellants their equal rights pursuant to the Fourteenth Amendment.

## STATEMENT OF THE CASE

Appellants hold a Federal Firearms License (hereinafter, "FFL"), run a commercial firearms business within the Commonwealth of Massachusetts and own a gun shop. Appellants were allowed under both State and Federal licenses to import, possess and sell the now banned firearms since their business opened in 2019. Appellants built a substantial business based on importing and selling the banned firearms to citizens of Massachusetts. However, in 2024, H-4885 "An Act Modernizing Firearm Laws" (hereinafter, the "Act") was signed by the Governor of Massachusetts and enforced by the Appellees, banning any new possession or sale of certain "assault-style" weapons and magazines.

As the Amended Complaint asserts, the ban not only denied Appellants their right to possess the banned firearms, it also negatively affected their business, causing them to lose several hundreds of thousands of dollars in income, and will perhaps lead to closure. This would result in Appellants losing their livelihood, source of revenue and his employees losing their jobs. Appellants imported the overwhelming majority of its inventory from out-of-state manufacturers and dealers prior to the Act being enacted.

Congress had a similar ban on assault-style weapons in place for some ten (10) years, affecting the entire nation, but allowed the ban to expire. Efforts to renew that Federal ban have been denied by Congress. Thus, in the majority of states, citizens enjoy the fundamental right to possess the firearms now banned in Massachusetts.

## SUMMARY OF THE ARGUMENTS

### I.

### THE SECOND AMENDMENT, WHEN RATIFIED, GUARANTEED CITIZENS THE RIGHT TO POSSESS FIREARMS THAT WERE THE EQUIVALENT OF THOSE CARRIED BY AN INDIVIDUAL. CONTINTENTAL SOLDIER.

Prior to the Revolutionary War and Declaration of Independence, King George of England denied the American Colonists certain rights and privileges. When the King learned that the Massachusetts Colonists had amassed arms that were the equivalent of the British Army, British troops were sent from occupied Boston on April 19, 1775, to seize the arms being held in Lexington and Concord. The "Minutemen" or citizen militia literally stopped the seizure by force, which in turn sparked the Revolutionary War. Subsequently, to ensure that no future government would be able to seize the arms of the constituency, Congress ratified the Second Amendment of the Bill of Rights that guaranteed the fundamental right of the people to retain the arms that the militia carried during the American War of Independence.

The Act strips the people of Massachusetts of the right to possess firearms that are equivalent to that of the regular military soldier. The right to possess such arms is the core of the Second Amendment. Therefore, the Commonwealth of Massachusetts has no authority to circumvent the Second Amendment.

## II.

### <u>THE STATUTE AT ISSUE IN THE INSTANT ACTION SIGNIFICANTLY INTERFERES IN THE COMMERCE BETWEEN THE STATES AND OTHER NATIONS IN VIOLATION OF THE UNITED STATES CONGRESS' SOLE POWER TO REGULATE.</u>

Congress has the sole authority to regulate commerce amongst the states and foreign nations. The Act at issue in this case usurps Congress' sole power by restricting manufacturers of firearms in other states and nations from doing business in Massachusetts, thus limiting the legal products that Appellants can import in, possess or sell to citizens. Congress lifted a similar national ban after ten (10) years and allowed United States citizens to possess and deal in the firearms now banned by Massachusetts. This was an affirmative action by Congress that restored United States citizens' rights to legally own and sell the formerly prohibited firearms. Massachusetts cannot now regulate a right that Congress has affirmatively granted to all eligible citizens.

## III.

## APPELLANTS HAVE A RIGHT UNDER BOTH THE EQUAL PROTECTION CLAUSE AND THE PRIVILEGES AND IMMUNITIES CLAUSE OF THE FOURTEENTH AMENDMENT TO OPERATE THEIR BUSINESS AND EARN A LIVING.

Appellants have a constitutional right under the Fourteenth Amendment to be treated equally, and enjoy the same privileges, as all other United States citizens. Firearm dealers and citizens in other states are allowed to engage in the business of selling the firearms now banned by the Act at issue in the instant matter. The Commonwealth has unconstitutionally taken away this same right from Appellants.

## ARGUMENT

## I.

## THE SECOND AMENDMENT, UPON RATIFICATION, GUARANTEED CITIZENS THE RIGHT TO POSSESS THE STANDARD FIREARM THAT EACH SOLDIER CARRIED.

Constitutional questions and questions of law are reviewed *de novo. Nadal-Ginard v. Holder*, 558 F.3d 61, 65 (1st Cir. 2009).

The Founders primary concern was the rights they incorporated into the first two (2) amendments of the Constitution. Namely, the right to speak freely, to assemble, practice their respective religions, to petition for relief and the right to defend themselves from tyrannical governments. What sparked the War of American Independence was that the tyrannical British government sent its troops

to disarm the citizens. It goes without saying that those who carry weapons, nay, superior weapons, will ultimately prevail over those with inferior weapons. Disarm your opponent and the war is won before it begins.

As the prestigious Heritage Foundation posited:

> The right to keep and bear arms for self-preservation may vest in the individual, but it also secures a collective resistance against large-scale threats to liberty. The founding generation well understood that people who lack the means to defend and enforce their rights are not, in any meaningful sense, free. For centuries, ruling monarchs had often disarmed the general population and then employed professional armies or loyal "select" militias to impose their tyrannical rule on a defenseless people.
>
> In a very real sense, the war for independence from Great Britain started over King George III's attempts to do the same. As colonial frustrations over repeated injuries to their rights and liberties reached a breaking point, the royal response grew progressively hostile and heavy-handed. Increasingly larger numbers of royal soldiers were sent to occupy Boston, not to protect the civilians from foreign threats, but to enforce controversial laws at bayonet-point and intimidate the colonists into submission. Ultimately, under orders from the King, General Thomas Gage led hundreds of well-armed professional troops to forcibly seize supplies of arms and gunpowder stored in some of the most disaffected areas of colonial America—the Massachusetts towns of Lexington and Concord. The ensuing skirmishes between British regulars and colonial militiamen were a final "spark" that set the Revolution ablaze. Had the colonists allowed themselves to be widely disarmed—or had they not already been one of the most widely armed civilian populations in history—the Revolution would certainly have been doomed.
>
> It is little wonder, then, that the Founders immediately sought to safeguard the "right of the people to keep and bear arms" in their new nation. Their foresight to guarantee a well-armed citizenry continues, even today, to ensure the "security of a free state."

Heritage.org, "*The Essential Second Amendment: The Origins of the Second Amendment."* In other words, when the Second Amendment was enacted, the Framers were more concerned about the government seizing their firearms for tyrannical purposes than for individual self-defense.

Other authorities have also spoken about the historical reasons behind the Second Amendment. For example, the United States Congress records say:

> Historical surveys of the Second Amendment often trace its roots, at least in part, through the English Bill of Rights of 1689. … That provision grew out of friction over the English Crown's efforts to use loyal militias to control and disarm dissidents and enhance the Crown's standing army, among other things, prior to the Glorious Revolution that supplanted King James II in favor of William and Mary.

> The early American experience with militias and military authority would inform what would become the Second Amendment as well. … and standing armies of professional soldiers were viewed by some with suspicion.

> \*\*\*

> Mistrust of standing armies, like the one employed by the English Crown to control the colonies, and anti-Federalist concerns with centralized military power colored the debate surrounding ratification of the federal Constitution and the need for a Bill of Rights.

> \*\*\*

> … fears remained during the ratification debates that these provisions of the Constitution gave too much power to the federal government and were dangerous to liberty.

*https://constitution.congress.gov/browse/essay/amdt2-2/ALDE_00013262/* (cites omitted)

In the *Federalist Papers, No. 29*, Hamilton wrote:

> By a curious refinement upon the spirit of republican jealousy, we are even taught to apprehend danger from the militia itself, in the hands of the federal government. It is observed that select corps may be formed, composed of the young and ardent, who may be rendered subservient to the views of arbitrary power. What plan for the regulation of the militia may be pursued by the national government, is impossible to be foreseen.

And, from the President Reagan library:

> The notion of average citizens possessing their own weapons predates the Constitution. In the English Bill of Rights in 1689, Parliament allowed all Protestant English citizens to "have arms for their defence [sic] suitable to their conditions and as allowed by law." This law was later commentated on by Sir William Blackstone in his Commentaries on the Laws of England. He described the possession of weapons as an "auxiliary right," designed to support the core rights of self-defense and *resistance to oppression*, as well as the responsibility for the armed citizenry to protect their homeland.

*https://www.reaganlibrary.gov/constitutional-amendments-amendment-2-right-keep-and-bear-arms* (emphasis added). *Also see, District of Columbia v. Heller*, 554 U.S. 570, 592-593 (2008) (explaining how tyrannies first disarm their opponents prior to suppressing them); *id*. at 598 that

> "history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights."

*Id*. at 608-609 ("'One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is by disarming the people, and making it an offence

to keep arms, and by substituting a regular army in the stead of a resort to the militia.'" (cite omitted). *See further, District of Columbia v. Heller*, 554 U.S. 570, 592-593 (2008) (explaining how the foundation of the Second Amendment was the disarmament edicts of the British aristocracy). The right to keep arms from our Founders' perspective was to protect "against both public and private violence" learned from history. *Id*. 594. George III tried to also disarm the colonists, following in the Stuarts footsteps, and hence the Second Amendment after the Founders defeated King George. *Id*. When men have arms and are trained in their use "they are better able to resist tyranny." *Id*. 598. In the final analysis, the principal reason for the Second Amendment was that history demonstrated the way tyrants eliminated their opponents was by "taking away the people's arms". *Id*. "[T]he threat" that government would take away citizens' arms was the reason the right to bear them was codified by constitutional amendment." *Id*. 599. Of course, "arms" were those that tyrannical forces would carry. *Also see, Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (Founders, in the Second Amendment, "sought to protect the citizenry's inherent liberties from the often oppressive hand of government"). *See further, id*. 484-494 (RICHRDSON, *J*. dissenting,) ("Historical Background of the Second Amendment")

The arms at stake during the Founding were, of course, flint-lock muskets. According to AmericanRevolution.org, both the Continental and British Armies

were equally equipped with the Brown Bess musket and bayonet during the Revolutionary War and it was "the most commonly used weapon of the American Revolution, as it was in continual service by large numbers of troops throughout the conflict." The Continental Army also used the Charleville musket, which was the equivalent of the Brown Bess. Today, the AR-15, although semi-automatic, is the civilian equivalent to the United States military's M-16.

*See,* https://www.americanrevolution.org/weapons/

Another important factor is that when the Second Amendment was passed, it was assumed that the "arms" in question were at least equal to the arms that military soldiers carried. In fact, during the Revolutionary War, the American military and militia had exactly the same type of muskets as the British Army, which American citizens had kept in their homes to defend against, for one thing, tyranny. If they had not possessed those firearms, this Court would not even exist. Consequently, the Second Amendment has to encompass arms that are at least nearly equal to that which the regular United States military soldier is equipped with. The courts that have made decisions relative to the banned-weapons statutes now at issue here and across the country without consideration to this historical fact: When the Second Amendment was ratified, Americans had the *equivalent* rifle that the soldier in the best Army in the world carried. Americans nowadays

enjoy the same right ratified in 1791. That was the purpose and historical understanding of the Second Amendment.

Counsel realizes that the Second Amendment issue may be considered moot in this Court because of the First Circuit's decision in *Capen v. Campbell*, 134 F.4th 660 (2025), which the Court is presently constrained to follow. Therefore, counsel will refrain from fully arguing the issue but is preserving it for further review. The Court should note that this issue will soon be decided by the Supreme Court, as indicated by four Justices in *Snope v. Brown*, 145 S.Ct. 1534 (June 2, 2025). *Snope* was decided by the Fourth Circuit under the name of *Bianchi v. Brown*, 111 F.4th 438 (2024) (*en banc*). Reading the comments on certiorari denial, in counsel's view, should the instant matter travel the appellate route to the Supreme Court, the Supreme Court will hopefully decide it, yea or nay, on this particular issue concerning the Second Amendment.

In that vein, the Supreme Court indicated in *Snope* that it was waiting for the issues surrounding the Second Amendment controversy to percolate a little more in the courts of appeals. Such has happened as of this date, with dozens of judges weighing in in six (6) different courts of appeals, including the First Circuit.

In *Capen*, a preliminary injunction appeal case like most of the courts of appeals decisions cited *infra*, the panel upheld the Massachusetts ban at issue herein. In effect, the panel used the "nuanced approach" suggested by the Supreme

11

Court to determine whether "historical precedent" showed a regulation of comparable weapons or arms. *Id*. 669. In doing so, the panel relied on this Court's previous decision in *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) that concerned large capacity magazines. For one thing, the panel held that the ban does not "impose a heavy burden on civilian *self-defense*." 134 F.4th at 669 (emphasis supplied). The panel also turned to historical regulations from the eighteenth and nineteenth centuries to uphold the ban, *id*. 670, concluding that the ban's restrictions "does not place a historically anomalous burden on *self-defense*." *Id*. 671, 272-673. (emphasis supplied). The panel held that the Commonwealth had met its burden for preliminary injunctive analysis that the ban "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. 674.

As with the other appellate court decisions cited *infra*, Appellants disagree with *Capen* and believes it was decided on a flawed premise, which will be discussed briefly *infra*.

The other Circuit Court decisions concerning the 2nd Amendment issue herein are the following: *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023). In *Bevis*, the panel held that the banned weapons, in the first instance, are more like "military-grade weaponry" and thus do not have Second Amendment protection. *Id*. 1195. Although that was enough to uphold the ban, *id*. 1197, the

panel also used the historical analysis that other appellate courts have applied,

concluding there's a long tradition of regulating items in the ban. *Id*. 1202; *Bianchi*

*v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc). Over a strong *five-judge dissent*,

the Bianchi court held:

> The assault weapons at issue fall outside the ambit of protection
> offered by the Second Amendment because, in essence, they are
> military-style weapons designed for sustained combat operations that
> are ill-suited and disproportionate to the need for self-defense.
> Moreover, the Maryland law fits comfortably within our nation's
> tradition of firearms regulation. It is but another example of a state
> regulating excessively dangerous weapons once their incompatibility
> with a lawful and safe society becomes apparent, while nonetheless
> preserving avenues for armed self-defense.

*Id*. 441-442; *Duncan v. Bonta,* 133 F.4th 852 (9th Cir. 2025) (en banc). Duncan

involved only large capacity magazine. The Duncan majority held the ban valid for

two reasons:

> First, the plain text of the Amendment protects the right to bear
> "Arms," not accessories to firearms that are neither arms themselves
> nor necessary to the ordinary functioning of a firearm. Because large-
> capacity magazines are neither weapons nor accessories that are
> necessary to the operation of a weapon, the Second Amendment's
> plain text does not protect possession of large-capacity magazines.
> Second, even assuming that California's law implicates the text of the
> Second Amendment, the ban on large-capacity magazines fits
> comfortably within our "historical tradition of firearm regulation," ***
> California's law fits within the traditions of protecting innocent
> persons by restricting a component necessary to the firing of a firearm
> and by restricting especially dangerous uses of weapons when those
> uses have proved particularly harmful.

*Id*. 865. Several Circuit Judges dissented from that conclusion*, id*. 890 *et seq*.; *Hanson v. District of Columbia*, 120 F.4th 223, (D.C. Cir. 2024). *Hanson* also concerned only large capacity magazines in a preliminary injunction scenario. The two-judge majority found that LCMs are arms under the Second Amendment. *Id*. 232. The majority held that the district court judge properly found that the magazine cap is "consistent with the Nation's historical tradition of firearm regulation." *Id*. 240. The dissenting judge in the panel said the *Heller* Court held "that the government cannot categorically ban an arm in common use for lawful purposes. Magazines holding more than ten rounds of ammunition are arms in common use for lawful purposes. Therefore, the government cannot ban them." *Id*. 251.; *National Association for Gun Rights v. Lamont*, ___ F.4th ___ (2nd Cir. 2025) No. 23-1162-civ and 23-1344-cv, WL2423599. *Lamont* is another preliminary injunction case. The panel concluded that "Assuming that Plaintiffs' proposed possession of the firearms and magazines at issue is presumptively entitled to constitutional protection, we nonetheless find that the Government has satisfied its burden of showing that the challenged laws are consistent with our Nation's historical tradition of firearm regulation." *Slip Op*. at 8.

Appellants, recognizing that this Circuit's current decision in *Capen* probably forecloses relief, he nonetheless preserves all the usual arguments that have been made in that and other cases, and his arguments in the Court Below,

however Appellants ask this Court, either itself or *en banc*, to revisit *Capen* for an important reason: All the appellate court decisions are flawed because the Second Amendment was codified *primarily* to ensure that citizens would not have their arms taken away by the Government. These arms are mostly comparable to those of the militia (military). The bans in effect now violate this important aspect of the Second Amendment because they ban firearms that are the equivalent of the arms carried today by the ordinary soldier in the United States military. The Second Amendment specifically protects the constituency to possess the equivalent arms that the regular military soldier possesses. While other "self-defense" reasons are incorporated in the Amendment, its primary purpose was to ensure the constituency was not disarmed and would be able to stand up to tyranny from its own government.

The support for this claim was given *supra*, including the treatises from the times predating the Amendment and the references to the reasons for the Second Amendment as outlined in Supreme Court and other cases. To possess an arm that is the equivalent of the arm carried by a regular member of the military is incorporated directly in the Second Amendment. No body politic can regulate said arms. History has demonstrated that tyrannies first disarm the people's firearms that will sufficiently and effectively prevent takeovers by the government. That is exactly why the Founders enacted the Second Amendment into the Bill of Rights

so they would be able to keep their firearms that were the equivalent of the prevailing armies and militias.

Of course, government entities have persuaded the courts to uphold this unconstitutional stripping of the Second Amendment by alleging that modern day arms, equivalent to those possessed by a regular military soldier, are being used to commit several atrocious mass shootings. These several incidents cannot be used to abrogate the rights codified in the Second Amendment. The Second Amendment allows the firearms at issue. If the constituency believes it should not so allow, then the Constitution allows the constituency a way to change the Second Amendment.

While mass shootings are a horrendous problem, there are more reasonable ways to attempt to thwart future attacks than taking away the constitutional rights of hundreds of millions of the citizenry.

In that respect, according to the United States Census Bureau, in 2020 the population of the United States was 331,449,281 people. Of these, 266,968,266 were 16 years of age or older, or 80.5 percent of the whole.

According to an article by the National Institute of Justice dated February 3, 2022, a "mass shooting" is identified as one involving "a shooting that kills four or more people." *See* https://nij.ojp.gov/topics/articles/public-mass-shootings-

database-amasses-details-half-century-us-mass-shootings. The same article posits

that from 1966 though 2019 there were 172 mass public shooters, or over a 53-year

period. The article states:

> Persons who committed public mass shootings in the U.S. over the last half century were commonly troubled by personal trauma before their shooting incidents, nearly always in a state of crisis at the time, and, in most cases, engaged in leaking their plans before opening fire. Most were insiders of a targeted institution, such as an employee or student. Except for young school shooters who stole the guns from family members, most used legally obtained handguns in those shootings.

> Those are prominent traits of persons who have engaged in public mass shootings – that is, a shooting that kills four or more people – collected in a comprehensive new database of identified U.S. mass shootings from 1966 to 2019. The data on 172 mass public shooters cover more than 150 psychosocial history variables, such as those individuals' mental health history, past trauma, interest in past shootings, and situational triggers.

An article in Wikipedia tracks the most-deadliest mass shootings since 1949,

or over a course of 76 years. *See*

https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States. The worst

one, of course, was the Las Vegas shooting were a madman, shooting from a hotel

window into a crowd of concert goers, killed 60 people and wounded 413.

Otherwise, there were 30 other mass shootings over those years that are termed the

most-deadly, involving *30 shooters* who killed approximately 524 people. *Id.*

Wikipedia also has published an article that lists all mass shootings, defined as shootings of three or more people in one incident, since the year 1900 to the present. See,

https://en.wikipedia.org/wiki/List_of_mass_shootings_in_the_United_States.

There are approximately 446 incidents listed. Of them, 343 were accomplished by single perpetrators, and 103 by more than one perpetrator, gangs, mobs, or police action. Various types of firearms were used.

Also worthy of note, according to the National Highway Traffic Safety Administration, there were approximately 39,345 deaths from vehicle accidents in 2024, with approximately 40,000+ deaths in previous years. See

https://www.nhtsa.gov/press-releases/nhtsa-2023-traffic-fatalities-2024-estimates#:~:text=The%20U.S.%20Department%20of%20Transportation's,quarterly%20decrease%20in%20traffic%20fatalities.

The above statistics reveal a startling fact that is an atrocious attack on all the law-abiding citizens' constitutional rights under the Second Amendment; i.e. because 343 half-crazed perpetrators misused firearms over the course of the last 125 years, then over 266 million citizens ought to be denied the right to choose what firearms they feel meets their self-protection needs from criminals and tyranny from their government. The Government entities, possibly with tongue-in-cheek, keep saying that they are passing these draconian laws limiting access to

firearms to those the governments deem satisfactory, all in order to save lives. If the governments really cared about saving innocent lives, then they first should be banning vehicles that kill approximately 40,000+ people each year!

If the government intends to stem atrocious killings done by a handful of people with mental health problems, they should pay extra attention to the NIJ report quoted above. Instead of taking away firearms from law-abiding citizens, governments should concentrate entirely on programs to identify those "troubled by personal trauma", who are in a "state of crisis," and who almost always have leaked "their plans before opening fire." Here, the Commonwealth is doing just the opposite, however, not focusing on human beings killing people, but taking away the Second Amendment. There is no credible evidence that stopping the sales of the banned firearms will prevent further atrocities and no government has offered evidence that it will. It is all speculation. It is virtually impossible to stop unless all manufacturers are prevented from making firearms anywhere in the world. Otherwise, as history has demonstrated time and again, the trade will simply go underground and the mentally ill will still be able to access any weapon they want as long as they have funds.

Banning "assault-type" firearms so the citizenry does not have access to them violates the core principle of the Second Amendment.

The Court Below held that it was bound by this Court's *Capen* holding

("*Capen* forecloses the Second Amendment claim") *Memorandum and Order on*

*Motion to Dismiss, 8-5-25, Addendum*. p. 6. The Court Below is not faulted in that

respect, however, *Capen* ought to be revisited because it is unconstitutional.

## II.

### THE STATUTE AT ISSUE INTERFERES IN THE COMMERCE BETWEEN THE COMMONWEALTH AND OTHER STATES AND NATIONS IN VIOLATION OF THE UNITED STATES CONGRESS' EXCLUSIVE POWER TO REGULATE SAID COMMERCE.

Constitutional questions and questions of law are reviewed *de novo. Nadal-*

*Ginard v. Holder*, 558 F.3d 61, 65 (1st Cir. 2009)

Appellants contend in the Amended Complaint that "his business, income,

and property values are substantially affected by the assault weapons ban" and the

Court Below recognized as much. *See Addendum* at 10 (District Court's dismissal

order). This is because the overwhelming majority of Appellants' business involves

the banned firearms that travel through interstate and foreign commerce. The

statute at issue interferes in this commerce. Pursuant to Article I, Section 8, Clause

3 of the United States Constitution, however, only Congress can regulate this type

of commerce. Massachusetts has thus usurped the power that belongs only to

Congress. The District Court correctly recognized that the "dormant" Commerce

Clause prohibits states from passing laws "'that discriminate[] against or unduly

burden[] interstate commerce.' " *Id*. at 8. But the District Court then went astray, holding that Appellants failed to show that statute was enacted "with a discriminatory purpose", although the judge chiefly relied on instructions handed down in *Brown-Forman Distillers Corp. v. New York State Liquor Auth*. 476 U.S. 573 (1986). In that case, the Court specifically held that statutes which "directly regulates or discriminates against interstate commerce" is "generally struck down … without further inquiry*." Id*. 579. The statute at issue in this matter "directly regulates" the importation of the restricted firearms into the Commonwealth. This case has nothing to do with discriminating against out-of-state manufacturers in favor of in-state ones, as the District Court attempted to insert into the issue. What discrimination *has* occurred in a commerce setting is that the statute favors one set of manufacturers over another, restricting some firearms dealers from doing business in the Commonwealth while allowing others to take up the slack created by the restriction; that is, assault-style firearms manufacturers are barred from doing business in Massachusetts but other firearms manufacturers are not so restricted. This in fact regulates the commerce of the United States.

Appellees rely on the Court Below's on two (2) leading Supreme Court cases in defense of the Act not violating the Dormant Commerce Clause: *National Pork Producers Council, et al. v. Ross*, 598 U.S. 356 (2023) and *Pike v. Bruce Church, Inc*. 397 U.S. 137 (1970).

*Ross*, the most recent Dormant Commerce Clause case, was a most fractured decision, which, Appellants suggest, was without a clear consensus. In fact, there were five (5) separate opinions, and the majority decision was by plurality vote. Appellee relied on *Ross* primarily because the Supreme Court has stated that for Dormant Commerce Clause purposes a state law must "discriminate" in order for it to run afoul of the Federal Commerce Clause power.

*Ross* concerned a California law that restricted sale of pork products where the pigs had been raised in what was considered inhumane conditions. The plurality decision held that the Court's Dormant Commerce Clause jurisprudence required an action to show that the controversial law discriminated against out-of-state economic interests. It appears that most, if not all, of the Justices agreed with the discriminatory nature of the Court's jurisprudence.

First of all, *Ross* is not well-suited to use as precedent for the issues involved in this case. Unlike this case, in *Ross*, the Plaintiffs did not claim that the law discriminated against out-of-state interests. *Id*. 364. Unlike here, no constitutional rights were involved. "While the Constitution addresses many weighty issues, the type of pork chops California merchants may sell is not on that list". *Id*. *Also see, id*. 368 (Congress has not enacted any law contrary to California's pork product restrictions).

This is not a pork chop case. Constitutional rights are intricately involved. Under prevailing law, as argued herein, Appellants submit they have a constitutional right to possess the arms banned by the Act, whereas in *Ross* the plaintiffs had no constitutional right to possess certain types of pork chops. Had a constitutional right to consume pork been involved in *Ross* it is obvious that the case would have been decided differently.

Second, Appellee claimed that the Act does not "discriminate against, or otherwise burden, interstate commerce." This is an astonishing statement. The Act discriminates against all manufacturers of the popular banned weapons and forbids their sale or possession in the Commonwealth, albeit such is not the case in other States, while not discriminating against manufacturers or sellers of, e.g., simple revolvers. The Act discriminates against millions of Massachusetts residents who cannot possess the banned firearms. The Act favors some manufacturers of firearms over the manufacturers of the banned firearms, thus discriminating against the latter. This violates the principles encompassed under the Commerce Clause. "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them." *H.P. Hood & Sons, Inc. v. De Mond*, 336 U.S. 525, 539 (1949). The Act violates

that principle by controlling interstate commerce and usurping the sole prerogative of the United States Congress. Congress specifically lifted a former, analogous firearms ban in question, granting citizens the right to possess the firearms banned by the Act. The Commonwealth cannot constitutionally disallow what Congress allowed without violating the Supremacy Clause.

Had the Commonwealth banned *all* firearms they arguably may have been able to make a better argument, but banning some firearms and not others makes out a plain case of *discrimination* against the banned firearms. Here, Appellees are favoring one manufacturer over another and directly interfering in the United States interstate commerce.

The *Pike* principle, also discussed *passim* in *Ross*, is "Where [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142. Even then, if "a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id*.

Here, the Commonwealth failed to identify a "legitimate local public interest" requiring enforcement of the Act or its constitutionality in contravention of the Commerce Clause. Instead, it referred to a few criminal acts in other states. Consequently, Appellee has failed to meet the first *Pike* burden.

Arguendo, even if the Commonwealth met that burden, they have failed to meet the second burden of demonstrating that the effects on interstate commerce are only incidental. Appellant submits that the effects are, in fact, enormous! First, the Act denies every citizen of the Commonwealth, including Appellants, their Second Amendment rights. Second, it denies Appellants the right to fully pursue their occupation of selling firearms and their components. Third, the Act literally burdens commerce in at least the tens of millions of dollars owing to the recognized fact that some of the banned weapons are the most popular firearms sold in the country. *See, e.g., Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (*en banc*) (AR-15 rifles, banned in the Act, are the "most popular and widely owned firearm in the Nation" and approximately 28,000,000 are in circulation) (RICHARDSON, *J.*, *dissenting*). Fourth, Appellants have alleged, accepted as true, that the Act has nearly decimated his business.

The firearms at issue are not banned from possession or sales by the United States Government, only some states. *See Snope, supra*, *Statement of Justice Kavanaugh* ("AR-15s are legal in 41 of the 50 States" and those that ban them are

25

"outlier[s]"). It is more than obvious that the Act's ban has seriously impacted

interstate commerce in Massachusetts, that it favors some manufacturers of

firearms over other manufacturers (forcing people who want firearms to buy only

from the manufacturers the Commonwealth approves), and that it has nearly put

Appellants out of business and subsequently restricted their income. Consequently,

the Commonwealth has stepped into the arena of regulating commerce amongst the

State's and nations without the right to do so. Only Congress has that authority,

therefore, parts of the Act that interfere in interstate commerce are unconstitutional

## III.

**APPELLANTS HAVE A CONSTITUTIONAL RIGHT TO EARN A LIVING IN A LEGITIMATE BUSINESS, THE SAME AS ALL UNITED STATES CITIZENS WITHOUT INTERFERENCE FROM THE COMMONWEALTH OF MASSACHUSETTS.**

Constitutional questions and questions of law are reviewed *de novo. Nadal-Ginard v. Holder*, 558 F.3d 61, 65 (1st Cir. 2009).

Appellants have a Federal right under the Constitution to engage in a

legitimate business, especially one where the Federal government has issued him

an FFL. In this case, Appellants' business is buying and selling firearms and their

accouterments. Every qualified citizen in the entire United States has the same

right. The Act deprives and limits this Federal right. The Equal Protection Clause

or the Privileges or Immunities Clause of the Fourteenth Amendment is violated

when a State significantly interferes in the rights of a United States citizen to

conduct a legitimate business that all other United States citizens are allowed to engage in. In this particular case, Federal law allows United States citizens the right to possess, import and trade in the firearms banned by the Commonwealth. Therefore, the Act violate the Fourteenth Amendment, denying Appellants equal protection and the privileges and immunities guaranteed to other citizens in other states.

In *Greene v. McElroy*, 360 U.S. 474, 492 (1960) the Court stated that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Also see, Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (the liberty that a citizen enjoys under the Fourteenth Amendment encompasses the right "to engage in any of the common occupations of life" and it may not be interfered with "under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect") (citations omitted). In that vein, citing to a plethora of settled-law, the Supreme Court held in *Shelton v. Tucker*, 364 U.S. 479, 488 (1960) that in cases where a state attempts to require certain conditions be met before allowing a citizen to practice their profession or occupation that "even though the governmental purpose be legitimate and

substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."

Moreover, "'the right of the individual … to engage in any of the common occupations of life'" has long been recognized as being one of the guarantees under the Fourteenth Amendment as it pertains to the concept of liberty. *Board of Regents v. Roth,* 404 U.S. 564, 572 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Even as far back as 1884 Mr. Justice Bradley wrote in his concurrence in *Butchers' Union Co. v. Crescent City Co*., 111 U.S. 746, 762 that the right to practice an occupation "is an unalienable right; it was formulated as such under the phrase 'pursuit of happiness' in the declaration of independence [sic]. … The right is a large ingredient of the civil liberty of the citizen." Likewise, in *Smith v. Texas*, 233 U.S. 630 (1914) the Court recognized that "all men are entitled to the equal protection of the law in their right to work for the support of themselves and families." *Id*. at 641.

> In so far as a man is deprived of the right to labor, his liberty is restricted, his capacity to earn wages and acquire property is lessened, and he is denied the protection which the law affords those who are permitted to work. Liberty means more than freedom from servitude, and the constitutional guaranty is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any lawful calling.

*Id*. 636.

Ironically, the Commonwealth of Massachusetts jurisprudence also recognized this tenet. "[T]he right to engage in any lawful occupation is an aspect of the liberty and property interests protected by the substantive reach of the due process clause of the Fourteenth Amendment to the United States Constitution and analogous provisions of our State Constitution." *Welter v. Board of Registration in Medicine*, 490 Mass. 718, 724 (2022) (cites omitted), *cert. denied* 143 S.Ct. 2561. The right to engage in any particular business is a "property right" protected by common law and several Federal and Commonwealth constitutional provisions. *Reeves v. Scott*, 324 Mass. 594, 598 (1949).

The Act at issue herein impermissibly interferes in Appellants' constitutional rights to earn a living in a legal occupation. Appellants' business was built upon the firearms banned by the Act. The Commonwealth allowed Appellants to build their business dealing in these firearms but now has unilaterally revoked that right without just cause and without warning. The business of dealing arms is legal in the United States. It is an honorable profession that has been recognized for centuries. The Commonwealth cannot interfere in Appellants' occupation "under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect". *Meyer*, *supra*. There is not a scintilla of evidence to prove that the firearms banned will eliminate or ameliorate criminal or mentally ill people from

committing mass murder in Massachusetts. The Act has come into existence under the "guise of protecting the public interest" without evidence that such anticipated action will work. The Act is arbitrary and unconstitutional.

The citizens of most of the majority of the states can possess or deal in the firearms banned by the Act. Appellants are being treated unequally from citizens of other states who can enjoy their full Second Amendment rights and their rights to engage in, and earn a living from, a legal occupation. Therefore, the Act is unconstitutional.

In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), one of the leading cases delivered by the Court concerning Second Amendment rights, it was held that the Second Amendment right to keep and bear arms noted in *Heller* is enforceable to the states through the Due Process Clause of the Fourteenth Amendment. *Id.* 3036-3044. The majority, however, averted revisiting the Privileges and Immunities Clause of the Fourteenth Amendment as applied to the *McDonald* gun case because "state infringement" of the rights under the Fourteenth Amendment had traditionally "been analyzed under the Due Process Clause of that Amendment" and the Court declined to change that in the McDonald case. *Id*. 3030-31. In his concurrence, however, Justice Thomas thought there was a better approach to enforcing one's Second Amendment rights to the States:

> I agree with that description of the right [to keep and bear arms and
> that it's applicable to the States through the Fourteenth Amendment].

But I cannot agree that it is enforceable against the States through a Clause that speaks only to 'process.' Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges and Immunities Clause.

*Id*. 3059. In that vein, Justice Thomas' powerful reasoning for his view certainly holds a lot of weight for applying the Privileges and Immunities Clause in the instant case, despite the fact that the other Justices in the majority did not adopt his view, at least *then*.

The Court Below first took issue that this claim was perhaps subsumed by the Second Amendment claim, citing to out-of-circuit jurisprudence. However, this claim is not about what is being sold, it is about the fact that other United States citizens in other states have a Federal right to sell the same items and earn a legitimate living, while the same right is being denied to Appellants. The jurisprudence relied upon for this issue is cited above. The District Court also erred when it reached the merits of the claim but held that since all citizens of Massachusetts were barred from dealing in the banned firearms, then there is no equal protection problem. However, it is irrelevant whether all other Massachusetts residents suffer under the same denial; what matters is that other United States citizens not residing in Massachusetts can exercise their constitutional rights, while the same rights are being denied to the Appellants by the Act.

## **CONCLUSION**

For any or all of the foregoing reasons, the District Court's decision ought to be set aside and the case remanded for further action as the Court deems just, meet and proper.

Respectfully submitted,
The Appellants,
Gino Mario Recchia, III, *et al*.,
By their attorney

DATED: October 9, 2025

*/s/  Richard C. Chambers, Jr. Esq.*
Richard C. Chambers, Jr. Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
E-mail: Richard@chamberslawoffice.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed.R.App.P. 32(g), I hereby certify that this document complies with the type-volume limitation set for in Fed.R.App.P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed.R.App.P. 32(f), this document contains 8,295 words.

I further certify that this document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

<u>/s/ Richard C. Chambers, Jr., Esq.</u>
Richard C. Chambers, Jr., Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel of record.

/s/  Richard C. Chambers, Jr., Esq.
Richard C. Chambers, Jr., Esq.

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

Memorandum and Order on Motion to Dismiss, filed August 5, 2025 .......... ADD1

Judgment, filed August 6, 2025 .................................................................... ADD15

Constitutional Provisions ............................................................................. ADD16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 24-12560-RGS

GINO MARIO RECCHIA, III, individually and as owner of MASS
ARMAMENT, LLC, INC., and MASS ARMAMENT, LLC, INC.

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of
the Commonwealth of Massachusetts, and TERRENCE M. REIDY,
in his official capacity as Secretary of the Executive Office of Public Safety
and Security of the Commonwealth of Massachusetts

MEMORANDUM AND ORDER ON MOTION TO DISMISS

August 5, 2025

STEARNS, D.J.

Plaintiff Gino Mario Recchia, III filed this putative class action against
defendants Andrea Joy Campbell, in her official capacity as Attorney General
of the Commonwealth of Massachusetts, and Terrence M. Reidy, in his
official capacity as Secretary of the Executive Office of Public Safety and
Security of the Commonwealth of Massachusetts. Recchia challenges the
provisions of the 2024 Act Modernizing Firearm Laws that ban the
importation and sale of large capacity firearms (assault-style weapons) and
large capacity feeding devices. *See* Mass. Gen. Laws ch. 140, § 131M(a).
Defendants move to dismiss the First Amended Complaint (FAC) pursuant

to Fed. R. Civ. P. 12(b)(6). For the following reasons, the court will allow the motion.

## BACKGROUND

On July 25, 2024, the Massachusetts Legislature enacted H-4885, "An Act Modernizing Firearm Laws," which Governor Maura Healey promptly signed into law.[1] The Act modified or added the definitions of "assault-style firearm," "large capacity firearm," and "large capacity feeding device," among others, and banned the import and sale of large capacity firearms and accessories (with various grandfathering provisions for gun owners and collectors in lawful possession of assault weapons prior to the passage of the Act). *See* Mass. Gen. Laws ch. 140, § 121

Plaintiff Recchia is a Massachusetts resident and sole owner of a Massachusetts gun store, Mass Armament, LLC (Mass Armament) (together, Recchia or plaintiff). *See* FAC (Dkt. # 26) ¶¶ 14-15. Recchia opened Mass Armament for business in 2019 and derives his livelihood from its sales. *Id.* ¶¶ 34-35. Mass Armament offered customers "new and used firearms of many types, including many of the items banned by the Act; that is, assault-style rifles, large capacity magazines and feeding devices," as well as

---

[1] The Act took effect on October 2, 2024, after the Governor issued an executive order inserting an emergency declaration accelerating the Act's effective date.

2

ammunition and firearm accouterments. *Id.* ¶ 37. Over half of Mass Armament's sales consisted of firearms and accessories now banned by the Act, while the bulk of its inventory was purchased from out-of-state manufactures, retailers, and private sellers. *Id.* ¶¶ 38-40.

In his initial Complaint (filed on October 4, 2024), Recchia named Governor Healey, in her official, as well as individual, capacity as the sole defendant. *See* Dkt. # 1. The original Complaint alleged violations of the dormant Commerce Clause (Count I), the Second Amendment (Count II), and the Equal Protection Clause (Count III). *See id.* ¶¶ 37-62. Following the court's April 17, 2025 hearing on the Governor's motion to dismiss the Complaint, the court, "with the explicit or tacit consent of the parties," dismissed the individual-capacity claims against Governor Healey with prejudice and dismissed the dormant Commerce Clause and Equal Protection Clause claims without prejudice. *See* Dkt. # 19. The court also granted Recchia leave to amend the Complaint. *See id.* That same day, following the hearing, the First Circuit issued its decision in *Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025), affirming another district court's denial of a preliminary injunction in a Second Amendment challenge to the prohibition of the sale and possession of assault weapons and large-capacity

magazines, as appearing in a previous version of the General Laws, ch. 140, § 131M.[2]

On June 16, 2025, Recchia filed a First Amended Complaint, substituting as defendants Attorney General Campbell in her official capacity and Secretary Reidy in his official capacity. *See* FAC at 1. The Amended Complaint sets out essentially the same claims as the initial Complaint: violations of the dormant Commerce Clause (as well as the Supremacy Clause) (Count I); the Second Amendment (Count II); and the Equal Protection Clause of the Fourteenth Amendment (Count III). Recchia seeks a declaratory judgment that the Act is unconstitutional, together with a permanent injunction enjoining defendants from enforcing the provisions of the Act and its restrictions on the importation, purchase, possession, transfer, and sale of assault-style firearms and large capacity feeding devices (as well as reasonable attorney's fees and costs). *See* FAC at 12.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009),

---

[2] The 2024 Act amended § 131M to extend the ban to the import of assault-style weapons and large capacity firearms. The balance of the statute was left unchanged.

4

quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two basic principles guide the court's analysis. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. If the allegations in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," the complaint will be dismissed. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

## DISCUSSION

### Second Amendment Claim (Count II)

Recchia concedes in his opposition to the motion to dismiss that "the Second Amendment issue may be considered moot at this time because of the First Circuit's decision in *Capen*." *See* Dkt. # 30 at 2. But he contends that he respectfully disagrees with *Capen*, explaining that when the Second Amendment was ratified, the American citizen solider was equipped with a rifle equal to that of the best contemporary army in the world (presumably the British army), and that should still be the case today. *See* Dkt. # 30 at 6.

5

The Second Amendment provides: "A well regulated Militia, being
necessary to the security of a free State, the right of the people to keep and
bear Arms, shall not be infringed." U.S. Const. amend. II. "[L]ike most
rights, the right secured by the Second Amendment is not unlimited."
*Capen*, 134 F.4th at 665, quoting *District of Columbia v. Heller*, 554 U.S.
570, 626 (2008). "One such limitation is a 'historical tradition of prohibiting
the carrying of dangerous and unusual weapons' that were not 'in common
use' at the time the Second Amendment was drafted." *Capen*, 134 F.4th at
665, quoting *Heller*, 554 U.S. at 627. The Supreme Court has established a
two-part test that courts are to use in assessing Second Amendment claims.
"Under [this] approach, we first consider whether 'the Second Amendment's
plain text covers'" the conduct at issue. *Ocean State Tactical, LLC v. Rhode
Island*, 95 F.4th 38, 43 (1st Cir. 2024), quoting *New York State Rifle & Pistol
Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). "If it does, we then consider
whether" a prohibition, arguably trenching upon the Second Amendment, "is
'consistent with this Nation's historical tradition of firearm regulation' and
thus permissible under the Second Amendment." *Id.*, quoting *Bruen*, 597
U.S. at 17.

The court agrees with the parties that *Capen* forecloses the Second
Amendment claim. In *Capen*, the First Circuit held that the Massachusetts

6

ban on assault weapons and large capacity feeding devices was "consistent with this Nation's historical tradition of firearm regulation," and imposed a *de minimis* burden on the right to self-defense (because civilian self-defense "rarely – if ever – calls for the rapid and uninterrupted discharge of many shots, much less more than ten"). *Capen*, 134 F.4th at 675-676. As the First Circuit observed, the ban was enacted in response to "unprecedented societal concern" over mass shootings, and given the ban's focus on exotic modern weaponry, did not offend the Second Amendment. *Id.* at 676; *see also Ocean State Tactical*, 95 F.4th at 43-45 (upholding the Rhode Island legislature's ban on large capacity magazines). As Recchia is unable to identify any meaningful distinction between *Capen*, *Ocean State Tactical*, and the relevant 2024 portions of the Massachusetts Act, the court will dismiss Count II.[3]

**Dormant Commerce Clause Claim (Count I)**

Recchia next alleges that Massachusetts, through the importation and exportation prohibitions of the Act, has "estopped the manufacturers and

---

[3] Additionally, to the extent that Recchia grounds his Second Amendment claim on an alleged "right" to sell firearms, the Second Amendment does not confer a "freestanding right" to sell firearms that is "wholly detached from any customer's ability to acquire firearms." *United States v. Vlha*, 142 F.4th 1194, 1198 (9th Cir. 2025), quoting *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc).

ADD7

local Federal firearms dealers [] from conducting business in Massachusetts," in violation of the Commerce Clause. FAC ¶ 58; *see* Dkt. # 30 at 8.

The Commerce Clause empowers Congress "[t]o regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. The Supreme Court "has also read 'a further, negative command' into the Commerce Clause." *Am. Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 35 (1st Cir. 2024), quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). Under the "dormant" Commerce Clause, states may not pass laws that "discriminate[] against or unduly burden[] interstate commerce." *Am. Trucking Ass'n, Inc.*, 123 F.4th at 35, quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997).

Dormant Commerce Clause claims are analyzed under a two-tiered approach. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 486 U.S. 573, 578-579 (1986). The first-tier test asks whether the state law at issue discriminates directly against interstate commerce or directly regulates interstate commerce. *See id.* at 579. If the state law does either, it violates the Commerce Clause and is "generally struck down . . . without

8

further inquiry." *Id.*[4] Under the second tier, which has come to be known as the *Pike* balancing test, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), when "a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the Court] examine[s] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers Corp.*, 486 U.S. at 579.

Here, Recchia's revised dormant Commerce Clause claim is substantially identical to his assay in the original Complaint (which the court previously dismissed). *See* Dkt. # 19. Looking to the first-tier approach, Recchia's Amended Complaint is devoid of any allegation that the Legislature enacted the Act's restrictions on the import and sale of assault-style weapons and large capacity devices with a discriminatory purpose. Recchia argues that the Act is discriminatory because it "favors manufacturers of some weapons over the manufacturers of the banned weapons, thus discriminating against the latter," and that the "Act bann[ing] some firearms and not all others amounts to discrimination against the banned weapon[s]," *see* Dkt. # 12 at 12. However, the Act contains no

---

[4] A state discriminates against interstate commerce "when it enacts 'economic protectionism' by imposing 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Am. Trucking Ass'n, Inc.*, 123 F.4th at 35, quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

ADD9

"differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *See Granholm v. Heald*, 544 U.S. 460, 472 (2005). By its terms, the Act's restrictions apply to all regulated weapons, regardless of where they are manufactured.[5]

Turning to the second tier, Recchia has failed to plausibly allege that the Act imposes a significant burden on interstate commerce. *See Pike*, 397 U.S. at 142. Recchia alleges that his business, income, and property values are substantially affected by the assault weapons ban. *See FAC ¶¶ 46, 72-74.* However, he cites to no authority for the proposition that any specific quantum of economic loss born by a subset of retailers is sufficient to demonstrate a substantial burden on the broad stream of interstate commerce. What Recchia has to say as to the Act's effect on other federal firearms dealers in the Commonwealth is speculative and presumes that all firearm retailers in Massachusetts depend on the sale of assault weapons and accessories as their major source of income. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 387 (2023) (plurality opinion) (noting that alleged harm that is "nothing more than a speculative possibility" does not amount to a "substantial harm" to interstate commerce). An undue impact

---

[5] Recchia is not a firearms manufacturer and, therefore, would not appear to have standing to challenge the Act based on its impact on out-of-state manufacturers.

10

on the stream of interstate commerce is gauged by its effect on the public as a whole and not by the disadvantageous effects felt by a small subset of participants in its ebb and flow. *Cf. United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) (dormant Commerce Clause not offended by higher prices "likely to fall upon the very people who voted for the [challenged] la[w]"). Nor does Recchia persuasively allege that the Act's burdens on interstate commerce are "clearly excessive in relation to the putative local benefits," which include the Commonwealth's manifest interest in protecting Massachusetts citizens from the "growing and real threat" of mass shootings and gun violence. *Pike*, 397 U.S. at 142; *see* Dkt. # 29 at 18, citing *Capen*, 134 F.4th at 673. Accordingly, the court will dismiss Count I.[6]

---

[6] Under this same count, Recchia appears to invoke the Supremacy Clause to argue that Congress authorized all citizens to possess the Act's banned weapons because it did not renew the federal assault weapons ban of 1994, Title XI of P.L. 103-322 (September 13, 1994). *See* FAC ¶¶ 48-53; Dkt. # 12 at 9-14. Recchia contends that the Act's restrictions conflict with Congress's authorization and, therefore, Massachusetts is usurping Congress's power to regulate interstate commerce. *See* Dkt. # 30 at 8. Besides pointing to no authority in support of this argument, Recchia's Supremacy Clause argument is incompatible with his dormant Commerce Clause claim because "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 524 (2019) (citations omitted).

11

**Equal Protection Claim (Count III)**

Recchia alleges that, as a United States citizen domiciled in Massachusetts, he is being subject to inferior treatment than that received by many other citizens who reside in states where they are permitted to possess the banned firearms and "earn a living [by selling them] in a legitimate business." *See* FAC ¶ 68; Dkt. # 30 at 10. Recchia argues this amounts to a violation of the Equal Protection Clause under the Fourteenth Amendment.[7] *See* Dkt. # 30 at 12.

First, "[t]o the extent that the [e]qual [p]rotection challenge is based on the Second Amendment's fundamental right to bear arms and the disparate treatment of groups in exercising that right . . . that challenge is subsumed in the Second Amendment inquiry." *Pena v. Lindley*, 898 F.3d 969, 986 (9th Cir. 2018); *see Teixeira v. Cnty. of Alameda*, 822 F.3d 1047, 1052 (9th Cir. 2016) (affirming dismissal of an equal protection challenge based on infringement of the right to bear arms because "the equal protection

---

[7] Recchia asserts claims under both the Fifth and Fourteenth Amendments' equal protection guarantees. *See* FAC ¶¶ 64, 70. Fifth Amendment equal protection claims are evaluated under the same standards as equal protection claims under the Fourteenth Amendment. *See Perrier-Bilbo v. United States*, 954 F.3d 413, 432 n.14 (1st Cir. 2020). However, the Fifth Amendment Due Process Clause applies "only to actions of the federal government – not to those of state or local governments." *Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 8 (1st Cir. 2007). The court, accordingly, will end any discussion of the Fifth Amendment claim here.

challenge [was] 'no more than a [Second] Amendment claim dressed in equal protection clothing,'" quoting *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001)), on *reh'g en banc*, 873 F.3d 670, 676 n.7 (9th Cir. 2017) (affirming dismissal of the equal protection claim "for the reasons given in the panel opinion"); *cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (citation and internal quotation marks omitted).

Second, even if the court were to entertain the equal protection claim, equal protection means that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Plaintiffs claiming an equal protection violation must first identify and relate *specific instances* where persons *situated similarly in all relevant respects* were treated differently." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis in original) (citation and internal quotation marks omitted); *see also McCoy v. Town of Pittsfield*, 59 F.4th 497, 508 (1st Cir.

2023) (explaining that an equal protection claim sounding in a fundamental rights theory typically requires an appropriate comparator).   Here, Recchia does not allege the existence of an individual who was "similarly situated [to him] in all relevant respects" within the state's jurisdiction but was treated more favorably.   Nor does the Act prevent Recchia from engaging in his profession as a gun dealer.[8]  Thus, the court will dismiss Count III.

## ORDER

For the foregoing reasons, the FAC is dismissed with prejudice.   The Clerk will enter judgment for Campbell and Reidy and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[8] In his opposition to the motion to dismiss, Recchia also alleges that "one of the privileges and immunities" of citizenship that he has been deprived of is the right to possess and carry the banned firearms and, moreover, that he is entitled to a privileged right to earn a "living in a legitimate business" related to selling the banned firearms. *See* Dkt. # 30 at 11-13. Article IV, § 2, cl. 1 of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The Clause entitles residents of one state to enjoy the same rights as citizens of other states. *See Selevan v. New York Thruway Auth.*, 584 F.3d 82, 102 (2d Cir. 2009).   Recchia misconstrues this Clause, which protects individual, "out-of-state residents from the discriminatory laws of other states and their municipalities." *Connecticut Citizens Def. League, Inc. v. Thody*, 664 F. Supp. 3d 235, 251 (D. Conn. 2023), *aff'd*, 2024 WL 177707 (2d Cir. Jan. 17, 2024). That is not the case here, as Recchia resides solely in Massachusetts.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * *
Gino Mario Recchia, III
Mass LLC, INC Armament
    Plaintiffs

                v.

Andrea Joy Campbell
Terrence M. Reidy
    Defendants
* * * * * * * * * * * * * * * * * * * * * * * * * * *

CIVIL ACTION NO.:
1:24-cv-12560-RGS

**<u>JUDGMENT</u>**
August 6, 2025

Stearns, D.J.

In accordance with the Memorandum and Order entered on <u>August 5, 2025</u>, GRANTING Defendant's Motion to Dismiss, Judgment is entered in favor of Andrea Joy Campbell and Terrence M. Reidy. This case is hereby DISMISSED.

      SO ORDERED.

                /s/ Richard G. Stearns
                RICHARD G. STEARNS
                United States District Judge

ADD15

## Constitutional Provisions

**Second Amendment**

> "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed"

**Fourteenth Amendment (Section 1)**

> "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**Article 1, Section 8, Clause 3 of the U.S. Constitution**

> "The Congress shall have the power *** To regulate commerce with foreign nations, and among the several states, and with the Indian tribes;"