No. 25-1817

# United States Court of Appeals
## for the First Circuit

GINO MARIO RECCHIA, III, INDIVIDUALLY AND AS OWNER OF
MASS ARMAMENT, LLC, INC.; MASS ARMAMENT, LLC, INC.,

*Plaintiffs-Appellants*,

*v.*

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS, AND GINA K. KWON, IN HER OFFICIAL
CAPACITY AS SECRETARY OF THE EXECUTIVE OFFICE OF
PUBLIC SAFETY AND SECURITY OF THE COMMONWEALTH OF MASSACHUSETTS,

*Defendants-Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

**BRIEF OF DEFENDANTS-APPELLEES**

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
Grace Gohlke, 1st Cir. No. 1204282
  *Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2527
grace.gohlke@mass.gov

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................1

STATEMENT OF THE ISSUES ..................................................1

STATEMENT OF THE CASE ......................................................2

I.     Statutory Background...........................................................2

       A.     The Federal Assault Weapons and Large Capacity
              Magazine Ban (1994-2004) .........................................2

       B.     Massachusetts's Restrictions on Assault Weapons and
              Large-Capacity Magazines Prior to 2024 ...................4

       C.     2024 Amendments to Massachusetts's Restrictions on
              Assault Weapons and Large-Capacity Magazines ...................5

II.    Factual Background................................................................6

III.   Procedural History................................................................7

SUMMARY OF THE ARGUMENT ...........................................11

ARGUMENT..............................................................................12

I.     Plaintiffs-Appellants' Second Amendment Claim Was
       Correctly Dismissed .............................................................13

       A.     The Second Amendment Framework ......................14

       B.     The Second Amendment's Plain Text Does Not Cover
              Plaintiffs-Appellants' Economic Interest in Selling
              Particular Firearms...................................................16

       C.     Plaintiffs-Appellants Concede the Second Amendment
              Claim is Foreclosed by First Circuit Precedent. ......................18

II.    Plaintiffs-Appellants' Dormant Commerce Clause Claim Was
       Correctly Dismissed Because the Act Neither Discriminates
       Against Out-of-State Business Nor Unduly Burdens Interstate
       Commerce. .........................................................................25

III.    Plaintiffs-Appellants' "Right to Earn a Living" Claim Was Correctly Dismissed Whether Stated Under Equal Protection or Privileges and Immunities ................................................... 31

CONCLUSION ............................................................................ 35

CERTIFICATE OF COMPLIANCE ........................................... 36

CERTIFICATE OF SERVICE .................................................... 36

ADDENDUM ................................................................................ 1

# TABLE OF AUTHORITIES

## Cases

*Am. Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.,*
   123 F.4th 27 (1st Cir. 2024)..................................................................26

*Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479 (1st Cir. 2022) ...........12

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) ...................... 16n, 17

*Bevis v. Naperville*, 85 F.4th 1175 (7th Cir. 2023)..................................................24

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ....................................................24

*Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025)......................................... *passim*

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... 14, 6n, 17, 24, 25

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) ......................................................23

*Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1 (1st Cir. 2010).........................26

*Gattineri v. Town of Lynnfield*, 58 F.4th 512 (1st Cir. 2023).......................... 31, 33

*Gen. Motors Corp. v. Tracy,* 519 U.S. 278 (1997)...................................................26

*Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366 (1976) ...................................29

*Greene v. McElroy*, 360 U.S. 474 (1960) ................................................................34

*Guy v. Baltimore*, 100 U.S. 434 (1880) ...................................................................29

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) ...........................24

*Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424 (1963) .........34

*Lyman v. Baker*, 954 F.3d 351 (1st Cir. 2020).........................................................32

*McDonald v. City of Chicago,* 561 U.S. 742 (2010) ................................................32

*Medeiros v. Vincent*, 431 F.3d 25 (1st Cir. 2005)....................................................31

*Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025) .........................23

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ..................................26

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022.............. *passim*

*Ocean State Tactical, LLC v. Rhode Island,*
   95 F. 4th 38 (1st Cir. 2024)............................................................................ *passim*

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).............................26

*Pena v. Lindley,* 898 F.3d 969 (9th Cir. 2018) ................................................. 10, 31

*Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970) ........................................ 2, 10, 28

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005) ...........................................14

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012)..........13

*State of Missouri v. Lewis*, 101 U.S. 22 (1879) .......................................................32

*Teixeira v. Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ...................... 16, 16n, 17

*Triumph Foods, LLC v. Campbell*, 156 F.4th 29 (1st Cir. 2025) ............. 27, 28, 33n

*United States v. Chafin*, 423 Fed. App'x 342 (4th Cir. 2011) .................................16

*United States v. Rahimi*, 602 U.S. 680 (2024)................................................ *passim*

*United States v. Rodríguez*, 527 F.3d 221 (1st Cir. 2008) .......................................18

*W. & S. Life Ins. Co. v. State Bd. of Equalization of California,*
   451 U.S. 648 (1981)...........................................................................................33n

iv

## Statutes

Mass. Gen. Laws ch. 140, § 121 ................................................... 4, 5, 6, 7

Mass. Gen. Laws ch. 140, § 131M ............................................. 5, 6, 7, 8

Mass. St. 1998, ch. 180, § 8 ...............................................................4

Mass. St. 1998, ch. 180, § 47 .............................................................4

Mass. St. 2004, ch. 150, § 1 ...............................................................4

Mass. St. 2004, ch. 150, § 2 ...............................................................4

Mass. St. 2004, ch. 150, § 3 ...............................................................4

Mass. St. 2024, ch. 135 ..................................................................5, 6

Mass. St. 2024, ch. 135 § 16 ..............................................................5

Mass. St. 2024, ch. 135 § 20 ..............................................................5

Mass. St. 2024, ch. 135 § 21 ..............................................................5

Mass. St. 2024, ch. 135 § 22 ..............................................................5

Mass. St. 2024, ch. 135 § 71 ..............................................................5

## Other Authorities

Pub. L. No. 103-322, § 110102(a) .......................................................3

Pub. L. No. 103-322, § 110102(b) .......................................................3

Pub. L. No. 103-322, § 110103(a) .......................................................3

Pub. L. No. 103-322, § 110103(b) .......................................................3

Pub. L. No. 103-322, § 110105(2) .............................................................3

Pub. L. No. 103-322, §§ 110101-106 ........................................................2

## Rules

Fed. R. Civ. P. 12(b)(6) ...........................................................................12

Fed. R. Civ. P. 25(d) ...............................................................................9n

## Constitutional Provisions

U.S. Const. amend. II ...............................................................................14

U.S. Const. amend. XIV, § 1 ...................................................................32

U.S. Const. art. I, § 8, cl. 3......................................................................26

U.S. Const. art. IV, § 2 ...................................................................... 33, 33n

## INTRODUCTION

In 2024, the Massachusetts legislature enacted amendments to preexisting restrictions on assault-style firearms and magazines capable of holding more than 10 rounds of ammunition. First enacted in 1998, these restrictions protect Massachusetts residents from the growing threat of mass shootings involving military-style weapons combined with the ability to shoot many rounds without pause—a threat that has only accelerated since then. While the 2024 amendments modified the definition of "assault-style firearms," most of the same weapons—including the AR-15—were banned both before and after the amendments.

Plaintiffs-Appellants, a licensed gun retailer and its business owner, argue their business model was centered around unspecified weapons and accessories that had been legal prior to the amendments but are no longer legal, and they seek an order enjoining enforcement of the restrictions in full. Plaintiffs-Appellants challenge the newly-modified restrictions under the Second Amendment, the dormant Commerce Clause, and a purported Fourteenth Amendment "right to earn a living." These claims were all properly dismissed by the district court because they are either foreclosed by existing precedent of this Court or fail on their own merits. The district court's dismissal should be affirmed.

## STATEMENT OF THE ISSUES

1. Did Plaintiffs-Appellants fail to state a claim under the Second Amendment challenging Massachusetts's current restrictions on assault-style

firearms and large-capacity magazines, where Plaintiffs-Appellants' claimed injury rests solely on their economic interest in selling firearms and where they concede this Court's opinion in *Capen v. Campbell* forecloses their claim?

2. Did Plaintiffs-Appellants fail to state a claim under the dormant Commerce Clause where they concede they did not allege any burden on out-of-state commerce for the benefit of in-state commerce, and they additionally did not plausibly allege an undue burden on interstate commerce under the *Pike v. Bruce Church* line of cases simply by alleging harm to their own business?

3. Did Plaintiffs-Appellants fail to state a claim under the Equal Protection Clause or Privileges and Immunities Clause of the Fourteenth Amendment where this Court's precedent establishes there is no fundamental "right to earn a living" under those clauses and where the challenged restrictions do not jeopardize Plaintiffs-Appellants' license to sell any lawful firearms in Massachusetts?

<u>**STATEMENT OF THE CASE**</u>

## I.    Statutory Background

### A.    The Federal Assault Weapons and Large Capacity Magazine Ban (1994-2004)

In 1994, Congress enacted the Public Safety and Recreational Firearms Use Protection Act (the "federal ban"), which prohibited certain semiautomatic assault weapons and large-capacity feeding devices (*i.e.*, magazines). Pub. L. No. 103-322, §§ 110101-106. The federal ban defined prohibited "assault weapons" in three ways:

(1) through an enumerated list of firearms, including, for example, the Colt AR-15[1]; (2) "copies or duplicates" of firearms on that list; and (3) a "features" test, which prohibited semiautomatic weapons that were able to accept detachable magazines and had at least two combat-style features, including, for example, a bayonet mount and a flash suppressor. *Id.* § 110102(b). The federal ban also prohibited the transfer or possession of large-capacity magazines ("LCMs"), defined as magazines that could accept more than ten rounds of ammunition. *Id.* § 110103(a), (b).[2]

The federal ban exempted from its prohibitions any assault weapons or LCMs lawfully possessed when the law was enacted (hereafter, "pre-ban" assault weapons), a list of particular firearms and their copies or duplicates, and semiautomatic rifles that could not accept a detachable magazine holding more than five rounds of ammunition. *Id.* §§ 110102(a), 110103(a). The federal ban expired in 2004, and Congress has not enacted a similar ban since then. *Id.* § 110105(2).

---

[1] The AR-15 is a type of semiautomatic assault rifle; "[a]ll AR-15 firearms are derivatives of the Armalite Rifle (AR) model 15, which was originally designed for the United States Military in the late 1950s." *Capen v. Campbell*, 134 F.4th 660, 669 n.4 (1st Cir. 2025).

[2] A magazine is a "feeding device" that feeds ammunition into a semiautomatic firearm and "enable[s] shooters to fire repeatedly without reloading." *Ocean State Tactical, LLC v. Rhode Island*, 95 F. 4th 38, 42 (1st Cir. 2024). A "fixed" magazine is "integral to the frame," while a "detachable" magazine "can be removed and replaced with another fully loaded magazine, much as an extra battery pack gets swapped in and out of a battery-operated tool." *Id.* (cleaned up).

### B. Massachusetts's Restrictions on Assault Weapons and Large-Capacity Magazines Prior to 2024

Four years after the federal ban went into effect, in 1998, Massachusetts enacted its own restrictions on assault weapons and LCMs modeled after the federal ban. Mass. St. 1998, ch. 180, §§ 8 and 47, codified at Mass. Gen. Laws ch. 140, §§ 121 and 131M (1998).

Like the federal ban, the Massachusetts statute prohibited the sale, transfer, or possession of certain semiautomatic assault weapons and LCMs. Mass. St. 1998, ch. 180, § 47. The statute defined "Assault weapon" to have "the same meaning as a semiautomatic assault weapon as defined" in the federal ban, *i.e.*, the federal ban's enumerated list, copies or duplicates of firearms on that list, and semiautomatic weapons that met the "features" test. *Id.* § 8. The statute's definition of LCMs also mirrored the federal ban's definition of magazines that could accept more than ten rounds of ammunition. *Id.* Like the federal ban, the statute exempted from its prohibition "pre-ban" assault weapons and magazines, firearms on the federal ban's exemption list, and semiautomatic rifles that could not accept a detachable magazine holding more than five rounds of ammunition. *Id.* § 47.

In 2004, following the federal ban's expiration, Massachusetts made its restrictions on assault weapons and LCMs permanent. *See* Mass. St. 2004, ch. 150, §§ 1-3. In signing the permanent enactment, then-Governor Mitt Romney stated that "[d]eadly assault weapons have no place in Massachusetts," and that "[t]hese guns

are not made for recreation or self-defense. They are instruments of destruction with the sole purpose of hunting down and killing people." *Capen v. Campbell*, 134 F.4th 660, 671 (1st Cir. 2025).

### C. 2024 Amendments to Massachusetts's Restrictions on Assault Weapons and Large-Capacity Magazines

In July 2024, the Massachusetts Legislature enacted, and the Governor signed, "An Act Modernizing Firearm Laws." Mass. St. 2024, ch. 135.

Relevant here, that law modified the restrictions on semiautomatic assault weapons and LCMs. Mass. St. 2024, ch. 135 §§ 16, 20-22, 71, as codified at Mass. Gen. Laws ch. 140, §§ 121 and 131M (collectively, the "Act"). The Act renamed "Assault weapons" as "Assault-style firearms." Mass. Gen. Laws ch. 140, § 121 ("Assault-style firearms"). The Act retained the three ways of defining prohibited assault weapons—the list of enumerated weapons, their copies or duplicates, and weapons with certain combat-style features—but modified those definitions. *See id.* (e), (f). The enumerated list of weapons remained the same, except for the addition of two "revolving cylinder shotguns." *Id.* (e). With respect to "copies or duplicates," the new definition codified guidance issued by the Attorney General in 2016 on identifying weapons that are "copies or duplicates" of the enumerated list of assault weapons. *See id.* (f). With respect to semiautomatic rifles with certain combat-style features, the definition replaced two prior features (bayonet mount and grenade launcher) with two new prohibited features (a foregrip and barrel shroud). *See id.*

(a)(iii), (v). The Act retained its prohibition on LCMs that could accept more than ten rounds of ammunition. *See id.* ("Large capacity feeding device"); Mass. Gen. Laws ch. 140, § 131M.

The Act also modified the circumstances under which a person could continue to lawfully possess or transfer assault weapons, permitting possession and transfer of assault weapons that lawfully were possessed within Massachusetts as of August 1, 2024, but not permitting assault weapons that lawfully were owned elsewhere prior to that date. *See* Mass. Gen. Laws ch. 140, § 131M. The Act allows "copy or duplicate" weapons possessed as of July 20, 2016, the date of the Attorney General's guidance. Mass. Gen. Laws ch. 140, § 121 ("Assault-style firearms"), subsection (f).

## II.    Factual Background

The following facts were plead in the first amended complaint and are accepted as true for purposes of this appeal.

Plaintiff-appellant Gino M. Recchia, III ("Recchia"), is a Massachusetts resident and sole owner of a firearms retailer, plaintiff-appellant Mass Armament, LLC ("Mass Armament") (together, "Plaintiffs-Appellants"). ADD.002.[3] Recchia opened Mass Armament in 2019 and derives his personal income from that business.

---

[3] The district court's decision is cited according to its reproduction in the Addendum to this brief. The first amended complaint is cited as "FAC," with citation to its reproduction in the Addendum to this brief. Plaintiffs-Appellants' opening appellate brief is cited as "Pls. Br."

ADD.002. Mass Armament sells "new and used firearms of many types, including many of the items banned by the [Act], that is, assault-style rifles, large capacity magazines and feeding devices." ADD.002-3. Plaintiffs-Appellants alleged that "[o]ver half of Mass Armament's sales consisted of firearms and accessories now banned by the Act." ADD.003.

Plaintiffs-Appellants did not identify in their first amended complaint which specific provisions of the Act, or changes to Massachusetts's longstanding ban on assault weapons or LCMs, impacted Mass Armament's business. FAC ¶¶ 38-42, 45-46 (ADD.020-21). Rather, the first amended complaint alleged Plaintiffs-Appellants' attorney made "extrapolation[s]" from Excel spreadsheets, not attached to the complaint, in order to estimate Mass Armament's past profits and future losses from "now banned" weapons. FAC ¶¶ 45-46 (ADD.021).

## III.   Procedural History

On October 4, 2024, Plaintiffs-Appellants filed their initial complaint challenging the constitutionality of the Act's amendments to Massachusetts's preexisting prohibition on the sale and possession of assault weapons and LCMs, as codified through amendments to Mass. Gen. Laws ch. §§ 121 and 131M. ADD.003. The initial complaint brought three claims under (1) the dormant Commerce Clause, (2) the Second Amendment, and (3) the Equal Protection Clause, and named Governor Maura Healey as a defendant in both her individual and official capacities.

ADD.003.[4] The Governor moved to dismiss and, at the close of the hearing on April 17, 2025, the court dismissed the individual-capacity claims against the Governor with prejudice and dismissed the dormant Commerce Clause and Equal Protection Clause claims without prejudice. ADD.003. The court granted Plaintiffs-Appellants leave to amend their complaint. ADD.003.

Later that same day, this Court issued its decision in *Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025), affirming the district court's denial of a preliminary injunction in a separate Second Amendment challenge to Massachusetts's prohibition on the sale and possession of assault weapons and LCMs, Mass. Gen. Laws ch. 140, § 131M (as then appearing in such section, prior to the 2024 amendment in St. 2024, ch. 135). There, this Court held that on the preliminary record "[a] straightforward application of our prior holding in [*Ocean State Tactical, LLC v. Rhode Island*, 95 F. 4th 38 (1st Cir. 2024), *cert. denied* 145 S.Ct. 2771]," demonstrates that the sale and possession of assault weapons is likely facially constitutional because it is "'consistent with the Nation's historical tradition of firearm regulation'" in its application to the Colt AR-15 rifle, the particular assault weapon focused on by the appellants in that case. *Capen*, 134 F.4th at 675-76 (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022)). *Capen*

---

[4] Although Governor Healey continues to appear in the case caption, she was not named as a defendant in either her official or individual capacity in the first amended complaint, and so is not a party to this appeal.

further explained that *Ocean State Tactical* "control[led] the outcome" of Plaintiffs-Appellants' challenge to Massachusetts's restrictions on LCMs. *Id.* at 676.

On June 16, 2025, Plaintiffs-Appellants filed the first amended complaint, in which Plaintiffs-Appellants substituted as defendants Andrea Joy Campbell, in her official capacity as Attorney General of the Commonwealth of Massachusetts, and Terrence Reidy, in his official capacity as the Secretary of the Massachusetts Executive Office of Public Safety and Security, for whom Secretary Kwon has now been substituted (collectively, "Defendants-Appellees"). ADD.004.[5] Against both defendants, the first amended complaint asserted claims for a violation of the dormant Commerce Clause (and the Supremacy Clause) (Count I); a violation of the Second Amendment (Count II), and a violation of the Fourteenth Amendment's Equal Protection Clause (Count III). ADD.004. The first amended complaint sought a declaration that the Act is unconstitutional, and an injunction preventing Defendants-Appellees from enforcing the Act as to the import, purchase, and possession of assault-style firearms and large capacity feeding devices. ADD.004.

Defendants-Appellees moved to dismiss the first amended complaint, which the district court granted as to all counts. As to the Second Amendment claim,

---

[5] Pursuant to Fed. R. Civ. P. 25(d), Gina K. Kwon, in her official capacity as Secretary of the Executive Office of Public Safety and Security, has been automatically substituted for former-Secretary Terrence Reidy in the caption as well as the body of this brief.

Plaintiffs-Appellants conceded that the claim was foreclosed by "the First Circuit's decision in *Capen*." ADD.005. The district court agreed with that concession and held that because Plaintiffs-Appellants were "unable to identify any meaningful distinction between *Capen*, *Ocean State Tactical*, and the relevant 2024 portions of the Massachusetts Act, the court will dismiss Count II." ADD.006.

As to the dormant Commerce Clause claim, the district court explained that such claims "are analyzed under a two-tier approach." ADD.008. The district court held that Plaintiffs-Appellants had not stated a claim for a violation under the first tier related to "discrimination," because they made no plausible allegations that the Act's "restrictions on the import and sale of assault-style weapons and large capacity devices" were enacted "with a discriminatory purpose" to benefit in-state economic interests at the expense of out-of-state competitors. ADD.009. Nor had Plaintiffs-Appellants plausibly alleged a "significant burden on interstate commerce" under the "second tier" test derived from *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970), where the complaint merely alleged economic harm to Plaintiffs-Appellants' own business as opposed to an "effect on the public as a whole." ADD.009-10.

Finally, on the equal protection claim, the district court first observed that where an equal protection claim is based on Second Amendment rights, "that challenge is subsumed in the Second Amendment inquiry." ADD.012 (quoting *Pena v. Lindley,* 898 F.3d 969, 986 (9th Cir. 2018)). But even on its own merits, the claim

would fail because Plaintiffs-Appellants did not identify a person who is "situated similarly in all relevant respects" but was nonetheless treated differently by the challenged Massachusetts laws. ADD.013-14.

As a result, the district court concluded Plaintiffs-Appellants had failed to state any of the three claims made in the first amended complaint and so dismissed the complaint with prejudice.

## SUMMARY OF THE ARGUMENT

The district court's dismissal of the Plaintiffs-Appellants' first amended complaint should be affirmed because Plaintiffs-Appellants failed to state any claim on which relief could be granted under the Second Amendment, the dormant Commerce Clause, or any clause of the Fourteenth Amendment.

First, Plaintiffs-Appellants did not plausibly allege claims for a violation of the Second Amendment based on the Act's changes to the restrictions on assault weapons and LCMs. Plaintiffs-Appellants do not have a freestanding right to sell assault weapons or LCMs wholly divorced from the ability of any customer to acquire them. And, in any case, the Second Amendment claim is foreclosed as to assault weapons by this Court's recent decision in *Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) and as to LCMs by both *Capen* and this Court's prior decision in *Ocean State Tactical, LLC v. Rhode Island*, 95 F. 4th 38 (1st Cir. 2024), *cert. denied* 145 S.Ct. 2771.

Second, Plaintiffs-Appellants likewise failed to state a claim for a violation of the dormant Commerce Clause. Plaintiffs-Appellants did not plausibly allege that Massachusetts's restrictions on assault weapons and LCMs either discriminate against, or otherwise unconstitutionally burden, interstate commerce. Nor does a dormant Commerce Clause claim arise any time a state regulates within its own borders a particular consumer good that travels through interstate commerce.

Third, Plaintiffs-Appellants' "right to earn a living" claim, whether styled under the Equal Protection Clause as in the first amended complaint, or under the Privileges and Immunities Clause, as in Plaintiffs-Appellants' appellate brief, was properly dismissed. Neither clause grants Plaintiffs-Appellants the right to sell all the same goods as a different retailer in another state; business operators are required to follow the laws of the states where they operate, absent some other constitutional infirmity with the state regulation, which has not been plausibly alleged here.

For these reasons, the district court's dismissal of the complaint with prejudice should be affirmed. *See* Fed. R. Civ. P. 12(b)(6).

## **ARGUMENT**

This Court reviews a district court's dismissal of a complaint under Rule 12(b)(6) de novo. *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 489 (1st Cir. 2022). This Court has articulated its task in assessing a complaint on a motion to dismiss as follows:

Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Step two: take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citations omitted). The Court may also consider "facts susceptible to judicial notice" and "concessions in plaintiff's response to the motion to dismiss." *Id.* at 55-56 (cleaned up).

## I.     Plaintiffs-Appellants' Second Amendment Claim Was Correctly Dismissed

The district court correctly determined that Plaintiffs-Appellants failed to state a claim for a violation of the Second Amendment based on the Act's changes to Massachusetts's longstanding restrictions on certain semiautomatic assault weapons and LCMs. First, the plain text of the Second Amendment does not protect Plaintiffs-Appellants' freestanding right to sell assault weapons or LCMs. Second, even if the Second Amendment protects that conduct, the Act's changes to Massachusetts's restrictions on assault weapons and LCMs have already been determined by this Court to likely be "consistent with the Nation's historical tradition of firearm regulation" and Plaintiffs-Appellants did not plead any facts that would change that analysis. *See Capen*, 134 F.4th at 675-76; *Ocean State Tactical*, 95 F.4th at 46, 52.

### A. The Second Amendment Framework

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

"Like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 26). Since the Founding, American law has regulated arms-bearing conduct in many ways, including bans on "dangerous and unusual weapons." *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Heller*, 554 U.S. at 627).

The Supreme Court in *Bruen* and *Rahimi* prescribed a two-step analysis to evaluate whether a firearm restriction is consistent with the Second Amendment. Under that approach, a plaintiff must first demonstrate that "the Second Amendment's plain text covers" the conduct at issue. *See Bruen*, 597 U.S. at 17, 24; *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("ordinary default rule" is that "plaintiffs bear the risk of failing to prove their claims"). If it does, the

government must show that the "challenged restriction is consistent with the Nation's historical tradition of firearm regulation." *Capen*, 134 F.4th at 665 (citing *Bruen*, 597 U.S. at 24). *Bruen* and *Rahimi* direct courts to examine whether the modern regulation is "relevantly similar" to historical regulations. *Rahimi*, 602 U.S. at 692; *Bruen*, 597 U.S. at 28-29. There are at least "two metrics" by which regulations are compared: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Bruen*, 597 U.S. at 29.

This analogical reasoning does not demand a "historical twin" or a "dead ringer" to modern regulations. *Rahimi*, 602 U.S. at 692. Indeed, *Rahimi* cautioned that "some courts have misunderstood the methodology" laid out in *Bruen* by insisting on "a law trapped in amber." *Id.* at 691. Properly understood, the Second Amendment "permits more than just those regulations identical to ones" in our nation's early history. *Id.* To require that a modern law perfectly match a historic law erroneously "assumes that founding-era legislatures maximally exercised their power to regulate." *Id.* at 739-40 (Barrett, J., concurring). The Constitution does not impose such a "'use it or lose it' view of legislative authority." *Id.*

Here, the first amended complaint failed on both parts of the *Bruen* analysis.

**B.** **The Second Amendment's Plain Text Does Not Cover Plaintiffs-Appellants' Economic Interest in Selling Particular Firearms.**

To start, the first amended complaint alleges injury based only on Plaintiffs-Appellants' claimed right to sell assault weapons and LCMs, not their individual rights to possess them. *See* FAC ¶¶ 4, 6, 34-46 (ADD.016-17, 20-21). But the Second Amendment's "plain text" does not cover Plaintiffs-Appellants' economic interest in selling firearms, including assault weapons and LCMs.[6]

While the Second Amendment protects "ancillary rights necessary to the realization of the core right to possess a firearm for self-defense," it "does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677, 682-83 (9th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 597 U.S. 1.[7] *Accord United States v. Chafin*, 423 Fed. App'x 342, 344 (4th Cir. 2011) (identifying no authority suggesting "that, at the time of its ratification, the Second Amendment was understood to protect an individual's

---

[6] The district court noted this "plain text" argument in a footnote, ADD.007 n.3, and it is an alternate ground for this Court to affirm the decision on the Second Amendment claim at the first step of the *Bruen* analysis. *See Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 222 (1st Cir. 2022) (on de novo review, court may "affirm on any ground appearing in the record") (citation omitted).

[7] Although *Teixeira* is a pre-*Bruen* case, the Ninth Circuit recently affirmed that because this holding in *Teixeira* "was based on the type of text-and-history analysis mandated by the Supreme Court in *Heller*, and *Bruen*, it remains good law." *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 n.18 (9th Cir. 2024) (citation omitted).

right to *sell* a firearm"). Further, as the Supreme Court explained in *Heller*, the Second Amendment guarantees an "*individual* right to possess and carry weapons in case of confrontation." 554 U.S. at 592 (emphasis added); *see also id.* at 635 (the Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). The right of citizens "to acquire firearms legally is not coextensive with the right of a particular proprietor to sell them." *Teixeira*, 873 F.3d at 682.

Indeed, nowhere does *Heller*, *Bruen*, or *Rahimi* suggest that the Second Amendment guarantees retailers a right to *sell* weapons, wholly divorced from the interest of their customers in obtaining them. *See B & L Prods.*, 104 F.4th at 118 n.18. There is likewise no historical basis upon which to suggest that the Second Amendment protects an individual right to "engage in firearms commerce" "or *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms." *See Teixeira*, 873 F.3d at 683-88 (emphasis in original) (conducting exhaustive textual and historical analysis of the Second Amendment to evaluate whether it encompassed plaintiffs' right to sell firearms). Thus, Plaintiffs-Appellants' first amended complaint fails at the first step of the *Bruen* framework because the Second Amendment's plain text does not cover Plaintiffs-Appellants' economic interest in selling firearms.

## C. Plaintiffs-Appellants Concede the Second Amendment Claim is Foreclosed by First Circuit Precedent.

On appeal, Plaintiffs-Appellants do not "fault[]" the district court for dismissing the Second Amendment claim in light of *Capen* and concede that "this Circuit's current decision in *Capen* probably forecloses relief," although they argue that "*Capen* ought to be revisited because it is unconstitutional." Pls. Br. at 14, 20. Because Plaintiffs-Appellants have thereby waived any argument that *Capen* is *not* dispositive, the Court can affirm on that basis alone. And as to Plaintiffs-Appellants' suggestion that *Capen* should be revisited, a panel of this Court is not authorized to overturn an earlier panel decision absent certain exceptions not present here, such as intervening Supreme Court authority. *See United States v. Rodríguez*, 527 F.3d 221, 224 (1st Cir. 2008) ("[N]ewly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point.")

Even if Plaintiffs-Appellants had not waived this argument, the Second Amendment claim nonetheless fails under existing First Circuit precedent. Here, Plaintiffs-Appellants' challenge to the Act is facial because they claim that the Act's restrictions on assault-style rifles and LCMs are unconstitutional in their entirety— *i.e.*, as applied to any firearm or magazine the restrictions cover, and as applied to any firearms dealer or individual—and seek a declaration to that effect. FAC at 1 (ADD.015) (alleging Act "is unconstitutional with respect to 'assault type weapons' and their magazines or ammunition feeders being banned throughout the

Commonwealth"); *see also id.* at 12, Prayers for Relief (ADD.026) (seeking declaration that challenged provisions of the Act are unconstitutional and seeking injunction restraining Defendants-Appellants from enforcing the Act against any dealer). Plaintiffs-Appellants' facial challenge to the Act's restrictions must fail because the first amended complaint does not plausibly allege "that no set of circumstances exists under which those restrictions would be valid." *Capen*, 134 F.4th at 669 (quoting *Rahimi*, 602 U.S. at 693). As this Court in *Capen* noted, if the Act's restrictions "validly restrict[] at least one type of weapon," a facial challenge must fail. *Id.*

Because Plaintiffs-Appellants did not allege any facts in their first amended complaint that would distinguish their facial Second Amendment challenge to the Act—which, as amended, continues to restrict LCMs and Colt AR-15s—from the facts put before this Court in *Ocean State Tactical* or *Capen*, respectively, Plaintiffs-Appellants did not state a claim for a facial Second Amendment violation.

As *Capen* recently reaffirmed, this Court's prior *Ocean State Tactical* decision "controls the outcome" of Plaintiffs-Appellants' claim with respect to the Act's restrictions on LCMs. *See Capen*, 134 F.4th at 676-77 (concluding *Ocean State Tactical* controlled and foreclosed plaintiffs' Second Amendment claim with respect to Massachusetts's restrictions on LCMs, prior to 2024 amendment). In *Ocean State Tactical*, this Court had affirmed the denial of a motion to preliminarily

enjoin Rhode Island's LCM restrictions, which are materially identical to the relevant provisions of the Act. *See Capen*, 134 F.4th at 676 (noting Rhode Island's restrictions on LCMs and those in the pre-2024 version of the Act were "almost identically worded"); *compare* 2024 Mass. St. ch. 135, § 21 (maintaining restriction on LCMs that can accept more than ten rounds of ammunition). Applying *Bruen*,[8] this Court concluded that Rhode Island's restrictions on LCMs were consistent with our Nation's history and tradition of firearm regulation because they were relevantly similar to historic regulations, including Founding-era gunpowder restrictions, as well as "bans on sawed-off shotguns, which the Supreme Court has deemed unprotected by the Second Amendment, restrictions on machine guns, most of which have been effectively banned nationally since 1986, and even the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent." *Ocean State Tactical*, 95 F.4th at 46, 52 (citations omitted).

Plaintiffs-Appellants identify no meaningful distinction between Massachusetts's restrictions on LCMs as they existed before the 2024 amendment and their current version, and thus the Court's reasoning in *Ocean State Tactical* still controls. As this Court reasoned with respect to "how" the restriction burdens

---

[8] This Court assumed, without deciding, that LCMs are "arms" covered by the Second Amendment's plain text. *Ocean State Tactical*, 95 F.4th at 43.

protected conduct, the Act's restrictions on LCMs impose "no meaningful burden" on the right of self-defense, because civilian self-defense "rarely—if ever—calls for the rapid and uninterrupted discharge of many shots, much less more than ten." *See Ocean State Tactical*, 95 F.4th at 45; *Capen*, 134 F.4th at 676 (affirming district court's conclusion that the LCM restrictions "pose a minimal burden on the right to self-defense" in light of *Ocean State Tactical*). Further, with respect to "why" the restriction burdens protected conduct, Massachusetts passed the Act for the same reasons as Rhode Island: to respond to "growing threats to public safety," specifically, "mass shootings." *Ocean State Tactical*, 95 F.4th at 44, 49-50. Accordingly, LCMs likely are "well within the realm of devices that have historically been prohibited once their danger became manifest," and thus Massachusetts's restrictions are consistent with the principles underpinning our Nation's tradition of firearms regulation. *See id.*

Just as *Ocean State Tactical* forecloses Plaintiffs-Appellants' claim with respect to LCMs, this Court's recent *Capen* decision forecloses Plaintiffs-Appellants' claim with respect to assault weapons, as Plaintiffs-Appellants concede. Pls. Br. at 14, 20. *Capen* concluded that Massachusetts's assault weapon ban likely is facially "consistent with the Nation's historical tradition of firearm regulation." *Capen*, 134 F.4th at 675-76 (citing *Bruen*, 597 U.S. at 24; *Rahimi*, 602 U.S. at 691-92). This Court concluded that the Act responded to the "unprecedented societal

concern[]" of mass shootings, making a "nuanced" consideration of historical analogues appropriate. *Id.* at 668. Under that approach, the Court concluded Massachusetts's restrictions on the AR-15 in particular satisfy *Bruen*'s second step, dooming a facial challenge to the Act's restrictions on assault-style weapons. *Id.* at 669-74.

Like Massachusetts's preexisting restrictions, the Act's current restrictions on assault weapons impose a similar burden on the right of armed self-defense, and are similarly justified, as other historical regulations that restricted access to "dangerous and unusual" weapons. *See id.* at 673 (citation omitted). With respect to the "how" metric, the Act does not impose a heavy burden on the right of self-defense, because assault weapons are neither suitable for nor actually used for self-defense. *See, e.g.*, *id.* at 669-70 (noting plaintiffs' failure to demonstrate actual use of AR-15, or any other banned weapon, in self-defense, as well as limited self-defense utility of such weapons). With respect to the "why" metric, the Act is similarly justified to historical analogues, because both the Act and historical regulations are measures "to protect the public from danger caused by weapons that create a particular public safety threat." *See id.* at 672-73 (citation and internal quotations omitted); *Ocean State Tactical*, 95 F.4th at 46-48 (discussing restrictions on certain weapons "once their popularity in the hands of murderers became apparent").

Here, Plaintiffs-Appellants fail to identify how their facial challenge does not fit squarely within *Capen*'s conclusion that the assault weapons ban is facially consistent with the Nation's historical tradition of firearm regulation. Nor do they identify any salient difference between the assault weapons restrictions as they existed before the Act and their current version. Although *Capen* was decided at the preliminary injunction stage and so involved only a "preliminar[y] demonstrat[ion]" of the Commonwealth's case, *Capen*, 134 F.4th at 674, there is nothing in Plaintiffs' first amended complaint that would change the analysis here—no additional facts have been alleged that would, even if ultimately proved, alter the Court's conclusions in *Capen*.

Moreover, the *Ocean State Tactical* and *Capen* decisions are consistent with those of other circuit courts across the country that, applying *Bruen*, either have upheld the constitutionality of restrictions on assault weapons, LCMs, or both, or have denied preliminary injunctive relief based on the likely constitutionality of those restrictions. *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 246 (2d Cir. 2025), *cert. pending sub nom. Grant v. Higgins* (No. 25-566) (affirming denial of preliminary injunction as to Connecticut's restrictions on assault weapons and LCMs as consistent with "permissible historical arms regulations that singled out the unusually dangerous weapons of their day"); *Duncan v. Bonta*, 133 F.4th 852, 881-82 (9th Cir. 2025) (en banc), *cert. pending* (No. 25-198) (directing

summary judgment to uphold California's LCM restrictions as consistent with "the national historical tradition of regulating a particular, especially dangerous use of a weapon, once that use becomes a specific threat to innocent persons"); *Bianchi v. Brown*, 111 F.4th 438, 462 (4th Cir. 2024) (en banc), *cert. denied sub nom. Snope v. Brown*, 145 S.Ct. 1534 (2025) (upholding dismissal of challenge to Maryland's assault weapons restrictions); *Hanson v. District of Columbia*, 120 F.4th 223, 242-43 (D.C. Cir. 2024), *cert. denied* 145 S.Ct. 2778 (affirming denial of preliminary injunction as to D.C.'s LCM restriction); *Bevis v. Naperville*, 85 F.4th 1175, 1198-1202 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S.Ct. 2491 (2024) (denying preliminary injunction as to Illinois's assault weapons and LCM restrictions).

Plaintiffs-Appellants argue all of these cases, including *Ocean State Tactical* and *Capen*, were wrongly decided because they do not take into account that "[t]he Second Amendment specifically protects the constituency to possess the equivalent arms that the regular military soldier possesses." Pls. Br. at 15. However, Plaintiffs-Appellants' legal arguments on this point run head-first into contrary statements by the Supreme Court in *Heller*. There, the Supreme Court observed that classes of "weapons that are most useful in military service—M-16 rifles and the like—may be banned," even while entire classes of weapons commonly used in self-defense, like handguns, may not. *Heller*, 554 U.S. at 627. The Supreme Court acknowledged

that while "[it] may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large," and that perhaps "no amount of small arms could be useful against modern-day bombers and tanks," that fact "cannot change our interpretation of the [Second Amendment] right" as an individual right to carry arms in common use for self-defense. *Id*. at 627-28.

Plaintiffs-Appellants do not situate their contrary analysis within the framework of *Heller, Bruen* or *Rahimi*, nor do they distinguish *Capen* or other cases which have concluded that these restrictions are consistent with our Nation's tradition of firearm regulation. Thus, the Court should conclude, consistent with its prior decisions in *Capen* and *Ocean State Tactical*, and those of other federal courts, that the Act's modifications to Massachusetts' preexisting restrictions are consistent with the principles underpinning our Nation's regulatory tradition. *See Capen* 134 F.4th at 675; *Ocean State Tactical*, 95 F.4th at 46, 52.

Accordingly, Plaintiffs-Appellants have failed to state a claim under the Second Amendment, and this Court should affirm the dismissal of that claim.

## II. Plaintiffs-Appellants' Dormant Commerce Clause Claim Was Correctly Dismissed Because the Act Neither Discriminates Against Out-of-State Business Nor Unduly Burdens Interstate Commerce.

Plaintiffs-Appellants did not state a claim under the dormant Commerce Clause. The Commerce Clause empowers Congress to "regulate Commerce . . .

among the several [s]tates." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has also read "a further, negative command" into the Commerce Clause. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). Under the "dormant" Commerce Clause, states may not pass laws that either "discriminate[] against or unduly burden[] interstate commerce." *Am. Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.,* 123 F.4th 27, 35 (1st Cir. 2024) (quoting *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 287 (1997)). This prohibition is meant to prevent states from "erect[ing] barriers against interstate commerce to protect local industries[.]" *Id.*

First, Plaintiffs-Appellants did not plausibly allege that Massachusetts's restrictions on assault weapons or LCMs discriminate against interstate commerce for the benefit of in-state commerce in violation of the dormant Commerce Clause. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) ("dormant" Commerce Clause prohibits state laws "driven by economic protectionism") (cleaned up). By its terms, the Act's restrictions apply to all covered weapons, regardless of where they are manufactured, and do not "impos[e] disproportionate burdens on out-of-state interests and confer[] advantages upon in-state interests." *See Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 10 (1st Cir. 2010).

Indeed, Plaintiffs-Appellants concede in their brief that "[t]his case has nothing to do with discriminating against out-of-state manufacturers in favor of in-state ones[.]" Pls. Br. at 21. Plaintiffs-Appellants nonetheless argue the Act is

discriminatory by "favor[ing] one set of manufacturers over another," namely, "assault-style firearms manufacturers are barred from doing business in Massachusetts but other firearms manufacturers are not so restricted." *Id.* To start, Plaintiffs-Appellants are not firearms manufacturers, so it is not clear how they would even have standing to challenge the Act on the basis of its effect on such out-of-state manufacturers.

But, in any case, Plaintiffs-Appellants misunderstand the type of "discrimination" that offends the dormant Commerce Clause. *E.g.*, Pls. Br. at 23-24 (arguing Act discriminates "against the banned firearms"). Discrimination against interstate commerce involves "imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests," not distinguishing between different subsets of products that may be sold in a state marketplace. *Triumph Foods, LLC v. Campbell*, 156 F.4th 29, 43 (1st Cir. 2025) (upholding state law that prohibited sale of certain pork products derived from cruel farming practices, but not other pork products). Under the dormant Commerce Clause, a state may "flatly outlaw[] a particular practice" so long as "[b]oth Massachusetts and out-of-state producers must abide by the same regulations" and the law does "not favor local groups over similarly situated out-of-Commonwealth . . . producers." *Id.* at 48. No allegation of discrimination against out-of-state firearms manufacturers for the

benefit of in-state firearms manufacturers has been made here, dooming the discrimination-based portion of the dormant Commerce Clause claim.

Nor do Plaintiffs-Appellants plausibly allege that "the law's burdens" on interstate commerce are "clearly excessive in relation to the putative local benefits" under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). This test sets out a "heavy burden," and "the Supreme Court has not invalidated a law under *Pike* in more than 30 years." *Triumph Foods*, 156 F.4th at 48. Here, Plaintiffs-Appellants allege only that the Act affects Recchia's personal "business, income, and property," as well as his personal "business with other entities and persons in other states and nations." FAC ¶¶ 48-58 (ADD.023-24).

This is not the type of burden that states a viable claim within the *Pike* line of cases. As the district court noted, Plaintiffs-Appellants have cited "no authority for the proposition that any specific quantum of economic loss born by a subset of retailers is sufficient to demonstrate a substantial burden on the broad stream of interstate commerce." ADD.010. Instead, a majority of the Supreme Court explained in *National Pork* that most cases in the *Pike* line "turned in whole or in part on the discriminatory character of the challenged state regulations" and those that did not typically involved "state regulations on instrumentalities of interstate transportation—trucks, trains, and the like." *Nat'l Pork*, 598 U.S. at 377, 379 n.2. Again, there is no discrimination against out-of-state business here, as Plaintiffs-

Appellants concede, nor is there any regulation on "trucks, trains, or the like." *See id.* Moreover, the Act's local benefits are substantial, and include protecting Massachusetts's citizens from the "growing and real threat" of mass shootings. *See Ocean State Tactical*, 95 F.4th at 46-47 (describing public-safety purpose of restrictions on LCMs); *Capen*, 134 F.4th at 673 (same for assault weapons).

Plaintiffs-Appellants provide two further arguments under the dormant Commerce Clause, both red herrings. First, Plaintiffs-Appellants appear to argue that Massachusetts may not restrict the sale of the restricted firearms and accessories solely on the basis that those products travel in interstate commerce. Pls. Br. at 20 (arguing "only Congress can regulate" "firearms that travel through interstate and foreign commerce"). That is incorrect. If that were true, no state could restrict the sale of virtually any product without running afoul of the dormant Commerce Clause. But it has been long established that "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976). More recently, *National Pork* made clear that a state *may* restrict the sale of certain products that travel through interstate commerce and may even "'exclude from its territory or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens." *Nat'l Pork*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).

Second, Plaintiffs-Appellants also allege a constitutional violation under the Supremacy Clause on the basis that Congress previously prohibited assault weapons and LCMs at the federal level, but no longer does. Pls. Br. at 24 ("The Commonwealth cannot constitutionally disallow what Congress allowed without violating the Supremacy Clause.") While it is true factually that Congress enacted a nationwide assault weapons and LCM ban that it then allowed to expire, that does not create a dormant Commerce Clause violation. As the district court recognized, Plaintiffs-Appellants' Supremacy Clause argument is incompatible with their dormant Commerce Clause claim because "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." ADD.011 n.6 (quoting *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 524 (2019) (citations omitted)). Indeed, Congress's current silence on this issue leaves for the States to decide the laws within their jurisdiction, consistent with the bounds of the Second Amendment as described above. *See Nat'l Pork*, 598 U.S. at 368 (upholding state sales restriction where Congress had not exercised its "power to regulate the interstate trade" of that product).

Plaintiffs-Appellants have failed to state any violation of the dormant Commerce Clause, and this Court should affirm the dismissal of that claim.

**III. Plaintiffs-Appellants' "Right to Earn a Living" Claim Was Correctly Dismissed Whether Stated Under Equal Protection or Privileges and Immunities**

Plaintiffs-Appellants' third claim was stated in the complaint as an Equal Protection claim and dismissed as such by the district court. FAC ¶¶ 63-75 (ADD.024-26). The claim is now restyled on appeal as a "right to earn a living" that appears to rely on both the Equal Protection Clause and the Privileges or Immunities Clause of the Fourteenth Amendment. Pls. Br. at 26-31. The claim fails under any formulation. Under First Circuit case law, "[t]he right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes," *Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005), *abrogated in part on other grounds by Bond v. United States*, 564 U.S. 211 (2011), and is also not guaranteed by either version of the Privileges and Immunities Clause, *see Gattineri v. Town of Lynnfield*, 58 F.4th 512, 516 (1st Cir. 2023).

Starting with the Equal Protection claim, "[t]o the extent that the Equal Protection challenge is based on the Second Amendment's fundamental right to bear arms and the disparate treatment of groups in exercising that right, . . . that challenge is subsumed in the Second Amendment inquiry above." *Pena v. Lindley,* 898 F.3d 969, 986 (9th Cir. 2018). Second, even applying an equal protection framework, the claim should be dismissed. The Equal Protection Clause guarantees that no State shall "deny to any person *within its jurisdiction* the equal protection of the laws."

U.S. Const. amend. XIV, § 1 (emphasis added). Plaintiffs-Appellants argue the Act violates equal protection because individuals and entities *in other states* can sell the banned weapons under the laws of those states, but Plaintiffs-Appellants cannot sell them in Massachusetts. Pls. Br. at 26-27; 30-31. But to establish an equal protection claim, Plaintiffs-Appellants must make a threshold demonstration that Massachusetts "treat[ed] 'those who are similarly situated' differently." *Lyman v. Baker*, 954 F.3d 351, 364 (1st Cir. 2020).

Here, Plaintiffs-Appellants do not and cannot make such a claim. The Act's challenged restrictions apply equally to all individuals and retailers within Massachusetts. Massachusetts has no authority to decide the laws of other States regarding which firearms may legally be sold within those jurisdictions, nor does the Equal Protection Clause require Massachusetts to adopt the same laws as other states. The Supreme Court long ago recognized that "[t]he Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies" and "[g]reat diversities in these respects may exist in two States separated only by an imaginary line." *State of Missouri v. Lewis*, 101 U.S. 22, 31 (1879). Differences in state laws are key to our system of federalism, not grounds for an equal protection claim. *See McDonald v. City of Chicago,* 561 U.S. 742, 785 (2010) (noting Second Amendment does not eliminate the ability of States "to devise solutions to social problems that suit local needs and values").

Similarly, Plaintiffs-Appellants did not state a claim under the Privileges and Immunities Clause. "[T]here are two versions of the Clause, the first in Article IV § 2 (Privileges *and* Immunities Clause) and the second in the Fourteenth Amendment (Privileges *or* Immunities Clause), with distinct applications." *Gattineri*, 58 F.4th at 516. Here, as in *Gattineri*, Plaintiffs-Appellants purport to bring a claim under their "right to earn a living." Pls. Br. at 26-31. Although Plaintiffs-Appellants cite the Privileges or Immunities Clause of the Fourteenth Amendment in their brief, there is "no authority" that clause "provides for a fundamental right to earn a living." *Gattineri*, 58 F.4th at 516. And to the extent Plaintiffs-Appellants instead rely on Article IV's clause, that "would protect the right to pursue work in a state where that individual is a nonresident." *Id.* Here, Recchia is a Massachusetts resident challenging the application of Massachusetts law and so the Privileges and Immunities Clause of Article IV, § 2 has no application.[9] *See id.* (because all parties are Massachusetts residents, no claim under Article IV).

In any case, neither Recchia nor his business is prohibited from engaging in the business of selling firearms, as Plaintiffs-Appellants appear to suggest. Pls. Br. at 27-28. Plaintiffs-Appellants constructed Mass Armament's business around

---

[9] Mass Armament cannot bring a Privileges and Immunities Clause claim under Article IV, § 2, because that clause "is inapplicable to corporations[.]" *Triumph Foods*, 156 F.4th at 42 (quoting *W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 656 (1981)).

specific products that they allege they are no longer permitted to sell. Pl. Br. at 29. They do not allege they have lost their license to operate or otherwise are prevented from continuing to operate as a licensed gun dealer by selling inventory that is permitted under Massachusetts law. This is entirely unlike, for example, the facts of *Greene v. McElroy*, 360 U.S. 474 (1960), *see* Pls. Br. at 27, where the federal government revoked a security clearance, thereby causing the plaintiff to "lose his job" and it "seriously affected, if not destroyed, his ability to obtain employment in the aeronautics field." *Id.* at 492. Instead, Plaintiffs-Appellants—like all other licensed gun dealers in the state—are merely limited to selling firearms that are legal in Massachusetts. This is a commonplace restriction on businesses of all kinds, which must operate within the laws of the state in which they are doing business. *See Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 432 n.12 (1963) (explaining the Privileges and Immunities clause "does not create a naked right to conduct a business free of otherwise valid state regulation").

Plaintiffs-Appellants therefore have failed to state any violation of the Equal Protection Clause or Privileges or Immunities Clause of the Fourteenth Amendment or any other constitutional provision related to the "right to earn a living," and this Court should affirm the dismissal of Count III.

## <u>CONCLUSION</u>

For the reasons set forth above, the order of the District Court dismissing the

Plaintiffs-Appellants' first amended complaint should be affirmed.

Respectfully submitted,

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the
Commonwealth of Massachusetts, and
GINA K. KWON, in her official capacity as
Secretary of the Executive Office of Public
Safety and Security,

*/s/ Grace Gohlke*
Grace Gohlke, First Circuit No. 1204282
Assistant Attorneys General
Government Bureau
Office of the Attorney General of
Massachusetts
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
grace.gohlke@mass.gov

December 11, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND
## TYPE-STYLE REQUIREMENTS

I hereby certify that:

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because the brief contains 8,009 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point, Times New Roman font.

*/s/ Grace Gohlke*

December 11, 2025

## CERTIFICATE OF SERVICE

I hereby certify that this brief, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on December 11, 2025.

*/s/ Grace Gohlke*
Counsel for the Defendant-Appellee

# **ADDENDUM**

The decision under review and the statutes included within this Addendum are not subject to the 25-page limit set forth in First Circuit Local Rule 28.0(a)(2).

Memorandum and Order of the District Court
    on Motion to Dismiss,
      dated August 5, 2025 .................................................................. ADD.1

First Amended Complaint, as filed
    on June 16, 2025 (Docket No. 26)................................................ ADD.15

Mass. Gen. Laws ch. 140, § 121 ............................................................ ADD.28

Mass. Gen. Laws ch. 140, § 131M ........................................................ ADD.51

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 24-12560-RGS

GINO MARIO RECCHIA, III, individually and as owner of MASS
ARMAMENT, LLC, INC., and MASS ARMAMENT, LLC, INC.

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of
the Commonwealth of Massachusetts, and TERRENCE M. REIDY,
in his official capacity as Secretary of the Executive Office of Public Safety
and Security of the Commonwealth of Massachusetts

MEMORANDUM AND ORDER ON MOTION TO DISMISS

August 5, 2025

STEARNS, D.J.

Plaintiff Gino Mario Recchia, III filed this putative class action against
defendants Andrea Joy Campbell, in her official capacity as Attorney General
of the Commonwealth of Massachusetts, and Terrence M. Reidy, in his
official capacity as Secretary of the Executive Office of Public Safety and
Security of the Commonwealth of Massachusetts.  Recchia challenges the
provisions of the 2024 Act Modernizing Firearm Laws that ban the
importation and sale of large capacity firearms (assault-style weapons) and
large capacity feeding devices.  *See* Mass. Gen. Laws ch. 140, § 131M(a).
Defendants move to dismiss the First Amended Complaint (FAC) pursuant

to Fed. R. Civ. P. 12(b)(6).  For the following reasons, the court will allow the motion.

## BACKGROUND

On July 25, 2024, the Massachusetts Legislature enacted H-4885, "An Act Modernizing Firearm Laws," which Governor Maura Healey promptly signed into law.[1]  The Act modified or added the definitions of "assault-style firearm," "large capacity firearm," and "large capacity feeding device," among others, and banned the import and sale of large capacity firearms and accessories (with various grandfathering provisions for gun owners and collectors in lawful possession of assault weapons prior to the passage of the Act).  *See* Mass. Gen. Laws ch. 140, § 121

Plaintiff Recchia is a Massachusetts resident and sole owner of a Massachusetts gun store, Mass Armament, LLC (Mass Armament) (together, Recchia or plaintiff).  *See* FAC (Dkt. # 26) ¶¶ 14-15.  Recchia opened Mass Armament for business in 2019 and derives his livelihood from its sales.  *Id.* ¶¶ 34-35.  Mass Armament offered customers "new and used firearms of many types, including many of the items banned by the Act; that is, assault-style rifles, large capacity magazines and feeding devices," as well as

---

[1] The Act took effect on October 2, 2024, after the Governor issued an executive order inserting an emergency declaration accelerating the Act's effective date.

2

ammunition and firearm accouterments. *Id.* ¶ 37. Over half of Mass Armament's sales consisted of firearms and accessories now banned by the Act, while the bulk of its inventory was purchased from out-of-state manufactures, retailers, and private sellers. *Id.* ¶¶ 38-40.

In his initial Complaint (filed on October 4, 2024), Recchia named Governor Healey, in her official, as well as individual, capacity as the sole defendant. *See* Dkt. # 1. The original Complaint alleged violations of the dormant Commerce Clause (Count I), the Second Amendment (Count II), and the Equal Protection Clause (Count III). *See id.* ¶¶ 37-62. Following the court's April 17, 2025 hearing on the Governor's motion to dismiss the Complaint, the court, "with the explicit or tacit consent of the parties," dismissed the individual-capacity claims against Governor Healey with prejudice and dismissed the dormant Commerce Clause and Equal Protection Clause claims without prejudice. *See* Dkt. # 19. The court also granted Recchia leave to amend the Complaint. *See id.* That same day, following the hearing, the First Circuit issued its decision in *Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025), affirming another district court's denial of a preliminary injunction in a Second Amendment challenge to the prohibition of the sale and possession of assault weapons and large-capacity

magazines, as appearing in a previous version of the General Laws, ch. 140, § 131M.[2]

On June 16, 2025, Recchia filed a First Amended Complaint, substituting as defendants Attorney General Campbell in her official capacity and Secretary Reidy in his official capacity. *See* FAC at 1. The Amended Complaint sets out essentially the same claims as the initial Complaint: violations of the dormant Commerce Clause (as well as the Supremacy Clause) (Count I); the Second Amendment (Count II); and the Equal Protection Clause of the Fourteenth Amendment (Count III). Recchia seeks a declaratory judgment that the Act is unconstitutional, together with a permanent injunction enjoining defendants from enforcing the provisions of the Act and its restrictions on the importation, purchase, possession, transfer, and sale of assault-style firearms and large capacity feeding devices (as well as reasonable attorney's fees and costs). *See* FAC at 12.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009),

---

[2] The 2024 Act amended § 131M to extend the ban to the import of assault-style weapons and large capacity firearms. The balance of the statute was left unchanged.

quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Two basic principles guide the court's analysis.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.  A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  If the allegations in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," the complaint will be dismissed. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

## DISCUSSION

### Second Amendment Claim (Count II)

Recchia concedes in his opposition to the motion to dismiss that "the Second Amendment issue may be considered moot at this time because of the First Circuit's decision in *Capen*." *See* Dkt. # 30 at 2.  But he contends that he respectfully disagrees with *Capen*, explaining that when the Second Amendment was ratified, the American citizen solider was equipped with a rifle equal to that of the best contemporary army in the world (presumably the British army), and that should still be the case today. *See* Dkt. # 30 at 6.

5

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "[L]ike most rights, the right secured by the Second Amendment is not unlimited." *Capen*, 134 F.4th at 665, quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  "One such limitation is a 'historical tradition of prohibiting the carrying of dangerous and unusual weapons' that were not 'in common use' at the time the Second Amendment was drafted."  *Capen*, 134 F.4th at 665, quoting *Heller*, 554 U.S. at 627.  The Supreme Court has established a two-part test that courts are to use in assessing Second Amendment claims. "Under [this] approach, we first consider whether 'the Second Amendment's plain text covers'" the conduct at issue.  *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024), quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).  "If it does, we then consider whether" a prohibition, arguably trenching upon the Second Amendment, "is 'consistent with this Nation's historical tradition of firearm regulation' and thus permissible under the Second Amendment."  *Id.*, quoting *Bruen*, 597 U.S. at 17.

The court agrees with the parties that *Capen* forecloses the Second Amendment claim.  In *Capen*, the First Circuit held that the Massachusetts

6

ban on assault weapons and large capacity feeding devices was "consistent with this Nation's historical tradition of firearm regulation," and imposed a *de minimis* burden on the right to self-defense (because civilian self-defense "rarely – if ever – calls for the rapid and uninterrupted discharge of many shots, much less more than ten"). *Capen*, 134 F.4th at 675-676. As the First Circuit observed, the ban was enacted in response to "unprecedented societal concern" over mass shootings, and given the ban's focus on exotic modern weaponry, did not offend the Second Amendment. *Id.* at 676; *see also Ocean State Tactical*, 95 F.4th at 43-45 (upholding the Rhode Island legislature's ban on large capacity magazines). As Recchia is unable to identify any meaningful distinction between *Capen*, *Ocean State Tactical*, and the relevant 2024 portions of the Massachusetts Act, the court will dismiss Count II.[3]

**Dormant Commerce Clause Claim (Count I)**

Recchia next alleges that Massachusetts, through the importation and exportation prohibitions of the Act, has "estopped the manufacturers and

---

[3] Additionally, to the extent that Recchia grounds his Second Amendment claim on an alleged "right" to sell firearms, the Second Amendment does not confer a "freestanding right" to sell firearms that is "wholly detached from any customer's ability to acquire firearms." *United States v. Vlha*, 142 F.4th 1194, 1198 (9th Cir. 2025), quoting *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc).

local Federal firearms dealers [] from conducting business in Massachusetts," in violation of the Commerce Clause. FAC ¶ 58; *see* Dkt. # 30 at 8.

The Commerce Clause empowers Congress "[t]o regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. The Supreme Court "has also read 'a further, negative command' into the Commerce Clause." *Am. Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 35 (1st Cir. 2024), quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). Under the "dormant" Commerce Clause, states may not pass laws that "discriminate[] against or unduly burden[] interstate commerce." *Am. Trucking Ass'n, Inc.*, 123 F.4th at 35, quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997).

Dormant Commerce Clause claims are analyzed under a two-tiered approach. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 486 U.S. 573, 578-579 (1986). The first-tier test asks whether the state law at issue discriminates directly against interstate commerce or directly regulates interstate commerce. *See id.* at 579. If the state law does either, it violates the Commerce Clause and is "generally struck down . . . without

8

further inquiry." *Id.*[4]  Under the second tier, which has come to be known as the *Pike* balancing test, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), when "a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the Court] examine[s] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers Corp.*, 486 U.S. at 579.

Here, Recchia's revised dormant Commerce Clause claim is substantially identical to his assay in the original Complaint (which the court previously dismissed).  *See* Dkt. # 19.  Looking to the first-tier approach, Recchia's Amended Complaint is devoid of any allegation that the Legislature enacted the Act's restrictions on the import and sale of assault-style weapons and large capacity devices with a discriminatory purpose. Recchia argues that the Act is discriminatory because it "favors manufacturers of some weapons over the manufacturers of the banned weapons, thus discriminating against the latter," and that the "Act bann[ing] some firearms and not all others amounts to discrimination against the banned weapon[s]," *see* Dkt. # 12 at 12.  However, the Act contains no

---

[4] A state discriminates against interstate commerce "when it enacts 'economic protectionism' by imposing 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Am. Trucking Ass'n, Inc.*, 123 F.4th at 35, quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

"differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *See Granholm v. Heald*, 544 U.S. 460, 472 (2005). By its terms, the Act's restrictions apply to all regulated weapons, regardless of where they are manufactured.[5]

Turning to the second tier, Recchia has failed to plausibly allege that the Act imposes a significant burden on interstate commerce. *See Pike,* 397 U.S. at 142. Recchia alleges that his business, income, and property values are substantially affected by the assault weapons ban. *See* FAC ¶¶ 46, 72-74. However, he cites to no authority for the proposition that any specific quantum of economic loss born by a subset of retailers is sufficient to demonstrate a substantial burden on the broad stream of interstate commerce. What Recchia has to say as to the Act's effect on other federal firearms dealers in the Commonwealth is speculative and presumes that all firearm retailers in Massachusetts depend on the sale of assault weapons and accessories as their major source of income. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 387 (2023) (plurality opinion) (noting that alleged harm that is "nothing more than a speculative possibility" does not amount to a "substantial harm" to interstate commerce). An undue impact

---

[5] Recchia is not a firearms manufacturer and, therefore, would not appear to have standing to challenge the Act based on its impact on out-of-state manufacturers.

on the stream of interstate commerce is gauged by its effect on the public as a whole and not by the disadvantageous effects felt by a small subset of participants in its ebb and flow. *Cf. United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) (dormant Commerce Clause not offended by higher prices "likely to fall upon the very people who voted for the [challenged] la[w]"). Nor does Recchia persuasively allege that the Act's burdens on interstate commerce are "clearly excessive in relation to the putative local benefits," which include the Commonwealth's manifest interest in protecting Massachusetts citizens from the "growing and real threat" of mass shootings and gun violence. *Pike*, 397 U.S. at 142; *see* Dkt. # 29 at 18, citing *Capen*, 134 F.4th at 673. Accordingly, the court will dismiss Count I.[6]

---

[6] Under this same count, Recchia appears to invoke the Supremacy Clause to argue that Congress authorized all citizens to possess the Act's banned weapons because it did not renew the federal assault weapons ban of 1994, Title XI of P.L. 103-322 (September 13, 1994). *See* FAC ¶¶ 48-53; Dkt. # 12 at 9-14. Recchia contends that the Act's restrictions conflict with Congress's authorization and, therefore, Massachusetts is usurping Congress's power to regulate interstate commerce. *See* Dkt. # 30 at 8. Besides pointing to no authority in support of this argument, Recchia's Supremacy Clause argument is incompatible with his dormant Commerce Clause claim because "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 524 (2019) (citations omitted).

**Equal Protection Claim (Count III)**

Recchia alleges that, as a United States citizen domiciled in Massachusetts, he is being subject to inferior treatment than that received by many other citizens who reside in states where they are permitted to possess the banned firearms and "earn a living [by selling them] in a legitimate business." *See* FAC ¶ 68; Dkt. # 30 at 10. Recchia argues this amounts to a violation of the Equal Protection Clause under the Fourteenth Amendment.[7] *See* Dkt. # 30 at 12.

First, "[t]o the extent that the [e]qual [p]rotection challenge is based on the Second Amendment's fundamental right to bear arms and the disparate treatment of groups in exercising that right . . . that challenge is subsumed in the Second Amendment inquiry." *Pena v. Lindley*, 898 F.3d, 969, 986 (9th Cir. 2018); *see Teixeira v. Cnty. of Alameda*, 822 F.3d 1047, 1052 (9th Cir. 2016) (affirming dismissal of an equal protection challenge based on infringement of the right to bear arms because "the equal protection

---

[7] Recchia asserts claims under both the Fifth and Fourteenth Amendments' equal protection guarantees. *See* FAC ¶¶ 64, 70. Fifth Amendment equal protection claims are evaluated under the same standards as equal protection claims under the Fourteenth Amendment. *See Perrier-Bilbo v. United States*, 954 F.3d 413, 432 n.14 (1st Cir. 2020). However, the Fifth Amendment Due Process Clause applies "only to actions of the federal government – not to those of state or local governments." *Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 8 (1st Cir. 2007). The court, accordingly, will end any discussion of the Fifth Amendment claim here.

challenge [was] 'no more than a [Second] Amendment claim dressed in equal protection clothing,'" quoting *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001)), on *reh'g en banc*, 873 F.3d 670, 676 n.7 (9th Cir. 2017) (affirming dismissal of the equal protection claim "for the reasons given in the panel opinion"); *cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (citation and internal quotation marks omitted).

Second, even if the court were to entertain the equal protection claim, equal protection means that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Plaintiffs claiming an equal protection violation must first identify and relate *specific instances* where persons *situated similarly in all relevant respects* were treated differently." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis in original) (citation and internal quotation marks omitted); *see also McCoy v. Town of Pittsfield*, 59 F.4th 497, 508 (1st Cir.

2023) (explaining that an equal protection claim sounding in a fundamental rights theory typically requires an appropriate comparator).  Here, Recchia does not allege the existence of an individual who was "similarly situated [to him] in all relevant respects" within the state's jurisdiction but was treated more favorably.  Nor does the Act prevent Recchia from engaging in his profession as a gun dealer.[8]  Thus, the court will dismiss Count III.

## ORDER

For the foregoing reasons, the FAC is dismissed with prejudice.  The Clerk will enter judgment for Campbell and Reidy and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[8] In his opposition to the motion to dismiss, Recchia also alleges that "one of the privileges and immunities" of citizenship that he has been deprived of is the right to possess and carry the banned firearms and, moreover, that he is entitled to a privileged right to earn a "living in a legitimate business" related to selling the banned firearms. *See* Dkt. # 30 at 11-13.  Article IV, § 2, cl. 1 of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1.  The Clause entitles residents of one state to enjoy the same rights as citizens of other states.  *See Selevan v. New York Thruway Auth.*, 584 F.3d 82, 102 (2d Cir. 2009).  Recchia misconstrues this Clause, which protects individual, "out-of-state residents from the discriminatory laws of other states and their municipalities." *Connecticut Citizens Def. League, Inc. v. Thody*, 664 F. Supp. 3d 235, 251 (D. Conn. 2023), *aff'd,* 2024 WL 177707 (2d Cir. Jan. 17, 2024).  That is not the case here, as Recchia resides solely in Massachusetts.

14

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **GINO MARIO RECCHIA, III,** individually and as owner of MASS ARMAMENT, LLC, INC., and **MASS ARMAMENT, LLC, INC.**<br><br>     Plaintiffs,<br><br>v.<br><br>**ANDREA JOY CAMPBELL,** in her official capacity as Attorney General of the Commonwealth of Massachusetts; and<br><br>**TERRENCE M. REIDY,** in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,<br><br>    Defendants.[1] | Civil No.: 1:24-cv-12560-RGS |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

On July 25, 2024, the Legislature of the Commonwealth of Massachusetts drafted H-4885 and the Governor of Massachusetts signed it into law (hereinafter, the "ACT" or "H-4885"). Plaintiffs submit that the ACT violates the Second Amendment to the United States Constitution and is unconstitutional with respect to "assault type weapons" and their magazines or ammunition feeders being banned throughout the Commonwealth as well as the duties now required of firearm retailers and their consumers. Plaintiffs are not making any claims relative to

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Maura Healey is hereby substituted for Attorney General Andrea Joy Campbell, and Secretary of the Executive Office of Public Safety and Security, Terrence M. Reidy.

1

other sections of H-4885. In other words, they are not challenging whether or not those other sections can stand constitutional muster since they have little or no effect on Plaintiffs at this time. Plaintiffs do however contend that sections of H-4885, enacted into law by the Commonwealth of Massachusetts' Legislature and Governor, violate Plaintiffs' rights under the Second Amendment to the United States Constitution, the Supremacy Clause, Article VI, Paragraph 2, the Fifth and Fourteenth Amendments to Equal Protection, and the Dormant Commerce Clause of the United States Constitution.

## I.    **INTRODUCTION**

1.    The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." The Second Amendment is fully applicable to the Commonwealth of Massachusetts through the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805.

2.    The Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*

3.    "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2143 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (*per curiam*), concerning stun guns). Moreover, "semiautomatic rifles," such as those proscribed under the ACT [2] "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994).

4.    Nonetheless under the ACT, the Commonwealth of Massachusetts

2

**ADD.016**

unconstitutionally bans commercial retailers from the commercial sale and transfer of a broad swath of semiautomatic rifles i.e. "assault style rifle" in common use for lawful purposes protected under the Second and Fourteenth Amendments to the United States Constitution in violation of the Supremacy Clause where the Federal Government does not.

5.      As the Supreme Court clarified in June 2022, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Ultimately, "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Id.*

6.      Here, the plain text of the Second Amendment covers the conduct that Plaintiffs were engaging in (i.e., "keep and bear arms"), just as it covers the arms they wish to keep and bear. *Id.* at 2132 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms"). Indeed, "Plaintiffs' desire to commercially purchase, import and sell to the public newer models of semiautomatic rifles in common use throughout the United States is covered by the Second Amendment and presumptively protected *Id.*

7.      *Heller* has already established that historically: bearable arms presumptively protected by the Second Amendment cannot be banned unless they are both dangerous *and* unusual. *Heller*, 554 at 627.

8.      The semiautomatic rifles that Plaintiffs are now prohibited to import and sell to Commonwealth of Massachusetts citizens are in common use for lawful purposes today throughout the country and thus cannot be dangerous *and* unusual. The nation's historical traditions, ironically beginning in the Commonwealth, 250 years ago at the Battle of Lexington and Concord, fails to support the Commonwealth's ban.

9.      Under the Supreme Court's analysis, Defendants' semiautomatic rifle Ban also violates the Second and Fourteenth Amendments to the United States Constitution. The analysis is straightforward: (a) Plaintiffs are not prohibited from exercising their right to keep and bear arms; (b) because Plaintiffs' proposed conduct is covered by the Second Amendment's plain text, the government must justify the semiautomatic rifles being banned as being consistent with this

3

Nation's tradition of firearm regulation; and (c), as *Heller* and *Bruen* establish, there is no historical basis for banning arms that are not prohibited by the Federal Government and are in common use for lawful purposes throughout the United States. Therefore, the "assault rifle ban" must be declared unconstitutional and enjoined.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

11.    This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the Commonwealth of Massachusetts, of the rights, privileges, or immunities secured by the United States Constitution.

12.    Venue lies in this Court under 28 U.S.C. § 1391, as the events giving rise to Plaintiffs' causes of action arose or exist in the District where the action is being brought.

13.    The Eastern Division of this Court is appropriate pursuant to Local Rule 40.l(d)(l)(C) because all parties residing in the District reside in the Eastern Division.

## III.  PARTIES

14.    Plaintiff Gino M. Recchia, III (hereinafter, "Plaintiff Recchia") is a Massachusetts citizen and resident.

15.    Plaintiff Recchia is the sole owner of Mass Armament LLC. He holds a valid Federal Firearms License (hereinafter, "FFL") and a Massachusetts License to Conceal Carry ("LLC")

17.    Plaintiff Mass Armament LLC (hereinafter, "Mass Armament") is a firearms commercial dealer located at 95 Mechanic Street, Unit 1 in Bellingham, Massachusetts. incorporated in 2018 within the Commonwealth of Massachusetts by Plaintiff Recchia.

18.    Defendant Andrea Joy Campbell (hereinafter, "Defendant Campbell") is sued in her official capacity as Attorney General of the Commonwealth of Massachusetts.

4

**ADD.018**

19.     Defendant Campbell is an independent constitutional officer responsible for regulating, implementing, and enforcing the Commonwealth's laws and regulations related to the sales, transfer, possession, and ownership of firearms.

20.     Defendant Campbell is therefore responsible for regulating, implementing, and enforcing the Commonwealth's laws and regulations which collectively comprise the ACT of which Plaintiffs complain herein.

21.     Defendant Campbell has enforced, is presently enforcing, and is threatening to enforce the ACT.

22.     Defendant Campbell has authority to cease such enforcement of the ACT. *See* M.G.L. c. 12 § 1 and § 3.

23.     Defendant Terrence M. Reidy (hereinafter, "Defendant Reidy") is sued in his official capacity as Secretary of the Commonwealth's Executive Office of Public Safety and Security (EOPSS), *see* https://bit.ly/3ppS94N.

24.      Defendant Reidy is an independent constitutional office within the Executive branch, *see* https://bit.ly/3NXjtR1; https://bit.ly/44tCfF7.

25.     Defendant Reidy is responsible for overseeing the Firearms Records Bureau (FRB) through his Department of Criminal Justice Information Services (DCJIS).

26.     Defendant Reidy is thus responsible for regulating and enforcing the Commonwealth's laws and regulations related to the sales, transfer, possession, and ownership of firearms which collectively comprise the ACT.

27.     Defendant Reidy has enforced, is presently enforcing, and is threatening to continue to enforce the ACT.

28.     Defendant Reidy has authority to cease such enforcement of the ACT consistent with the relief Plaintiffs seek through this action. *See* M.G.L. c. 6A § 2 and § 3.

## IV. FACTS

29.     On or about July 25, 2024, the Governor of Massachusetts signed into law H-4885 the "ACT".

30.     *Inter alia*, the ACT transformed the definition of "assault-style firearm", including many of the most popular semiautomatic rifles or their copies sold in the United States,

and others that will be named by a newly formed board and roster (Section 16); "feeding device" and "firearm", (Section 20); "large capacity feeding device" (Section 21); "large capacity firearm" (Section 22).

31.    *Inter alia*, the ACT requires retailers to act as quasi law enforcement officers by confiscating licensing documents presented by customers that appear to be "expired, suspended or revoked" and; restricts to whom and under what conditions a retailer may sell firearms. (Section 123).

32.    *Inter alia*, the ACT authorizes the forming of a "firearm control advisory board" which, among other things, will help make a list of which firearms can be sold and purchased in the Commonwealth of Massachusetts (Section 131½ *et seq.*).

33.    *Inter alia*, the ACT virtually bans the "possess[ion], own[ership], sell[ing] or otherwise transfer[ring] in the commonwealth [sic] or import into the commonwealth [sic] an assault-style firearm, or a large capacity feeding device." (Section 131M).

34.    Plaintiff, Mass Armament opened to the public in 2019.

35.    Plaintiff Recchia derives his livelihood from Mass Armament and usually employs two (2) others.

36.    Recchia receives all of his income from Mass Armament's business.

37.    Mass Armament sells new and used firearms of many types, including many of the items banned by the ACT; that is, assault-style rifles, large capacity magazines and feeding devices, along with ammunition, parts, accessories, knives, collectables, cleaning supplies, and targets.

38.    More than 50% of Mass Armament sales were derived from the sale of the firearms and accessories now banned by the ACT.

6

**ADD.020**

39.    The majority of Mass Armament purchases are from out-of-state manufacturers, retailers, private sellers and other industry members. There are some in-store and in-state purchases and sales, but the majority of items are imported from outside the state; purchases now banned by the ACT.

40.    The ACT has restricted the majority of purchases and sales Mass Armament can hereon legally conduct.

41.    Mass Armament's main business is, and has been built up, centered around firearms and large-capacity magazines banned by the ACT.

42.    It is estimated that more than 50% of Plaintiffs' business will be lost because of the ACT.

43.    It is estimated that the majority of Mass Armament's business is conducted with out-of-state sellers and buyers.

44.    It appears possible at this early enforcement of the ACT that Mass Armament may either lay off employees and/or go out of business.

45.    Mass Armament's business was built primarily by dealing in the firearms banned by the ACT.

46.    Undersigned counsel asked Plaintiffs to send counsel the company's records from the time the company came into existence until the near-present. Counsel and his staff have examined Plaintiff's *Excel Spreadsheets*/Records and Counsel has extrapolated from said *Spreadsheets* the following information:

### Sales of Weapons Now Banned by the Commonwealth

**BOOK:**

|     |         |          | Pre-Ban In: | Est. Profit: |
| --- | ------- | -------- | ----------- | ------------ |
| 1.  | 12-2-18 | 8-13-19  | 72          | $77,200      |
| 2.  | 8-8-19  | 6-2-20   | 159         | $145,200     |
| 3.  | 6-29-20 | 12-30-20 | 229         | $253,600     |
| 4.  | 12-30-20| 5-29-21  | 276         | $325,000     |

7

**ADD.021**

| 5.  | 5-29-21  | 1-31-22  | 170 | $145,700 |
| 6.  | 1-31-22  | 11-28-22 | 121 | $98,500  |
| 7.  | 11-29-22 | 7-17-23  | 134 | $91,600  |
| 8.  | 7-17-23  | 2-13-24  | 230 | $233,600 |
| 9.  | 3-13-24  | 8-13-24  | 413 | $347,700 |
| 10. | 8-13-24  | 2-21-25  | 194 | $137,600 |

**Average All Books (mean)    199              $185,570**

**After Ban Became Effective**

| 11 | 2-21-25 | 5-1-25 | 5 | $7,500 |

While the above is not completely accurate because the actual total loss per Book-year will be considerably more than $185,000.00 (because included in Book 10 are sales of less than one year), these general figures show that Plaintiffs are suffering perhaps unsustainable losses due to the ban at issue in this case. In other words, these several Books provided by Plaintiffs as the business records of Plaintiffs are Books that encompass less than a year. Plaintiff has been in business for approximately six (6) years before the Ban was signed into law. Thus, Books 1-9 summarized above cover a little less than those six (6) years. During that less than six (6) years, Plaintiffs' estimated profit on the now-banned weapons was approximately $1,718,100.00. Generously dividing that estimated profit by six years equal $286,350.00 per year. The same would apply as to the banned weapons dealt in for the six (6) year period: 1998 banned weapons sold over six (6) years, or a mean average of 333 per year. Thus, undersigned Counsel's extrapolation from Plaintiff's business records is perhaps 60% lower than it actually is.

**V. CLAIMS**

**COUNT I**
**DEPRIVATION OF CIVIL RIGHTS SUPREMACY CLAUSE, ARTICL VI,**
**PARAGRAPH 2 AND DORMANT COMMERCE CLAUSE U.S. CONST., ARTICLE. I §**
**VIII CLAUSE III 42 U.S.C. § 1983**

47.    Plaintiffs re-allege and incorporate paragraphs 1-46 as if set forth again here.

48.    In 1994 Congress enacted legislation banning many of the same firearms listed in the ACT, *see*, Title XI of P.L. 103-322 (September 13, 1994), (codified at 18 USC 921 *et seq*.), but the ACT appears to encompass even more firearms than the Federal legislation of 1994.

49.    Title XI was automatically repealed by Congress 10 years after it became enacted. *Sec. id.* Sec. 110105 (2).

50.    Federal efforts to reinstate the Title XI ban have been made since its repeal. All have failed. On April 17, 2013 the United States Senate failed to pass a bill similar to Title XI. Although the House of Representatives narrowly voted in favor of passing new firearms restrictions on July 29, 2022, the bill died in the Senate at the end of the term.

51.    There is an actual and present controversy between the parties.

51.    Under the United States Constitution, Art. I § 8, Congress has the power "to regulate Commerce with foreign Nations, and among the several States".

52.    The Defendants do not have the power under the Massachusetts Constitution, Part I, Art. IV, to override the United States Congress' Commerce Clause power, in that said Article specifically states that Defendant has the right to govern themselves except when such power is "[expressly] delegated to the United States of America in Congress assembled."

53.    The United States Congress has expressly allowed the possession, sale, etc. of most of the firearms banned by the Defendant, as noted herein, simply by repealing the former ban on such weapons that had been enacted into law in 1994.

54.    The United States Congress has by its recent actions rejected calls to ban the firearms now banned by the Defendants.

55.    Citizens of the United States have a constitutional right to possess, etc. the firearms banned by the Defendants.

**ADD.023**

56.     Plaintiffs' business in the main encompasses buying and selling the firearms banned by the Defendants through interstate commerce.

57.     Plaintiffs' business, income, and property is being substantially affected by the Defendants' ban on the firearms as mentioned *supra*.

58.     Plaintiffs' business with other entities and persons in other states and nations is being affected by the Defendants' ban on the firearms as mentioned herein, all in violation of the Commerce clauses mentioned *supra*.

### COUNT II
### DEPRIVATION OF CIVIL RIGHTS RIGHT TO KEEP AND BEAR ARMS U.S. CONST., AMENDS. II AND XIV 42 U.S.C. § 1983

59.     Plaintiffs re-allege and incorporate paragraphs 1-58 as if set forth again here.

60.     The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. Pursuant to their rights under the Second Amendment to the United States Constitution, the Plaintiffs have a right to possess the firearms banned by the Defendant.

61.     Pursuant to Art. XVII of the Massachusetts Constitution, the Plaintiffs have a "right to keep and to bear arms for the common defence [sic]". This right is at least equal to the right under the United States Constitution.

62.     Defendants' ban on the firearms as mentioned herein has denied Plaintiffs of their rights to keep and bear arms as mentioned in the two (2) preceding paragraphs.

### COUNT III
### DEPRIVATION OF CIVIL RIGHTS EQUAL PROTECTION U.S. CONST., AMENDS. XIV 42 U.S.C. § 1983

63.     Plaintiffs re-allege and incorporate paragraphs 1-62 as if set forth again here.

64.     Pursuant to Amendment V of the United States Constitution, no person can "be deprived of life, liberty, of property, without due process of law." Equal protection of the law is

**ADD.024**

encompassed under the due process clause of this Amendment, and said Amendment is applicable to the several states through the Fourteenth Amendment to the United States Constitution.

65.    Pursuant to Amendment XIV of the United States Constitution, no State may "deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

66.    Pursuant to Art. I of the Commonwealth's Declaration of Rights, all Massachusetts citizens "have certain natural, essential and unalienable rights" that include "the right of enjoying and defending their lives and liberties, that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness."

67.    It is the law of the United States that persons may possess the firearms banned by the Defendant. Plaintiffs are United States Citizens and persons who enjoy this right.

68.    Defendants are not treating Plaintiffs equally compared to the majority of the citizens of the United States in that these other citizens can enjoy their full Second Amendment rights nonetheless Plaintiffs cannot because of the ACT banning the semiautomatic rifles i.e. firearms mentioned in this civil action.

69.    The portions of H-4885 as noted herein banning certain firearms is in conflict with the laws of the United States of America in that most United States citizens can legally possess the banned firearms but Plaintiffs cannot.

70.    Plaintiffs have a constitutional right under Amendment V's liberty and property concepts to follow a chosen profession free from unreasonable governmental interference. This right is enforceable to the States under the Fourteenth Amendment to the United Staes Constitution, which itself gives citizens the right to engage in any of the common occupations of life.

71.    Plaintiffs are in a lawful occupation and are merely earning a living.

72.    Plaintiffs have dedicated several years and considerable resources in order to engage in their occupation as a firearms dealer.

73.    Plaintiffs' primary business and main income derived from dealing in many of the arms banned by the legislation involved in this action.

74.    Defendants' actions as noted herein, banning business in the sale of certain firearms is and will have a serious detrimental impact on Plaintiffs' livelihood.

75.    Defendants never gave Plaintiffs any warning that if they delved into the legal firearms business that the Defendants would later enact laws detrimental to that business.

## **PRAYER**

WHEREFORE, Plaintiffs pray for the following relief:

1.    A declaratory judgment that H-4885, the ACT, as defined is Unconstitutional to the United States Constitution;

2.    A permanent injunction restraining Defendants, their successors assignees, and their officers, agents, servants, employees, and all persons in concert or participation with them, and all who have notice of the injunction, from enforcing  H-4885, the ACT and preventing otherwise qualified individuals from importing, purchasing and possessing new semiautomatic rifles that are proscribed from sale under the ACT;

3.    Attorney's fees and costs (including incidental costs such as expert witness fees) pursuant to 42 U.S.C. § 1988 and any other applicable law; and,

4.    Such other and further legal and equitable relief as may be necessary to effectuate the Court's judgment, or as the Court otherwise deems meet, just and proper.

12

**ADD.026**

Respectfully submitted,
The Plaintiffs,
Gino Mario Recchia, III, individually and as
owner of Mass Armament, LLC, Inc.,
By their attorney,

DATED: June 16, 2025

/s/ Richard C. Chambers, Jr., Esq.
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
E-mail: Richard@chamberslawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 16, 2025.

/s/ Richard C. Chambers, Jr., Esq.
Richard C. Chambers, Jr., Esq.

ADD.027

| **Part I** | ADMINISTRATION OF THE GOVERNMENT |
| **Title XX** | PUBLIC SAFETY AND GOOD ORDER |
| **Chapter 140** | LICENSES |
| **Section 121** | FIREARMS SALES; DEFINITIONS; ANTIQUE FIREARMS; APPLICATION OF LAW; EXCEPTIONS |

---

Section 121. As used in sections 122 to 131Y, inclusive, the following words shall, unless the context clearly requires otherwise, have the following meanings:--

"Ammunition", cartridges or cartridge cases, primers (igniter), bullets or propellant powder designed for use in any firearm, rifle or shotgun. The term "ammunition" shall also mean tear gas cartridges.

*[ Definition of "Antique firearm" in first paragraph inserted following "Ammunition" by 2024, 135, Sec. 15 effective October 2, 2024.]*

"Antique firearm", any firearm or replica thereof manufactured in or prior to the year 1899 if such firearm: (i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition; or (ii) uses rimfire or conventional centerfire fixed ammunition that is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; provided, that "antique firearm" shall include any muzzle loading rifle, shotgun or pistol that is designed to use black powder, or a black powder substitute, and that

cannot use fixed ammunition, unless the firearm: (a) incorporates a firearm frame or receiver; (b) is converted into a muzzle loading firearm; or (c) is a muzzle loading firearm that can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.

*[ Definition of "Assault weapon" in first paragraph effective until October 2, 2024. Deleted by 2024, 135, Sec. 16.]*

"Assault weapon", shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(30) as appearing in such section on September 13, 1994, and shall include, but not be limited to, any of the weapons, or copies or duplicates of the weapons, of any caliber, known as: (i) Avtomat Kalashnikov (AK) (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vi) Steyr AUG; (vii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (viii) revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12; provided, however, that the term assault weapon shall not include: (i) any of the weapons, or replicas or duplicates of such weapons, specified in appendix A to 18 U.S.C. section 922 as appearing in such appendix on September 13, 1994, as such weapons were manufactured on October 1, 1993; (ii) any weapon that is operated by manual bolt, pump, lever or slide action; (iii) any weapon that has been rendered permanently inoperable or otherwise rendered permanently unable to be designated a semiautomatic assault weapon; (iv) any weapon that was manufactured prior to the year 1899; (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile

and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable assault weapon; (vi) any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition; or (vii) any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.

*[ Definition of "Assault-style firearm" in first paragraph inserted by 2024, 135, Sec. 16 effective October 2, 2024.]*

"Assault-style firearm", any firearm which is:

(a) a semiautomatic, centerfire rifle with the capacity to accept a detachable feeding device and includes at least 2 of the following features: (i) a folding or telescopic stock; (ii) a thumbhole stock or pistol grip; (iii) a forward grip or second handgrip or protruding grip that can be held by the non-trigger hand; (iv) a threaded barrel designed to accommodate a flash suppressor or muzzle break or similar feature; or (v) a shroud that encircles either all or part of the barrel designed to shield the bearer's hand from heat, excluding a slide that encloses the barrel.

(b) a semiautomatic pistol with the capacity to accept a detachable feeding device and includes at least 2 of the following features: (i) the capacity to accept a feeding device that attaches to the pistol outside of the pistol grip; (ii) a second handgrip or a protruding grip that can be held by the non-trigger hand; (iii) a threaded barrel capable of accepting a flash suppressor, forward handgrip or silencer; or (iv) a shroud that encircles either all or part of the barrel designed to shield the bearer's hand from heat, excluding a slide that encloses the barrel.

(c) a semiautomatic shotgun that includes at least 2 of the following features: (i) a folding or telescopic stock; (ii) a thumbhole stock or pistol grip; (iii) a protruding grip for the non-trigger hand; or (iv) the capacity to accept a detachable feeding device.

*[ Clause (d) of the definition of "Assault-style firearm" in first paragraph as amended by 2024, 206, Sec. 50 effective September 16, 2024.]*

(d) Any firearm listed on the assault-style firearm roster pursuant to section 1313/4.

(e) Any of the following firearms, or copies or duplicates of these firearms, of any caliber, identified as: (i) Avtomat Kalashnikov, or AK, all models; (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta AR70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vii) Steyr AUG; (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (ix) revolving cylinder shotguns including, but not limited to, the Street Sweeper and Striker 12;

(f) a copy or duplicate of any firearm meeting the standards of or enumerated in clauses (d) and (e); provided, that for the purposes of this subsection, "copy or duplicate" shall mean a firearm: (A) that was manufactured or subsequently configured with an ability to accept a detachable magazine; and (B)(i) that has internal functional components that are substantially similar in construction and configuration to those of an enumerated firearm in clauses (d) and (e); or (ii) that has a receiver that is the same as or interchangeable with the receiver of an enumerated firearm in said clauses (d) and (e); provided further, that the firearm shall not be considered a copy or duplicate of a firearm identified in clauses (d) and (e) if sold, owned and registered prior to July 20, 2016

(g) "Assault-style firearm" shall not include any: (i) firearm that is operated by manual bolt, pump, lever or slide action; (ii) firearm that has been rendered permanently inoperable or otherwise rendered permanently unable to be designated as a semiautomatic assault-style firearm; (iii) firearm that is an antique or relic, theatrical prop or other firearm that is not capable of firing a projectile and which is not intended for use as a functional firearm and cannot be readily modified through a combination of available parts into an assault-style firearm; (iv) any of the firearms, or replicas or duplicates of such firearms, specified in appendix A to 18 U.S.C. section 922 as appearing in such appendix on September 13, 1994, as such firearms were manufactured on October 1, 1993; or (v) semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable feeding device.

*[ Definitions of "Assemble", "Automatic conversion", "Automatic part" and "Bona fide collector of firearms" in first paragraph inserted by 2024, 135, Sec. 16 effective October 2, 2024.]*

"Assemble", to fit together a firearm's component parts; provided, however, that "assemble" shall not include firearm reassembly, repair or the fitting of special barrels, stocks or trigger mechanisms to firearms.

"Automatic conversion", any modification made to a firearm, including through the use of an automatic part, that allows for the automatic discharge of more than 1 shot with 1 continuous activation of the trigger or that alters or increases the rate of fire to mimic automatic fire.

"Automatic part", any device, part or combination of parts capable of being attached to a firearm that allows for the automatic discharge of more than 1 shot with 1 continuous activation of the trigger or that increases the rate of fire of a firearm to mimic automatic fire.

"Bona fide collector of firearms", a licensed collector pursuant to 18 U.S.C. section 923(b).

"Bump stock", any device for a weapon that increases the rate of fire achievable with such weapon by using energy from the recoil of the weapon to generate a reciprocating action that facilitates repeated activation of the trigger.

"Conviction", a finding or verdict of guilt or a plea of guilty, whether or not final sentence is imposed.

"Court", as used in sections 131R to 131Y, inclusive, the division of the district court department or the Boston municipal court department of the trial court having jurisdiction in the city or town in which the respondent resides.

*[ Definitions of "Covert firearm" and "Curio or relic firearms" in first paragraph inserted following the definition of "Court" by 2024, 135, Sec. 17 effective October 2, 2024.]*

"Covert firearm", a firearm placed in a camouflaging firearm container, or a firearm that is not a stun gun, that is capable of discharging a bullet or shot and is constructed in a shape that does not resemble a firearm or is not immediately recognizable as a firearm, including, but not limited to, zip guns, concealed bolt guns, folding guns and any other firearm that resemble key-chains, pens, canes, wallets, flashlights, cigarette-lighters or cigarette-packages, flare guns, pellet guns and bb gun conversion kits.

"Curio or relic firearms", firearms which are of special interest to collectors because they possess some qualities not ordinarily associated with firearms intended for sporting use or as offensive or defensive firearms.

*[ Definition of "Deceptive weapon device" in first paragraph effective until October 2, 2024. Deleted by 2024, 135, Sec. 18.]*

"Deceptive weapon device", any device that is intended to convey the presence of a rifle, shotgun or firearm that is used in the commission of a violent crime, as defined in this section, and which presents an objective threat of immediate death or serious bodily harm to a person of reasonable and average sensibility.

*[ Definition of "Deceptive firearm device" in first paragraph inserted by 2024, 135, Sec. 18 effective October 2, 2024.]*

"Deceptive firearm device", any device that is intended to convey the presence of a firearm that is used in the commission of a violent crime and that presents an objective threat of immediate death or serious bodily harm to a person of reasonable and average sensibility.

*[ Definition of "Extreme risk protection order" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Extreme risk protection order", an order by the court ordering the immediate suspension and surrender of any license to carry firearms or firearm identification card which the respondent may hold and ordering the respondent to surrender all firearms, rifles, shotguns, machine guns, weapons or ammunition which the respondent then controls, owns or possesses; provided, however, that an extreme risk protection order shall be in effect for up to 1 year from the date of issuance and may be renewed upon petition.

*[ Definition of "Extreme risk protection order" in first paragraph as amended by 2024, 135, Sec. 19 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Extreme risk protection order", an order by the court that orders: (i) the immediate suspension and surrender of any license to carry firearms or firearm identification card that the respondent may hold; (ii) the respondent to surrender all firearms or ammunition that the respondent then controls, owns or possesses; and (iii) that the respondent shall be ineligible for any new license to carry or firearm identification card for the duration of the order; provided, however, that an extreme risk protection order shall be in effect for up to 1 year from the date of issuance and may be renewed upon petition.

"Family or household member", a person who: (i) is or was married to the respondent; (ii) is or was residing with the respondent in the same household; (iii) is or was related by blood or marriage to the respondent; (iv) has or is having a child in common with the respondent, regardless of whether they have ever married or lived together; (v) is or has been in a substantive dating relationship with the respondent; or (vi) is or has been engaged to the respondent.

*[ Definition of "Feeding device" in first paragraph inserted by 2024, 135, Sec. 20 effective October 2, 2024.]*

"Feeding device", any magazine, belt, strip, drum or similar device that holds ammunition for a firearm, whether fixed or detachable from a firearm.

*[ Definition of "Firearm" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Firearm", a stun gun or a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured;

provided, however, that the term firearm shall not include any weapon that is: (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette-packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk- through metal detectors.

*[ Definition of "Firearm" in first paragraph as amended by 2024, 135, Sec. 20 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Firearm", a stun gun, pistol, revolver, rifle, shotgun, sawed-off shotgun, large capacity firearm, assault-style firearm and machine gun, loaded or unloaded, which is designed to or may readily be converted to expel a shot or bullet; the frame or receiver of any such firearm or the unfinished frame or receiver of any such firearm; provided, however, that "firearm" shall not include any antique firearm or permanently inoperable firearm.

*[ Definition of "Frame" in first paragraph added by 2024, 135, Sec. 20 effective October 2, 2024.]*

"Frame", the part of a pistol or revolver that provides housing or a structure for the component designed to hold back the hammer, striker, bolt or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component to the housing or structure. Any such part that is identified with an importer or manufacturer serial number shall be presumed, absent an official determination by the Bureau of Alcohol,

Tobacco, Firearms and Explosives in the United States Department of Justice or other reliable evidence to the contrary, to be the frame of the firearm.

*[ Definition of "Gunsmith" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Gunsmith", any person who engages in the business of repairing, altering, cleaning, polishing, engraving, blueing or performing any mechanical operation on any firearm, rifle, shotgun or machine gun.

*[ Definition of "Gunsmith" in first paragraph as amended by 2024, 135, Sec. 20 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Gunsmith", any person who engages in the business of repairing, altering, cleaning, polishing, engraving, blueing or performing any mechanical operation on any firearm.

*[ Definition of "Imitation firearm" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Imitation firearm", any weapon which is designed, manufactured or altered in such a way as to render it incapable of discharging a shot or bullet.

*[ Definition of "Imitation firearm" in first paragraph as amended by 2024, 135, Sec. 20 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Imitation firearm", any firearm which is designed, manufactured or altered in such a way as to render it incapable of discharging a shot or bullet.

*[ Definition of "Large capacity feeding device" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Large capacity feeding device", (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber ammunition.

*[ Definition of "Large capacity feeding device" in first paragraph as amended by 2024, 135, Sec. 21 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Large capacity feeding device", (i) a fixed or detachable magazine, belt, drum, feed strip or similar device that has a capacity of, or that can be readily converted to accept, more than 10 rounds of ammunition or more than 5 shotgun shells; or (ii) any part or combination of parts from which a device can be assembled if those parts are in the possession or control of the same person; provided, however, that "large capacity feeding device" shall not include: (a) any device that has been permanently altered so that it cannot accommodate more than 10 rounds of ammunition or more than 5 shotgun shells; (b) an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition; or (c) a tubular magazine that is contained in a lever-action firearm or on a pump shotgun.

*[ Definition of "Large capacity weapon" in first paragraph effective until October 2, 2024. Deleted by 2024, 135, Sec. 22.]*

 "Large capacity weapon", any firearm, rifle or shotgun: (i) that is semiautomatic with a fixed large capacity feeding device; (ii) that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device; (iii) that employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm; or (iv) that is an assault weapon. The term "large capacity weapon" shall be a secondary designation and shall apply to a weapon in addition to its primary designation as a firearm, rifle or shotgun and shall not include: (i) any weapon that was manufactured in or prior to the year 1899; (ii) any weapon that operates by manual bolt, pump, lever or slide action; (iii) any weapon that is a single-shot weapon; (iv) any weapon that has been modified so as to render it permanently inoperable or otherwise rendered permanently unable to be designated a large capacity weapon; or (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable large capacity weapon.

*[ Definition of "Large capacity firearm" in first paragraph inserted by 2024, 135, Sec. 22 effective October 2, 2024.]*

 "Large capacity firearm", any firearm that: (i) is semiautomatic with a fixed large capacity feeding device; (ii) is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device when both are in the same person's possession or under

their control in a vehicle; (iii) employs a rotating cylinder capable of accepting more than 10 rounds of ammunition or more than 5 shotgun shells; or (iv) is an assault-style firearm; provided, however, that "large capacity firearm" shall be a secondary designation and shall apply to a firearm in addition to its primary designation as a firearm, and shall not include, any firearm that: (a) operates by manual bolt, pump, lever or slide action; (b) is a single-shot firearm; (c) has been modified so as to render it permanently inoperable or otherwise rendered permanently unable to be designated a large capacity firearm; or (d) is an antique or relic, theatrical prop or other firearm that is not capable of firing a projectile and which is not intended for use as a functional firearm and cannot be readily modified through a combination of available parts into an operable large capacity firearm.

"Length of barrel" or "barrel length", that portion of a firearm, rifle, shotgun or machine gun through which a shot or bullet is driven, guided or stabilized and shall include the chamber.

*[ Definition of "Licensing authority" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Licensing authority", the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them.

*[ Definition of "Licensing authority" in first paragraph as amended by 2024, 135, Sec. 23 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Licensing authority", the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them; provided, however, that should no such chief or officer exist the colonel of the state police or their designee shall act as the licensing authority.

*[ Definition of "Machine gun" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Machine gun", a weapon of any description, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged by one continuous activation of the trigger, including a submachine gun; provided, however, that "machine gun" shall include bump stocks and trigger cranks.

*[ Definition of "Machine gun" in first paragraph as amended by 2024, 135, Sec. 24 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Machine gun", a firearm, loaded or unloaded, which may automatically discharge more than 1 shot by a continuous activation of the trigger, whether originally manufactured as such or modified by automatic conversion, including through the use of an automatic part or any firearm, loaded or unloaded, which has been modified by automatic conversion to alter or increase its rate of fire to mimic automatic fire; provided, however, that "machine gun" shall include a submachine gun.

*[ Definitions of "Manufacture", "Nonresident", and "Permanently embedded" in first paragraph inserted by 2024, 135, Sec. 24 effective October 2, 2024.]*

"Manufacture", to fabricate, make, form, produce or construct, by manual labor or by machinery, a firearm; provided, however, that "manufacture" shall not include firearm reassembly, firearm repair or the making or fitting of special barrels, stocks or trigger mechanisms to firearms.

"Nonresident", a person who is temporarily in the commonwealth but legally resides in another state or territory of the United States.

"Permanently embedded", applied in such a way that cannot be easily or readily removed without destroying the part to which it is applied.

*[ Definition of "Petition" effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Petition", a request filed with the court by a petitioner for the issuance or renewal of an extreme risk protection order.

*[ Definition of "Petition" in first paragraph as amended by 2024, 135, Sec. 25 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Petition", as used in sections 131R to 131Y, inclusive, a request filed with the court by a petitioner for the issuance or renewal of an extreme risk protection order.

*[ Definition of "Petitioner" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Petitioner", the family or household member, or the licensing authority of the municipality where the respondent resides, filing a petition.

*[ Definition of "Petitioner" in first paragraph as amended by 2024, 135, Sec. 25 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Petitioner", as used in sections 131R to 131Y, inclusive, the individual that is filing the petition and is: (i) a family or household member of the respondent; (ii) the licensing authority of the municipality wherein the respondent resides; (iii) a law enforcement agency or officer, as defined

in section 1 of chapter 6E that has interacted with the respondent in an official capacity within the preceding 30 days; (iv) a health care provider that provided health care services to the respondent within the preceding 6 months; provided, that for the purposes of this clause "health care provider" shall include a: licensed physician, licensed physician assistant, registered nurse, licensed practical nurse, certified nurse practitioner, certified clinical nurse specialist, certified psychiatric clinical nurse specialist, licensed psychiatrist, licensed psychologist, licensed mental health counselor, licensed marriage and family therapist, licensed alcohol and drug counselor, licensed independent clinical social worker or licensed certified social worker; or (v) a principal or assistant principal of an elementary school or secondary school, or an administrator of a college or university where the respondent is enrolled.

*[ Definition of "Privately made firearm" in first paragraph inserted by 2024, 135, Sec. 25 effective October 2, 2024.]*

"Privately made firearm", a firearm manufactured or assembled by an individual who is not a licensed manufacturer; provided, however, that "privately made firearm" shall not include firearms manufactured or assembled by persons licensed under section 122 in the course of their business activities.

"Purchase" and "sale" shall include exchange; the word "purchaser" shall include exchanger; and the verbs "sell" and "purchase", in their different forms and tenses, shall include the verb exchange in its appropriate form and tense.

*[ Definition of "Rapid-fire trigger activator" in first paragraph inserted by 2024, 135, Sec. 26 effective October 2, 2024.]*

"Rapid-fire trigger activator", any: (i) manual, power-driven or electronic device that is designed to increase the rate of fire of a semiautomatic firearm when attached; or (ii) other device, part or combination of parts that are designed to substantially increase the rate of fire of a semiautomatic firearm above its standard rate of fire when not equipped with such device, part or combination of parts; provided, however, that this shall not include adjusting or using a device to adjust the trigger pull weight of a firearm or adjusting or replacing a magazine spring in a firearm.

*[ Definition of "Receiver" in first paragraph inserted by 2024, 135, Sec. 26 effective October 2, 2024.]*

"Receiver", the part of a rifle or shotgun that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component to the housing or structure. Any such part that is identified with an importer or manufacturer serial number shall be presumed, absent an official determination by the Bureau of Alcohol, Tobacco, Firearms and Explosives in the United States Department of Justice or other reliable evidence to the contrary, to be the receiver of the firearm.

*[ Definition of "Respondent" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Respondent", the person identified as the respondent in a petition against whom an extreme risk protection order is sought.

*[ Definition of "Respondent" in first paragraph as amended by 2024, 135, Sec. 26 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Respondent", as used in sections 131R to 131Y, inclusive, the person identified as the respondent in a petition against whom an extreme risk protection order is sought.

*[ Definition of "Rifle" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Rifle", a weapon having a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging a shot or bullet for each pull of the trigger.

*[ Definition of "Rifle" in first paragraph as amended by 2024, 135, Sec. 27 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Rifle", a firearm having a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging a shot or bullet for each pull of the trigger.

*[ Definition of "Sawed-off shotgun" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Sawed-off shotgun", any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon as modified has one or more barrels less than 18 inches in length or as modified has an overall length of less than 26 inches.

*[ Definition of "Sawed-off shotgun" in first paragraph as amended by 2024, 135, Sec. 27 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Sawed-off shotgun", any firearm made from a shotgun, whether by alteration, modification or otherwise, if such firearm as modified has one or more barrels less than 18 inches in length or as modified has an overall

length of less than 26 inches.

*[ Definitions of "Secured in a locked container" and "Self-defense spray" in first paragraph inserted by 2024, 135, Sec. 28 effective October 2, 2024.]*

"Secured in a locked container", secured in a container that is capable of being unlocked only by means of a key, combination or similar means, including in an unoccupied motor vehicle, a locked trunk not accessible from the passenger compartment, a locked console or locked glovebox and for purposes of a common carrier in the course of the regular and ordinary transport of firearms, locked access to any area containing firearms.

"Self-defense spray", chemical mace, pepper spray or any device or instrument which contains, propels or emits a liquid, gas, powder or other substance designed to incapacitate.

"Semiautomatic", capable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and requiring a separate pull of the trigger to fire each cartridge.

*[ Definition of "Serialization" in first paragraph inserted by 2024, 135, Sec. 29 effective October 2, 2024.]*

"Serialization", the process of conspicuously engraving, casting or otherwise permanently embedding a unique serial number on a firearm frame or receiver; provided, that the serial number shall be placed in a manner not susceptible to being readily obliterated, altered or removed and shall be engraved, cast or otherwise permanently embedded to a depth of not less than .003 inches and in a print size not less than 1/16 inch; and provided further, that serialization of firearms, frames and

receivers made from non-metallic materials shall be accomplished by using a metal plate permanently embedded in the material of the frame or receiver.

*[ Definition of "Shotgun" in first paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]*

"Shotgun", a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger.

*[ Definition of "Shotgun" in first paragraph as amended by 2024, 135, Sec. 27 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

"Shotgun", a firearm having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger.

"Stun gun", a portable device or weapon, regardless of whether it passes an electrical shock by means of a dart or projectile via a wire lead, from which an electrical current, impulse, wave or beam that is designed to incapacitate temporarily, injure or kill may be directed.

"Substantive dating relationship", a relationship as determined by the court after consideration of the following factors: (i) the length of time of the relationship; (ii) the type of relationship; (iii) the frequency of interaction between the parties; and (iv) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship.

*[ Definition of "Trigger crank" effective until October 2, 2024. Deleted by 2024, 135, Sec. 30.]*

"Trigger crank", any device to be attached to a weapon that repeatedly activates the trigger of the weapon through the use of a lever or other part that is turned in a circular motion; provided, however, that "trigger crank" shall not include any weapon initially designed and manufactured to fire through the use of a crank or lever.

*[ Definitions of "Trigger modifier", "Undetectable firearm", "Unfinished frame or receiver", "Untraceable firearm" and "Valid serial number" in first paragraph inserted by 2024, 135, Sec. 30 effective October 2, 2024.]*

"Trigger modifier", any modification that repeatedly activates the trigger of a firearm, including, but not limited to, trigger cranks, binary triggers and hellfire triggers.

"Undetectable firearm", (i) a firearm that after the removal of grips, stocks and magazines, is not detectable by walk-through metal detectors calibrated and operated to detect the security exemplar as defined in 18 U.S.C. Section 922(p)(2)(C); or (ii) a major component of a firearm as defined in 18 U.S.C. Section 922(p)(2)(B) that, when inspected by detection devices commonly used at secure public buildings and transit stations, does not generate an image that accurately depicts the shape of the component.

"Unfinished frame or receiver", a forging, casting, printing, extrusion, machined body or similar item that: (i) has reached a stage in manufacture when it may readily be completed or assembled to function as a frame or receiver; or (ii) is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed

or assembled; provided, however, that "unfinished frame or receiver" shall not include a component designed and intended for use in an antique firearm.

"Untraceable firearm", a firearm that has not been serialized or a firearm whose serial or other identification number has been removed, defaced, altered, obliterated or mutilated in any manner.

"Valid serial number", an identifying number that has been: (i) placed on a firearm by a federally licensee authorized to serialize firearms or pursuant to the laws of any state or 26 U.S.C. 5842 and the regulations promulgated thereunder; or (ii) a serial number issued by the director of the Bureau of Alcohol, Tobacco, Firearms and Explosives in the United States Department of Justice or the department of criminal justice information services.

"Violent crime", shall mean any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or possession of a deadly weapon that would be punishable by imprisonment for such term if committed by an adult, that: (i) has as an element the use, attempted use or threatened use of physical force or a deadly weapon against the person of another; (ii) is burglary, extortion, arson or kidnapping; (iii) involves the use of explosives; or (iv) otherwise involves conduct that presents a serious risk of physical injury to another.

*[ Definition of "Weapon" in first paragraph effective until October 2, 2024. Deleted by 2024, 135, Sec. 31.]*

"Weapon", any rifle, shotgun or firearm.

*[ Second and third paragraphs effective until October 2, 2024. Deleted by 2024, 135, Sec. 31.]*

Where the local licensing authority has the power to issue licenses or cards under this chapter, but no such licensing authority exists, any resident or applicant may apply for such license or firearm identification card directly to the colonel of state police and said colonel shall for this purpose be the licensing authority.

The provisions of sections 122 to 129D, inclusive, and sections 131, 131A, 131B and 131E shall not apply to:

(A) any firearm, rifle or shotgun manufactured in or prior to the year 1899;

(B) any replica of any firearm, rifle or shotgun described in clause (A) if such replica: (i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition; or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; and

(C) manufacturers or wholesalers of firearms, rifles, shotguns or machine guns.

| **Part I** | ADMINISTRATION OF THE GOVERNMENT |
| **Title XX** | PUBLIC SAFETY AND GOOD ORDER |
| **Chapter 140** | LICENSES |
| **Section 131M** | ASSAULT WEAPON OR LARGE CAPACITY FEEDING DEVICE NOT LAWFULLY POSSESSED ON SEPTEMBER 13, 1994; SALE, TRANSFER OR POSSESSION; PUNISHMENT |

---

*[ Text of section effective until October 2, 2024. For text effective October 2, 2024, see below.]*

   Section 131M. No person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

   The provisions of this section shall not apply to: (i) the possession by a law enforcement officer; or (ii) the possession by an individual who is retired from service with a law enforcement agency and is not otherwise

prohibited from receiving such a weapon or feeding device from such agency upon retirement.

**Chapter 140: Section 131M. Assault weapon or large capacity feeding device not lawfully possessed on August 1, 2024; sale, transfer or possession; punishment; exceptions**

*[ Text of section as amended by 2024, 135, Sec. 71 effective October 2, 2024. For text effective until October 2, 2024, see above.]*

Section 131M. (a) No person shall possess, own, offer for sale, sell or otherwise transfer in the commonwealth or import into the commonwealth an assault-style firearm, or a large capacity feeding device.

(b) Subsection (a) shall not apply to an assault-style firearm lawfully possessed within the commonwealth on August 1, 2024, by an owner in possession of a license to carry issued under section 131 or by a holder of a license to sell under section 122; provided, that the assault-style firearm shall be registered in accordance with section 121B and serialized in accordance with section 121C.

(c) Subsection (a) shall not apply to large capacity feeding devices lawfully possessed on September 13, 1994 only if such possession is: (i) on private property owned or legally controlled by the person in possession of the large capacity feeding device; (ii) on private property that is not open to the public with the express permission of the property owner or the property owner's authorized agent; (iii) while on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair; (iv) at a licensed firing range or sports shooting competition venue; or (v) while traveling to and from these locations; provided, that the large capacity feeding device is stored unloaded and

secured in a locked container in accordance with sections 131C and 131L. A person authorized under this subsection to possess a large capacity feeding device may only transfer the device to an heir or devisee, a person residing outside the commonwealth, or a licensed dealer.

(d) Whoever violates this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than 1 year nor more than 10 years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than 5 years nor more than 15 years, or by both such fine and imprisonment.

(e) This section shall not apply to transfer or possession by: (i) a qualified law enforcement officer or a qualified retired law enforcement officer, as defined in the Law Enforcement Officers Safety Act of 2004, 18 U.S.C. sections 926B and 926C, respectively, as amended; (ii) a federal, state or local law enforcement agency; or (iii) a federally licensed manufacturer solely for sale or transfer in another state or for export.