# United States Court of Appeals
## *for the*
## First Circuit

Case No. 25-1817

GINO MARIO RECCHIA, III, individually and as owner of
Mass Armament, LLC, Inc.; MASS ARMAMENT, LLC, INC.,

*Plaintiffs-Appellants,*

v.

ANDREA JOY CAMPBELL, in the official capacity as Governor
of the Commonwealth of Massachusetts; TERRENCE M. REIDY,
in the official capacity as Secretary of the Executive Office of
Public Safety and Security of the Commonwealth of Massachusetts,

*Defendants-Appellees,*

MAURA HEALEY, in the individual capacity,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:24-CV-12560-RGS

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

RICHARD C. CHAMBERS, JR.
CHAMBERS LAW OFFICE
*Counsel for Plaintiffs-Appellants*
220 Broadway, Suite 404
Lynnfield, Massachusetts 01940
(781) 581-2031

CP COUNSEL PRESS  (800) 4-APPEAL • (388956)

# TABLE OF CONTENTS

**Table of Authorities** …………………………………………………… i

**Rebuttal Arguments**:

    1.    **Appellees' reliance on this Court's decision in *Capen v. Campbell* is misguided because *Capen* does not comport with Supreme Court precedent.** ……………………. 1

    2.    **The dormant commerce clause jurisprudence, contrary to Appellees' arguments, does not solely protect a state's self-interest only.** ……………………………………… 9

    3.    **The Equal Protection Clause, contrary to Appellees' arguments, is not limited to unequal treatment between citizens of the same state but encompasses unequal treatment compared to all U.S. citizens regardless of their residency**. ……………………………………………… 12

**Conclusion** …………………………………………………………….. 14

# TABLE OF AUTHORITIES

*Barnett v. Raoul,* No. 24-3060 (7th Cir. Pending) ……………………………….. 1

*Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) …………………………… *passim*

*District of Columbia v. Heller*, 554 U.S. 570 (2008) …………………………… 3,4,5

*H.P. Hood and Sons, Inc. v. De Mond*. 336. U.S. 525 (1949) ………………… 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ……. 2,3,5,6

*National Pork Producers Council, et al. v. Ross,* 598 U.S. 356 (2023) ……… 10

*Parker v. Brown*, 317 U.S. 341, 363 (1943) ……………………………………….. 9

*United States v. Miller*, 307 U.S. 174 (1939) …………………………………… 4

*United States v. Rahimi*, 602 U.S. ___ (2024) ………………………………… 5

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ………………………………… 2

# ARGUMENT

## I.

## THIS COURT'S DECISION IN *CAPEN V. CAMPBELL* WAS WRONGLY DECIDED AND OUGHT TO BE REVISITED AND SET ASIDE

Throughout Appellees' Opposition Brief, and in the Court Below, it was conceded by the parties and the District Court that the Court Below was bound to dismiss the Second Amendment claim brought herein because this Circuit Court had ruled in *Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) and a previous case that the ban at issue herein was constitutional. Appellants submit *Capen*, however, was wrongly decided and ought to be revisited and set aside for the below reasons. Throughout their Opposition, the Appellees have constantly relied on the *Capen* decision in urging the Court to uphold the District Court's decision. In that respect, perhaps the panel in this case ought to recommend that the Court sit *en banc* to decide this matter, especially since, as pointed out in Appellants' Opening Brief, the Supreme Court has indicated they are ready to hear the issue involved in this appeal.

Moreover, in further support of why the *Capen* decision was erroneously decided, counsel refers this Court to the pending case of *Barnett v. Raoul,* No. 24-3060 (and other numbers). *Barnett* is a continuation of the Seventh Circuit case of *Bevis v. City of Naperville*, referred to in Appellants' Opening Brief and Appellees' Opposition as one of the cases that has upheld statutes similar to the one at issue

1

here upholding assault-style rifle bans. The *Bevis* case was remanded, hearings held, and the district court then held the ban unconstitutional, and the case was appealed under the *Barnett* name. While the appeal is still pending, the Department of Justice has filed an *amicus* brief and has now taken up the position that bans on the weapons at stake in this case, or at least AR-15s, are unconstitutional.

1. **The District Court erred by relaying upon a jurisprudence explicitly abrogated by the Supreme Court.**

The District Court's decision is fatally flawed because it is rooted in a method of analysis the Supreme Court has forbidden. For years, this Circuit, like others, employed a two-step framework that subordinated the Second Amendment to a judicial interest-balancing test. *See Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019). This approach first asked if a regulated activity fell within the amendment's scope, and if so, applied a level of means-end scrutiny to weigh the law's burden against the government's interest.

The United States Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) declared this framework "one step too many." 597 U.S. at 17. The Supreme Court was unequivocal: means-end scrutiny, whether strict or intermediate, has no place in Second Amendment analysis. *Id*. at 19-20. The Second Amendment "is the very product of an interest balancing by the people," and its protections cannot be diluted by judicial assessments of a regulation's costs and benefits. *Id*. at 23, 26.

The only permissible inquiry is a historical one. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 17. The District Court, in following the reasoning of *Capen v. Campbell*, finding the ban consistent with tradition because it addressed the "unprecedented societal concern" of mass shootings (*Capen*, 134 F.4th at 676), engaged in precisely the sort of ends-justifies-the-means reasoning that *Bruen* prohibits. The gravity of a modern problem does not license the government to disregard a clear constitutional command. Consequently, the proper course for this Court is to reverse the judgment and apply the text-and-history test as mandated by the Supreme Court.

2. **Massachusetts ban on commonly-used semiautomatic rifles and magazines is presumptively unconstitutional.**

   a. **The proscribed firearms and magazines are "arms" in "common use" for lawful purposes.**

The Second Amendment protects arms that are "in common use at the time" for lawful purposes like self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). Civilian semi-automatic rifles, especially those based on the AR-15 platform, are the quintessential commonly used modern rifle. They are legally owned by tens of millions of law-abiding Americans for a variety of lawful

3

activities, chief among them the defense of citizen's homes and families. These firearms are, in the words of *Heller*, precisely the type of "bearable arms" that the Second Amendment protects. *Id*. at 582. The *Corpus Juris Secundum* correctly summarizes the current state of the law: the Second Amendment safeguards "semiautomatic weapons or assault rifles" as "arms in common use." 94 C.J.S. *Weapons* § 10.

  The Commonwealth's attempt to label these common firearms "assault weapons" is a rhetorical sleight of hand designed to obscure their constitutional status. The features targeted by the ban, including pistol grips, adjustable stocks, and barrel shrouds, are not sinister military accoutrements; they are ergonomic features that make the firearms safer, more accurate, and more adaptable for citizens of all physical statures. A pistol grip enhances a user's control, reducing the risk of accidental discharge. An adjustable stock allows a smaller-statured person to shoulder the rifle properly. These are features of safety and utility, not of unusual danger. To ban them is to ban arms that are ideally suited for defensive use. Thus, the Commonwealth's attempt to relegate these arms to "dangerous and unusual" status collapses under scrutiny. *Heller* reserved that exception for rarities like short-barreled shotguns or machine guns, not ubiquitous tools. 554 U.S. at 627 (citing *United States v. Miller*, 307 U.S. 174 (1939)). With ownership eclipsing that of many handguns, AR-15s are neither "unusual" nor disproportionately

4

"dangerous", involved in under 3% of firearm homicides, per FBI data. To deem them unprotected would invert *Heller's* command, allowing governments to ban any arm deemed "too effective" for self-defense. As *United States v. Rahimi*, 602 U.S. ___ (2024) reiterated, the Amendment's text presumes protection for arms "typically possessed by law-abiding citizens for lawful purposes." 144 S. Ct. at 1898.

Likewise, magazines capable of holding more than ten (10) rounds are standard equipment for a vast number of modern firearms, including the most popular handguns and rifles. Prohibiting them arbitrarily limits a citizen's ability to defend against multiple threats, a tragically common scenario in violent encounters. Both the rifles and the magazines are in "common use" for lawful purposes; therefore, the Massachusetts ban is presumptively unconstitutional.

    b.    **<u>This Court's ruling in *Capen v. Campbell* is irreconcilable with *Bruen* and must be disavowed.</u>**

This Court's decision in *Capen* v. *Campbell*, affirming the denial of a preliminary injunction against this very ban, is a significant departure from the Supreme Court's instructions in *Bruen*. In *Capen*, this Court held that the ban was "consistent with this Nation's historical tradition of firearm regulation" by drawing an analogy to the modern problem of mass shootings. 134 F.4th at 676. This reasoning is flawed. As Professor Andrew Willinger has noted, *Bruen* established a rigorous form of "heightened scrutiny," where modern regulations must find a

close historical parallel in both the "how" and the "why." Andrew Willinger, *History and Tradition as Heightened Scrutiny*, 60 Wake Forest L. Rev. 415, 421 (2025).

The *Capen* court's reliance on "unprecedented societal concern[s]" (*Capen*, 134 F.4th at 676) is a backdoor reintroduction of means-end balancing. The "why" of a regulation cannot be a modern exigency that was unknown to the Founders; it must be a societal problem that the Founders themselves addressed with analogous regulations. Since the historical record contains no evidence of bans on entire classes of common arms to address public violence, *Capen* rests on a faulty premise. It creates a "mass shooting" exception to the Second Amendment that has no basis in the text or history of the Constitution. Therefore, this Court must correct its course and disavow the flawed reasoning of *Capen*.

3. **The Commonwealth has failed to demonstrate that the ban is consistent with the nation's historical tradition of firearm regulation.**

The Commonwealth bears the burden of establishing a historical tradition of regulation that is "relevantly similar" to its categorical ban on common firearms. *Bruen*, 597 U.S. at 29. It cannot meet this burden. The historical landscape of the Founding Era is one that celebrated, rather than restricted, the ownership of firearms suitable for militia service and self-defense.

At the Founding, Americans possessed the most advanced arms available, repeating rifles like the Girandoni, capable of 20 or more shots without reloading,

6

and multi-barrel volley guns, without categorical prohibitions. Sir William Blackstone, whose *Commentaries on the Laws of England* profoundly influenced the Framers and was a cornerstone of legal education for the founding generation, describing the right of "having and using arms for self-preservation and defence" as one of the absolute rights of individuals. William Blackstone, *Commentaries* 139, 140. This right was not limited to antiquated weaponry but extended to arms "suitable to their condition and degree." *Id*. at 139. This English antecedent, echoed in state constitutions, envisioned an armed citizenry as a bulwark against oppression, not subject to feature-based bans.

*The Federalist Papers* further illuminate the Founders' intent. James Madison, in *Federalist* No. 46, contrasted the American people, who possessed "the advantage of being armed," with the disarmed populaces of European kingdoms. Alexander Hamilton, in *Federalist* No. 29, envisioned a militia composed of the entire citizenry, armed with their own private firearms. The notion that the government could disarm the people of the most effective infantry weapons of the day would have been antithetical to the very concept of the militia as a check on standing armies.

The historical regulations cited by the Commonwealth in defense of its ban are not analogous. Laws restricting the storage of gunpowder in urban areas were fire-safety measures, not restrictions on the right of the people to bear arms.

7

Prohibitions on "going armed to the terror of the people" regulated the *manner* of carrying firearms, not the types of weapons themselves. The Commonwealth can point to no Founding-era law that banned an entire class of commonly owned firearms based on its features. Consequently, the Massachusetts ban on commonly used firearms is a modern anomaly, not the continuation of a historical tradition.

Moreover, it should be noted that the instant attack on the statutes at issue concern only the firearms that the Act bans but which, under the Second Amendment, citizens of Massachusetts have a constitutional right to legally possess, sell or transfer pursuant to Supreme Court jurisprudence. In that respect, it is believed that this case involves more of an as-applied challenge than a facial challenge to the Act, contrary to Appellees' arguments, since the Act also encompasses other statutes which have nothing to do with bans on specific firearms.

## II.

## THE DORMANT COMMERCE CLAUSE APPLIES TO THE STATUTES AT ISSUE HEREIN

Appellants chiefly rely on their arguments in the Opening Brief and will not repeat them here. Instead, Appellants point out several flaws in the Appellees' Opposition. Of course, if the Court grants Appellants relief as to the Second Amendment issue and invalidates the ban on the so-called assault-style weapons,

then this issue, along with the Fourteenth Amendment issue that follows, is probably moot and need not to be reached.

At the outset, Appellant points out that Appellees concentrate their entire opposition on the sole argument that the *raison d'etre* of the dormant commerce clause is to prevent states from enacting laws that "protect local industries." Appellees' Brief, p. 26. *Also see, id*. 27 ("Discrimination against interstate commerce involves 'imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests'"). (The Appellees' cite to this Circuit's decision in *American Trucking*, 123 F.th 27, 35 is inapropos because this Court never held that the purpose of the dormant commerce clause was to prevent states from enacting laws to protect local commerce, but only that it *could* so prevent—meaning that is just one of the reasons for the dormant commerce clause. *See further, Parker v. Brown*, 317 U.S. 341, 363 (1943) (the principal object of the Commerce Clause was "the regulation of commerce by a single authority and without materially obstructing the free flow of commerce")) Moreover, the Appellees have also failed to point to any *evidence* that the dormant commerce clause violation can be condoned because the violation is justified by "putative local benefits". That is, that it will prevent mass murders in Massachusetts, a totally tongue-in-cheek assertion.

then this issue, along with the Fourteenth Amendment issue that follows, is probably moot and need not to be reached.

At the outset, Appellant points out that Appellees concentrate their entire opposition on the sole argument that the *raison d'etre* of the dormant commerce clause is to prevent states from enacting laws that "protect local industries." Appellees' Brief, p. 26. *Also see, id*. 27 ("Discrimination against interstate commerce involves 'imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests'"). (The Appellees' cite to this Circuit's decision in *American Trucking*, 123 F.th 27, 35 is inapropos because this Court never held that the purpose of the dormant commerce clause was to prevent states from enacting laws to protect local commerce, but only that it *could* so prevent—meaning that is just one of the reasons for the dormant commerce clause. *See further, Parker v. Brown*, 317 U.S. 341, 363 (1943) (the principal object of the Commerce Clause was "the regulation of commerce by a single authority and without materially obstructing the free flow of commerce")) Moreover, the Appellees have also failed to point to any *evidence* that the dormant commerce clause violation can be condoned because the violation is justified by "putative local benefits". That is, that it will prevent mass murders in Massachusetts, a totally tongue-in-cheek assertion.

What Appellees have not responded to is what Appellants pointed out in their Opening Brief at pages 20-26: The dormant commerce clause reaches situations where Congress has specifically chosen to regulate or not regulate certain commerce, and also where a State enacts a law the bars a manufacturer from the State's markets.

As pointed out in the instant proceedings, Congress has positively regulated firearms commerce in the United States as it relates to the particular firearms involved in this case. At one time they banned the weapons nationally, but only for ten (10) years, more than likely to see what affect the ban had. After the ten (10) year period, the ban was automatically repealed and subsequent efforts to reinstate it have summarily failed on each occasion. This unequivocally means that Congress meant to allow ownership and sales of the banned firearms. In *National Pork Producers Council, et al. v. Ross,* 598 U.S. 356, 364-368 (2023), the Supreme Court made clear that if the law does not discriminate against out-of-state interests (not mentioning discrimination in favor of in-state interests), there are no constitutional rights involved (types of pork chops a merchant may sell are not constitutionally protected) and Congress has never acted on the issue, then there is no violation. Notwithstanding, all those factors exist here. The statutes at issue in this case discriminate against out-of-state manufacturers of the mentioned firearms, the models at issue are protected under the Second Amendment, and Congress has

allowed, in a positive action then inaction, United States citizens to possess these firearms.

Additionally, the Supreme Court has specifically addressed the instant situation in *H.P. Hood and Sons, Inc. v. De Mond*. 336. U.S. 525, 539 (1949) when they said:

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs, duties or regulations exclude them.

It cannot be more straight forward. Massachusetts cannot exclude the manufacturers of the firearms at issue in this case from selling their products in the Commonwealth, absent a command from Congress banning them throughout the Nation. This action by the Commonwealth directly affects Appellants' business and their right to earn a legitimate living.

Therefore, the statutes at issue in this case are unconstitutional and violate the dormant commerce clause.

### III.

### **THERE IS A CLEAR EQUAL PROTECTION VIOLATION IN THIS CASE**

Apparently, it is the Commonwealth's position that an Equal Protection violation occurs only when a State enacts a law that discriminates against one set of citizens from another set in its particular jurisdiction and the Commonwealth is

11

not obligated to have the "same laws as other states." Appellees' Brief at page 32. Additionally, according to the Commonwealth, Massachusetts citizens have no constitutional right to earn a living. *Id*. 31.

Indubitably, this case is not in any manner about just the citizens of Massachusetts and their particular rights under state law. What comes before any law enacted by the Commonwealth is the rights of Massachusetts citizens under the Constitution and Laws of the United States. Citizens of the United States have a right to be treated equally in relation to citizens of every other state under the United States Constitution and its Laws. According to the United States Constitution, the United States Supreme Court and some other inferior courts, citizens of Massachusetts have the equal right to possess firearms, including those banned by the statutes at issue herein. As pointed out in Appellants' Opening Brief on the issue, citizens of the United States have a right to earn a living in their chosen profession. Citizens of the overwhelming majority of states are enjoying their right to earn a living selling the firearms now banned by Massachusetts. The statutes at issue, however, have revoked the Appellants' rights as United States citizens from doing the same. Appellants are forbidden from possessing said firearms without violating the law, unlike citizens of other states. The right to deal in firearms is the right to deal in *all* firearms that the Federal Government has allowed citizens to sell in their businesses. The Commonwealth cannot infringe

upon this Federal right that all citizens hold without violating those citizens' constitutional rights at issue in this case.

The Appellees' argument that Appellants can still have their firearms business, like those businesses in other states, ignores the facts in this case. Appellants have sufficiently shown that the majority of their business consists of selling the popular banned firearms. The Commonwealth does not care that banning the firearms will substantially and seriously affect Appellants' business, perhaps leading to bankruptcy as noted in the complaint. In fact, what the Commonwealth has done in this case can be compared to allowing someone to operate an ice cream shop, but ban selling vanilla, chocolate, strawberry and other flavors of ice cream. That is, the most popular flavors. In the Commonwealth's view, that is not interfering in a person's business.

The bottom line is that Massachusetts cannot pass a law that restricts the Federal rights of its citizens, rights enjoyed by United States citizens, throughout other states because the Constitution and Congress allow these specific rights. Massachusetts is attempting to segregate its state citizens from their federal rights. The Constitutionally protected rights do not have borders. They apply equally across the states and must be honored fully in Massachusetts just as they are in her sister states. In other words, if a citizen enjoys a federal right under the Constitution and Laws of the United States to earn a living selling firearms in one

state, that same right cannot be denied or restricted in this state. Consequently, Massachusetts has restricted firearms possession and sales in the Commonwealth in contradiction to the Appellants' Federal constitutional and statutory rights. Therefore, Appellants submit the statutes at issue violate Appellants' equal protection rights.

## **CONCLUSION**

The decision below ought to be set aside, the case remanded, and the Court should grant such other and further relief that it deems just, meet, proper and equitable.

Respectfully submitted,
The Appellants,
Gino Mario Recchia, III, *et al.*,
By their attorney

DATED: January 2, 2026

*/s/ Richard C. Chambers, Jr. Esq.*
Richard C. Chambers, Jr. Esq.
BBO # 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
E-mail: Richard@chamberslawoffice.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed.R.App.P. 32(g), I hereby certify that this document complies with the type-volume limitation set for in Fed.R.App.P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed.R.App.P. 32(f), this document contains 3,600 words.

I further certify that this document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

DATED: January 2, 2026            /s/ *Richard C. Chambers, Jr.*
                                                    Richard C. Chambers, Jr.

# **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

DATED: January 2, 2026

                                                */s/ Richard C. Chambers, Jr.*
                                                Richard C. Chambers, Jr.