# United States Court of Appeals
## For the First Circuit

---

No. 25-1817

GINO MARIO RECCHIA, III, individually and as owner of
Mass Armament, LLC, Inc.; MASS ARMAMENT, LLC, INC.,

Plaintiffs, Appellants,

v.

ANDREA JOY CAMPBELL, in the official capacity as Attorney
General of the Commonwealth of Massachusetts; GINA K. KWON* in
the official capacity as Secretary of the Executive Office of
Public Safety and Security of the Commonwealth of Massachusetts,

Defendants, Appellees,

and

MAURA HEALEY, in the individual capacity,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Aframe, Lynch, and Dunlap,
Circuit Judges.

---

* Pursuant to Federal Rule of Appellate Procedure
43(c)(2), Gina Kwon is substituted for the former Secretary of the
Executive Office of Public Safety and Security of the Commonwealth
of Massachusetts, Terrence M. Reidy.

Richard C. Chambers, Jr., with whom Chambers Law Office was on brief, for appellants.

Grace Gohlke, Assistant Attorney General, Government Bureau, with whom Andrea Joy Campbell, Attorney General of Massachusetts, was on brief, for appellees.

---

July 21, 2026

---

**AFRAME**, <u>**Circuit Judge**</u>.    Since 1998, Massachusetts has prohibited the sale, transfer, or possession of certain semiautomatic assault weapons. <u>See</u> Mass. Gen. Laws ch. 140, §§ 121 and 131M (1998).  In 2024, Massachusetts extended the scope of its prohibition to include "assault-style firearms."  <u>See</u> 2024 Mass. Acts ch. 135 § 71 (codified at Mass. Gen. Laws ch. 140, §§ 121 and 131M).    Following the 2024 statutory amendments, Gino Mario Recchia, III, and Mass Armament, LLC, a gun store that Recchia owns, brought an official-capacity claim against the Massachusetts Attorney General and Secretary of the Executive Office of Public Safety and Security, alleging that certain provisions of the amended law are facially unconstitutional.  The state defendants successfully moved to dismiss for failure to state a claim.  We affirm.

## I.

"An Act Modernizing Firearm Laws" ("the Act") was signed into law on July 25, 2024.  <u>See</u> 2024 Mass. Acts ch. 135.  As is relevant here, the Act requires that "[n]o person shall possess, own, offer for sale, sell or otherwise transfer in the commonwealth or import into the commonwealth an assault-style firearm . . . ." Mass. Gen. Laws ch. 140, § 131M(a).[1]  These restrictions do not

---

[1]    Due to the complexity and length of the law's definition of "assault-style firearms," <u>see</u> Mass. Gen. Laws ch. 140, § 121, we include it in full in an appendix.

apply to assault-style firearms lawfully possessed within Massachusetts as of August 1, 2024, so long as the owner-in-possession is properly licensed and the firearm is properly registered. Id. § 131M(b). A first-time violator of the Act faces a fine of between $1,000 and $10,000 and/or imprisonment of between one and ten years. Id. § 131M(d). For a second offense, the fine range increases to between $5,000 and $15,000, and the prison term increases to between five and fifteen years. Id.

Gino Mario Recchia, III, is the sole owner of Mass Armament, LLC, a Bellingham, Massachusetts, gun store that he opened in 2019. Mass Armament sells firearms and related accessories, the majority of which come from out-of-state manufacturers, retailers, private sellers, and other industry participants. In June 2025, Mass Armament and Recchia, both individually and on behalf of Mass Armament (together, "Recchia"), filed an amended complaint under 42 U.S.C. § 1983 challenging select provisions of the Act as facially unconstitutional insofar as it prohibits certain actions involving assault-style firearms and magazines.[2]

---

[2]   As best we can tell, Recchia's challenge centered on two provisions of the Act, §§ 121 and 131M(a). See Mass. Gen. Laws ch. 140, §§ 121, 131M(a). Section 121 defines, inter alia, assault-style firearms. Id. § 121. Section 131M(a) precludes persons from "possess[ing], own[ing], offer[ing] for sale, sell[ing] or otherwise transfer[ing] in the commonwealth or import into the commonwealth an assault-style firearm, or a large capacity feeding device." Id. § 131M(a).

As is pertinent here, Recchia alleged that provisions of the Act violate: (1) the Second Amendment, by infringing upon the right to keep and bear arms; (2) the dormant Commerce Clause, by discriminating against manufacturers of assault-style firearms and causing hardship for his business; and (3) the Equal Protection Clause of the Fourteenth Amendment, by discriminating against him with respect to his right to possess firearms and to earn a living as compared to residents of other States.[3]

On the state defendants' motion, the district court dismissed Recchia's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The court ruled that Recchia's Second Amendment claim was foreclosed by this Court's decision in Capen v. Campbell, 134 F.4th 660 (1st Cir. 2025), which affirmed the denial of a motion for a preliminary injunction seeking to block an earlier version of the Act as facially violative of the Second Amendment.  See id. at 662-63.  The court also rejected Recchia's dormant Commerce Clause challenge for failure to adequately allege that the Act discriminated against, or imposed a substantial burden on, interstate commerce.  Finally, the court concluded that Recchia

---

[3]     In his reply brief, Recchia asserts that "this case involves more of an as-applied challenge than a facial challenge" because he is challenging only certain provisions of the Act.  As there was no mention of an as-applied challenge in Recchia's opening brief, this argument is waived.  See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) (stating that arguments not raised in a party's opening brief are waived).

had failed to state a claim under the Equal Protection Clause of the Fourteenth Amendment. While noting that Recchia's equal protection claim appeared to be "subsumed in the Second Amendment inquiry," (quoting Pena v. Lindley, 898 F.3d, 969, 986 (9th Cir. 2018)), the court in any event held that Recchia had failed to allege that the Act treats any similarly situated person differently or prevented Recchia from practicing his profession.

This appeal followed.

## II.

We review de novo the dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Mulero-Carillo v. Román-Hernández, 790 F.3d 99, 104 (1st Cir. 2015). In so doing, "we assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff[s'] stated theory of liability." Id. (alteration in original) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003)). A plaintiff will survive a motion to dismiss a federal constitutional claim "only if [the] pleadings plausibly establish" a constitutional violation. Id. at 105. Also, we may affirm an order dismissing a complaint on any ground that is apparent from the record. See Newman v. Lehman Bros. Holdings, Inc., 901 F.3d 19, 25 (1st Cir. 2018).

- 6 -

**A.**

Recchia's principal contention is that the challenged provisions of the Act violate the right to keep and bear arms under the Second Amendment.[4]  This Court recently addressed this question in Capen, 134 F.4th 600.  As we explain, under "law of the circuit" doctrine, we are bound by this decision.  See United States v. Robertson, 162 F.4th 209, 249-50 (1st Cir. 2025) (holding that "new panels are 'bound by prior panel decisions closely on point'" (quoting United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018))).

In Capen, we affirmed the denial of a motion for a preliminary injunction seeking to prevent Massachusetts from enforcing a statutory predecessor of the Act on Second Amendment grounds.  See 134 F.4th at 662-63.  In considering the predecessor law's constitutionality under the Second Amendment, we looked to whether the law was "consistent with the Nation's historical

---

[4]    On appeal, Recchia specifically challenges the Act's restrictions on the sale and purchase of semiautomatic weapons, in particular the AR-15.  Recchia provides no developed argument as to any other aspect of the Act and we limit our discussion accordingly.  In his reply brief, Recchia passingly suggests that the Act's regulation of magazines is also unconstitutional.  See Mass. Gen. Laws ch. 140, § 131M(a) (prohibiting persons from possessing, owning, offering for sale, selling, or otherwise transferring a "large capacity feeding device," which constitutes a type of magazine).  We do not consider this unpreserved argument. See Sparkle Hill, 788 F.3d at 29; United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (stating that insufficiently developed arguments are waived).

tradition of firearm regulation." Id. at 675 (quoting N.Y. State Rifle & Pistol Ass'n. v. Bruen, 597 U.S. 1, 24 (2022)). Specifically, we considered (1) how the predecessor law's burden on the right of armed self-defense compared with the burden imposed by similar historical weapons regulations, and (2) whether the justification for the predecessor law was analogous to the justification for earlier weapon regulations.[5] See id. at 669.

As for the first consideration, we "gauge[d] how [the predecessor law] might burden the right of armed self-defense," Capen, 134 F.4th at 669 (quoting Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 45 (1st Cir. 2024)), and then compared that burden "to the burdens imposed by historical regulations," id. at 670. We concluded "that the Massachusetts [b]an's AR-15 restriction d[id] not impose a heavy burden on civilian

---

[5] There is an exception to "law of the circuit" doctrine that "arises when '[a]n existing panel decision [is] undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court.'" United States v. Holloway, 630 F.3d 252, 258 (1st Cir. 2011). No Supreme Court precedent published since Capen was decided upsets the analytical framework we applied in Capen. See United States v. Hemani, 146 S. Ct. 1677, 1685-86 (2026) (explaining that "the government . . . bears the burden of showing its regulatory efforts are 'consistent with the Nation's historical tradition of firearm regulation'" by looking to whether "a contemporary law mirrors a well-established historical analogue in purpose and operation" (quoting Bruen, 597 U.S. at 24)); Wolford v. Lopez, No. 24-1046, 609 U.S. ___, ___ S. Ct. ___, 2026 WL 1825723, at *10 (U.S. June 25, 2026) ("At this second step, the inquiry mandated by Heller and Bruen turns to an exploration of the historical understanding of the scope of the right the Constitution codified.").

self-defense." Id. at 669.  We then compared that burden to the burden arising from historical restrictions on Bowie knives, sawed-off shotguns, and machine guns, concluding that it was "'reasonably clear that our historical tradition of regulating arms used for self-defense has tolerated' burdens similar to those posed by" the law's ban on assault weapons.  Id. at 671 (quoting Ocean State Tactical, 95 F.4th at 46).

As for the second consideration, we concluded that the justification for the ban was analogous to justifications that have "underpinned a tradition of weapon regulation throughout American history." Capen, 134 F.4th at 672.  We noted that when a permanent enactment of the ban was being signed in 2004, then-Governor Mitt Romney stated that the ban was justified because assault weapons are "instruments of destruction with the sole purpose of hunting down and killing people" and that a corresponding press release stated the ban "will help keep the streets and neighborhoods of Massachusetts safe." Id. at 671.  We found that the ban "reflect[ed] a common concern regarding 'the State's responsibility to protect the public from the danger caused by weapons that create a particular public safety threat.'"  Id. at 672.  And we concluded that similar justifications were employed as a basis for prohibiting sawed-off shotguns and Bowie knives. Id. (noting that bans on sawed-off shotguns were spurred by the popularity of the gun "with the mass shooters of their day" and

- 9 -

that bans on Bowie knives were spurred by "growing societal concern about violent crime" (quoting Ocean State Tactical, 95 F.4th at 47, 48)).

Capen thus concluded that the Massachusetts ban, as it applies to assault-style weapons such as the AR-15, was "consistent with the Nation's historical tradition of firearm regulation." 134 F.4th at 675 (quoting Bruen, 597 U.S. at 24).

Here, Recchia has presented no persuasive argument for why this analysis should not control our assessment of the constitutionality of the Act's challenged provisions under the Second Amendment.  Critically, he does not provide any additional historical arguments, makes no attempt to distinguish the Act from the predecessor law analyzed in Capen, and, in fact, concedes that Capen "probably forecloses relief."  Recchia nonetheless makes several arguments for why the challenged provisions of the Act are unconstitutional; those that are preserved are foreclosed by Supreme Court or circuit precedent.

Recchia first argues that the Second Amendment guarantees an individual right to possess weapons equivalent to those carried by the modern-day soldier.  The argument runs as follows: The Second Amendment protects the right to keep and bear firearms for self-defense, which includes the right of individuals to keep and bear arms for protection against government tyranny. In Recchia's view, it necessarily follows that to resist tyranny

through the possession of arms, "the Second Amendment has to encompass arms" roughly equal to those carried by United States military soldiers. Here, the challenged provisions of the Act bar access to the AR-15, which Recchia asserts is the "civilian equivalent" of the M-16, the standard-issue rifle for the United States military. In so doing, Recchia argues that these provisions restrict the keeping and bearing of arms that are necessary to resist government tyranny and accordingly, are unconstitutional on their face.

In District of Columbia v. Heller, the Supreme Court rejected this argument. See 554 U.S. 570, 598, 627-28 (2008). There, the Court acknowledged that the Second Amendment's prefatory clause -- "A well regulated Militia, being necessary to the security of a free State . . . ," U.S. Const. amend. II -- was drafted in part as "a safeguard against tyranny." Id. at 600; see also id. at 597-98 (explaining that a "well-regulated militia" was deemed "necessary to the security of a free State" because "able-bodied men . . . trained in arms and organized . . . are better able to resist tyranny"). In so concluding, the Court also acknowledged -- like Recchia -- that the prefatory clause sits in some tension with "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Id. at 626-27. As the Court put it: "It may be objected that if weapons that are most useful in military service -- M-16 rifles and the like -- may

- 11 -

be banned, then the Second Amendment right is completely detached from the prefatory clause." Id. at 627.  It nonetheless concluded that "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." Id. at 627-28.  In so doing, Heller rejected any notion that the Second Amendment guarantees an individual right to possess weapons equivalent to those carried by the modern soldier.

Recchia separately rehashes several arguments we addressed in Capen.  He first contends that mass shootings are not a valid justification for restricting access to select firearms because there are more reasonable approaches to addressing the problem.  He also claims that the district court, "in following the reasoning of [Capen] . . . engaged in precisely the sort of ends-justifies-the-means reasoning that" the Supreme Court prohibited in Bruen.  And finally, he argues that the "proscribed firearms" fall within the ambit of the Second Amendment because they are "in common use," as evidenced by the fact that they are "legally owned by tens of millions of law-abiding Americans."

Recchia's latter two arguments were first introduced in his reply brief and are thus waived.  See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015).  As for Recchia's first argument, it was rejected in Capen, which, as a panel, we are bound to follow.  See Capen, 134 F.4th at 676 (noting

- 12 -

that "newly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point" (quoting United States v. Rodríguez, 527 F.3d 221, 224 (1st Cir. 2008))).

In sum, Recchia has presented a narrow claim for declaring the Massachusetts law facially invalid that cannot succeed given Capen.  We, of course, do not consider other potential arguments against the law that Recchia has not raised. See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 948 F.3d 457, 476 n. 18 (1st Cir. 2020) ("We do not decide an argument not presented to us.").  Accordingly, we affirm the district court's rejection of Recchia's facial challenge as a faithful application of circuit precedent.[6]

**B.**

Recchia next contends that the challenged provisions of the Act violate the dormant Commerce Clause.  The Constitution grants Congress the power to regulate interstate commerce.  U.S. Const. art. I, § 8, cl. 3.  "While the Commerce Clause's text provides only an affirmative grant of power," it has long "been

---

[6]    We note that the Supreme Court recently granted certiorari in two consolidated cases to address whether the Second and Fourteenth Amendments guarantee the right to possess AR-15 platform and similar semiautomatic rifles. See Viramontes v. Cook Cnty., No. 24-1437, 2025 WL 1553896 (7th Cir. June 2, 2025), cert. granted, ___ S. Ct. ___, No. 25-238, 2026 WL 1871322 (U.S. June 30, 2026); Nat'l Ass'n for Gun Rts. v. Lamont, 153 F.4th 213 (2d Cir. 2025), cert. granted sub nom. Grant, et al. v. Higgins, et al., ___ S. Ct. ___, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026).

- 13 -

interpreted to contain a negative aspect known as the dormant Commerce Clause." Walgreen Co. v. Rullan, 405 F.3d 50, 55 (1st Cir. 2005). This negative aspect "prohibits state laws that unduly restrict interstate commerce." Ass'n to Preserve & Protect Loc. Livelihoods v. Sidman, 147 F.4th 40, 55 (1st Cir. 2025) (quoting Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 514 (2019)). Specifically, state laws "may not discriminate against interstate commerce" or "impose undue burdens on interstate commerce." Id. at 55-56 (quoting South Dakota v. Wayfair, 585 U.S. 162, 173 (2018)). Recchia argues that the challenged provisions of the Act do both. We disagree.

We start with Recchia's discrimination argument. Recchia contends that the law discriminates by impermissibly distinguishing between manufacturers of assault-style firearms who are not permitted to sell in Massachusetts and manufacturers of other firearms who may. As Recchia puts it, "banning some firearms and not others makes out a plain case of discrimination against the banned firearms."

This is not a cognizable dormant Commerce Clause argument. "The dormant Commerce Clause exists to eradicate economic protectionism among the states." Am. Trucking Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth., 123 F.4th 27, 37 (1st Cir. 2024). That is, it bars "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Nat'l

Pork Producers Council v. Ross, 598 U.S. 356, 369 (2023) (quoting Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008)). "[T]his antidiscrimination principle lies at the 'very core' of [the] dormant Commerce Clause jurisprudence." Id. (quoting Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 581 (1997)).

Here, Recchia concedes that "this case has nothing to do with discriminating against out-of-state manufacturers in favor of in-state ones." And absent such discrimination, there is no dormant Commerce Clause violation on interstate discrimination grounds. Rather, Massachusetts is merely exercising its sovereign authority to "'exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens." Ross, 598 U.S. at 369 (quoting Guy v. Baltimore, 100 U.S. 434, 443 (1880)).[7]

Recchia separately argues that, even if the challenged provisions of the Act do not facially discriminate against interstate commerce, he has sufficiently pleaded that the challenged provisions unduly burden interstate commerce. In Pike

---

[7]   At a few points in his brief, Recchia intimates that the 2004 expiration of the 1994 federal assault weapons ban, see Pub. L. No. 103-322, §§ 110101-06, 108 Stat. 1796, 1996-2010 (1994), should be understood to preempt Massachusetts from now regulating assault-style firearms. But Recchia has cited no authority for treating the expiration of a law as affirmative preemptive legislation. In any event, the argument is undeveloped and thus waived. See Zannino, 895 F.2d at 17.

v. Bruce Church, the Supreme Court held that nondiscriminatory state laws are valid under the Commerce Clause "unless the burden [they] impose[] on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. 137, 142 (1970). When bringing a Pike claim, it is a "plaintiff['s] burden -- not the defendants' -- to show that a measure's adverse impact on interstate commerce is 'clearly excessive.'" Sidman, 147 F.4th at 65. To satisfy this burden, a plaintiff "must plead facts 'plausibly' suggesting a substantial harm to interstate commerce." Ross, 598 U.S. at 385; see also id. at 393 (Sotomayor, J., concurring) ("Alleging a substantial burden on interstate commerce is a threshold requirement that plaintiffs must satisfy before courts need even engage in Pike's balancing and tailoring analyses."); Triumph Foods, LLC v. Campbell, 156 F.4th 29, 48 (1st Cir. 2025) (explaining that plaintiffs "must demonstrate that a challenged law imposes a 'substantial' or 'significant' burden on interstate commerce before Pike balancing can occur" (quoting Flynt v. Bonta, 131 F.4th 918, 925 (9th Cir. 2025))).

Here, Recchia alleges only that (1) his business involves "buying and selling" banned firearms through interstate commerce, with the majority of his business partners comprising entities and individuals outside of Massachusetts; (2) his "business, income, and property [are] being substantially affected"; and (3) his "business with other entities and persons"

- 16 -

outside of Massachusetts is also "being affected." These allegations do not plausibly show that the challenged provisions of the Act impose an undue burden on interstate commerce.

To start, costs borne by an in-state consumer or business, standing alone, are insufficient to constitute "cognizable harm under [the Supreme Court's] dormant Commerce Clause precedents." Ross, 598 U.S. at 386; see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 345 (2007) (explaining that where "the citizens and businesses of the [State] bear the costs of the ordinances[,] [t]here is no reason to step in and hand local businesses a victory they could not obtain through the political process"). Apart from that, in focusing almost exclusively on the burdens the law inflicts on his own business, Recchia fails to allege any facts that the challenged provisions of the Act impermissibly burden interstate commerce.

To the extent Recchia touches at all on interstate effects, it is his allegation that his business with out-of-state entities will be affected by the challenged provisions of the Act. But the fact that the Commonwealth's regulation of a Commonwealth business imposes downstream costs on out-of-state suppliers does not, standing alone, constitute a "substantial burden" of the type identified in Pike. Concluding otherwise would upend the long-standing presumption that "'a State may exclude from its territory, or prohibit the sale therein of any articles which, in

- 17 -

its judgment, fairly exercised, are prejudicial to' the interests of its citizens." Ross, 598 U.S. at 369 (quoting Guy, 100 U.S. at 443); id. at 391 (noting that the "Pike line of cases . . . has never before" "prevent[ed] a State from regulating the sale of an ordinary consumer good within its own borders on nondiscriminatory terms"). Accordingly, we affirm the district court's dismissal of Recchia's dormant Commerce Clause claim.

## C.

Finally, Recchia challenges provisions of the Act on equal protection grounds, arguing that they are unconstitutionally discriminatory because they prevent him from selling certain types of firearms that purveyors in other States can sell. Broadly speaking, the Equal Protection Clause requires States to treat similarly situated persons similarly. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). But that abstract principle "must coexist with the practical necessity that most legislation classifies . . . with resulting disadvantage to various groups or persons." United States v. Skrmetti, 605 U.S. 495, 509 (2025) (quoting Romer v. Evans, 517 U.S. 620, 631 (1996)). To reconcile this "reality of legislative classification" with the equal protection guarantee, a law that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relation to some legitimate end." Id. at 510 (quoting Romer, 517 U.S. at 631). Courts traditionally

afford legislative enactments "wide latitude" when conducting such rational-basis review.  Id. at 510 (quoting Cleburne, 473 U.S. at 440).

Recchia contends that the challenged provisions of the Act violate his "constitutional right to earn a living" and to "engage in a legitimate business" by preventing him from buying and selling assault-style firearms.[8]  But "the right to 'make a living' is not a 'fundamental right' for either equal protection or substantive due process purposes."  Medeiros v. Vincent, 431 F.3d 25, 32 (1st Cir. 2005), abrogated in part on other grounds by Bond v. United States, 564 U.S. 211 (2011).[9]  Because the asserted

---

[8]    At points, Recchia weaves his Second Amendment claim into his equal protection claim by arguing that he is "being treated unequally from citizens of other [S]tates who can enjoy their full Second Amendment rights."  To the extent Recchia's equal protection claim turns on the Second Amendment, our analysis of his equal protection claim is addressed by our rejection of his Second Amendment claim.  See Pena, 898 F.3d at 986 (considering an equal protection claim "based on the Second Amendment's fundamental right to bear arms" to be "subsumed in the Second Amendment inquiry").

[9]    The district court considered whether Recchia stated a claim under Article IV's Privileges and Immunities Clause, U.S. Const. art. IV, § 2, cl. 1, in response to Recchia's reference to "privileges and immunities" in his opposition to the state defendants' motion to dismiss.  The court concluded that the Clause, which guards against discrimination by a State against citizens of other States, was inapplicable.  On appeal, Recchia argues that the challenged provisions of the Act violate not the Privileges and Immunities Clause of Article IV but the Privileges or Immunities Clause of the Fourteenth Amendment, U.S. Const. amend. XIV § 1.  See also Hellman v. Mass. Dep't of Elementary & Secondary Educ., 171 F.4th 69, 78 n.6 (1st Cir. 2026) (noting that the Constitution contains two clauses addressing the privileges and immunities of citizenship with "distinct applications").

"rights" to earn a living and engage in a legitimate business involve neither a fundamental right nor a suspect classification for equal protection purposes, we review the challenged provisions only for a rational basis.  See Skrmetti, 605 U.S. at 510.

Again, Recchia's principal contention is that the challenged provisions of the Act violate the Equal Protection Clause by barring Commonwealth dealers such as himself from selling assault-style firearms while some out-of-state sellers are not similarly prohibited.  This argument is meritless.  "[T]he Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies."  Mills v. Maine, 118 F.3d 37, 46 (1st Cir. 1997) (quoting Holden v. Hardy, 169 U.S. 366, 388 (1898)).  States may reach different conclusions about what types of firearms may be sold within their legislative jurisdiction without violating the equal protection guarantee.  The district court therefore properly dismissed Recchia's equal protection claim.

---

Specifically, Recchia now contends that the right to make a living is a fundamental right under the Fourteenth Amendment's Privileges or Immunities Clause.  While we agree with the state defendants that Recchia has not stated a claim under either clause, we note for completeness that this Court has not held that the right to make a living is fundamental under the Fourteenth Amendment's Privileges or Immunities Clause.  Gattineri v. Town of Lynnfield, 58 F.4th 512, 516 (1st Cir. 2023).

## III.

For the reasons stated, we **affirm** the district court's grant of the state defendants' motion to dismiss.

**Appendix**

Mass. Gen. Laws Ann. ch. 140, § 121 defines an "assault-style firearm" as follows:

a) a semiautomatic, centerfire rifle with the capacity to accept a detachable feeding device and includes at least 2 of the following features: (i) a folding or telescopic stock; (ii) a thumbhole stock or pistol grip; (iii) a forward grip or second handgrip or protruding grip that can be held by the non-trigger hand; (iv) a threaded barrel designed to accommodate a flash suppressor or muzzle break or similar feature; or (v) a shroud that encircles either all or part of the barrel designed to shield the bearer's hand from heat, excluding a slide that encloses the barrel.

b) a semiautomatic pistol with the capacity to accept a detachable feeding device and includes at least 2 of the following features: (i) the capacity to accept a feeding device that attaches to the pistol outside of the pistol grip; (ii) a second handgrip or a protruding grip that can be held by the non-trigger hand; (iii) a threaded barrel capable of accepting a flash suppressor, forward handgrip or silencer; or (iv) a shroud that encircles either all or part of the barrel designed to shield the bearer's hand from heat, excluding a slide that encloses the barrel.

c) a semiautomatic shotgun that includes at least 2 of the following features: (i) a folding or telescopic stock; (ii) a thumbhole stock or pistol grip; (iii) a protruding grip for the non-trigger hand; or (iv) the capacity to accept a detachable feeding device.

d) Any firearm listed on the assault-style firearm roster pursuant to section 131 ¾.

e) Any of the following firearms, or copies or duplicates of these firearms, of any caliber, identified as: (i) Avtomat Kalashnikov, or AK, all models; (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta AR70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vii) Steyr AUG; (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (ix) revolving cylinder shotguns including, but not limited to, the Street Sweeper and Striker 12[.]

f) a copy or duplicate of any firearm meeting the standards of or enumerated in clauses (d) and (e); provided, that for the purposes of this subsection, "copy or duplicate" shall mean a firearm: (A) that was manufactured or subsequently configured with an ability to accept a detachable magazine; and (B)(i) that has internal functional components that are substantially similar in construction and configuration to those of an enumerated firearm in clauses (d) and (e); or (ii) that has a receiver that is the same as or interchangeable with the receiver of an enumerated firearm in said clauses (d) and (e); provided further, that the firearm shall not be considered a copy or duplicate of a firearm identified in clauses (d) and (e) if sold, owned and registered prior to July 20, 2016[.]

g) "Assault-style firearm" shall not include any: (i) firearm that is operated by manual bolt, pump, lever or slide action; (ii) firearm that has been rendered permanently inoperable or otherwise rendered permanently unable to be designated as a semiautomatic assault-style firearm; (iii) firearm that is an antique or relic, theatrical prop or other firearm that is not capable of firing a projectile and which is not intended for use as a functional firearm and cannot be readily modified through a combination of available parts into an assault-style firearm; (iv) any of the firearms, or replicas or duplicates of such firearms, specified in appendix A to 18 U.S.C. section 922 as appearing in such appendix on September 13, 1994, as such firearms were manufactured on October 1, 1993; or (v) semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable feeding device.